In The

# United States Court of Appeals
# for the Eleventh Circuit

FLORIDA EAST COAST RAILWAY LLC (No. 24-11076); TEXAS & NORTHERN RAILWAY CO. (No. 24-11300); ASSOCIATION OF AMERICAN RAILROADS (No. 24-11366); AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION (24-11367); INDIANA RAILROAD CO. (No. 24-11428); UNION PACIFIC RAILROAD CO. (No. 24-11444); NEBRASKA CENTRAL RAILROAD CO. (No. 24-11445), *and* BNSF RAILWAY CO. (No. 24-12003),

Petitioners,

v.

FEDERAL RAILROAD ADMINISTRATION, ET AL.,

Respondents.

ON PETITION FOR REVIEW FROM THE FEDERAL RAILROAD ADMINISTRATION

## BRIEF OF AMICUS CURIAE THE OHIO CHAMBER OF COMMERCE IN SUPPORT OF PETITIONERS AND URGING THE COURT TO VACATE THE CREW SIZE RULE

Matthew L. Jalandoni
W. Benjamin Reese
FLANNERY | GEORGALIS LLC
175 South Third Street, Suite 1060
Columbus, Ohio 43054
(380) 444-6096

*Counsel for the Ohio Chamber of Commerce*

*Florida East Coast Railway, et al. v. Federal Railroad Administration, et al.*
*24-11076*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and the accompanying circuit rules, the Ohio Chamber of Commerce certifies that in addition to those identified in the opening brief filed by the Petitioners, the following persons may have an interest in the outcome of this case:

1. Jalandoni, Matthew L., counsel for the Ohio Chamber of Commerce;

2. Ohio Chamber of Commerce, *amicus curiae*; and

3. Reese, W. Benjamin, counsel for the Ohio Chamber of Commerce.

*Amicus curiae* the Ohio Chamber of Commerce is a non-profit 501(c)(6) organization with no corporate parent and is not owned in whole or in part by any publicly held corporation.

Dated:  August 2, 2024                  /s/ W. Benjamin Reese
                                        W. Benjamin Reese
                                        *Counsel for Amicus Curiae*

## TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i.

TABLE OF AUTHORITIES......................................................................ii.

CONSENT OF THE PARTIES...................................................................1

STATEMENT OF INTEREST ...................................................................1

STATEMENT OF AUTHORSHIP .............................................................2

STATEMENT OF ISSUES .........................................................................3

STATEMENT OF THE CASE ...................................................................3

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................3

ARGUMENT ...............................................................................................5

    A.    The FRA's Crew Size Rule is unnecessary for railroad safety. ............5

    B.    The Crew Size Rule Will Cause Widespread Economic Harm. .........11

    C.    This Court Should Not Defer to the FRA's "Expertise." ................16

CONCLUSION .........................................................................................19

CERTIFICATE OF COMPLIANCE......................................................21

CERTIFICATE OF SERVICE ...............................................................22

# TABLE OF AUTHORITIES

**Cases**

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) .......................... 11

*Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ....... 15, 16, 17

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ................... 3, 16, 17, 18

*Michigan v. EPA*, 576 U.S. 743 (2015) ................................................. 11, 12

*Nat'l Cable & Tel. Ass'n v. Brand X Internet Servs.*, 545 U.S. 968 (2005) .............. 17

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ........................................ 16

**Statutes**

49 U.S.C. § 20103(a) ........................................................... 5, 17

**Rules and Regulations**

Fed. R. App. P. 26.1 ............................................................. C-1

Fed. R. App. P. 29(a) ............................................................ 1, 2

Fed. R.R. Admin., *Final Rule—Train Crew Size Safety Requirements*, 89 Fed. Reg. 25052 (April 9, 2024) ........................................................ 5, 14, 18

Fed. R.R. Admin., *Notice of Proposed Rulemaking—Train Crew Size Safety Requirements*, 87 Fed. Reg. 45564 (July 28, 2022) ............................... 10

Fed. R.R. Admin., *Proposed Rule—Train Crew Staffing*, 81 Fed. Reg. 13918 (Mar. 15, 2016) .................................................................. 10

Fed. R.R. Admin., P*roposed Rule—Train Crew Staffing*, 84 Fed. Reg. 24735 (May 29, 2019) .................................................................. 16

**Other Authorities**

Alliance for Innovation and Infrastructure "The Safety Impact of Technology and Crew Size" Comment on the Proposed Two Crew Size Safety Requirements,

Docket Number 2022-15540, available at
https://www.regulations.gov/comment/FRA-2021-0032-12313 .................10, 11

*Association of American Railroads v. Yost, et al.*, U.S. District Court, Southern
District of Ohio, Eastern Division Case No. 2:23-cv-2096, (May 22, 2024)........ 2

Association of American Railroads, "Freight Rail & Preserving the Environment,"
available at https://www.aar.org/wp-content/uploads/2020/06/AAR-
Sustainability-Fact-Sheet.pdf...........................................................................14

Bill Stephens, *Wheel Bearing Expert: To Prevent Derailments, Railroads Should Equip
Freight Cars With Sensors*, Trains (March 6, 2023), available at
https://www.trains.com/trn/news-reviews/news-wire/wheel-bearing-expert-to-
prevent-derailments-railroads-should-equip-freight-cars-with-sensors/ ............ 8

Christian Wolmar, *The Great Railroad Revolution: A History of Trains in America* 347
(2012) ..............................................................................................................14

David Kemp and Peter Van Doren, *Federal Rail Administration's New Two-Person
Crew Rule is a Union Concession, Not a Legitimate Safety Rule*, CATO Institute
(Apr. 5, 2024), available at https://www.cato.org/blog/federal-rail-
administrations-new-two-person-train-crew-requirement-union-concession-not
........................................................................................................................19

Gabe Cohen, *Hot Box Detectors Didn't Stop the East Palestine Derailment. Research
Shows Another Technology Might Have*, CNN (Feb. 25, 2023), available at
https://www.cnn.com/2023/02/25/us/ohio-train-derailment-bearing-
vibration/index.html...................................................................................... 9

Jeff Wilson, *The Railroad Handbook* 326 (2022) ............................................7, 8, 9

Josh Funk & Patrick Orsagos, *A Year On, a Small Ohio Town is Recovering from a
Fiery Train Derailment but Health Fears Persist*, Associated Press (Feb. 2, 2024),
available at https://apnews.com/article/norfolk-southern-train-derailment-east-
palestine-ohio-eab23ed0fd6577a5cf96e8fd301da681 .......................................... 6

Josh Funk, *Freight Railroads Must Keep 2-Person Crews, According to New Federal
Rule First Proposed Under Obama*, Associated Press (April 2, 2024), available at
https://apnews.com/article/two-man-train-crew-railroad-rule-
72393a8ad58584ba2c5cdda8f2361130 .................................................... 16, 17, 18

iii

Josh Funk, *Norfolk Southern Will Pay $15 Million Fine as Part of Federal Settlement Over Ohio Derailment*, Associated Press (May 23, 2024), available at https://apnews.com/article/norfolk-southern-east-palestine-derailment-federal-settlement-7d17ffc3f3f5763c0306cf10e2012713 ................................................... 6

Marybeth Luczak, *Railway Age's 2023 Short Line and Regional Railroads of the Year: NDW, AMIC Railway*, RAILWAY AGE (Feb. 10, 2023), available at https://www.railwayage.com/freight/short-lines-regionals/railway-ages-2023-short-line-and-regional-railroads-of-the-year-ndw-amic-railway/ ................... 3, 4

National Transportation Safety Board, *Norfolk Southern Railway Train Derailment with Subsequent Hazardous Material Release and Fires*, Preliminary Report No. RRD23MR005 (Feb. 23, 2023), available at https://www.ntsb.gov/investigations/Documents/RRD23MR005%20East%20Palestine%20OH%20Prelim.pdf ........................................................... 7, 8

NTSB Investigative Hearing on East Palestine, OH Derailment, Rail Public Hearing DCA23HR001, Document Number 41 "Group B – Exhibit 8 – System Safety and Human Performance Report Group Chair's Factual Report," available at https://data.ntsb.gov/Docket?ProjectID=106864 ........................... 7

Ohio Chamber of Commerce Opponent Testimony by Kevin Shimp on Ohio House Bill 186 on October 22, 2019, available at https://www.legislature.ohio.gov/legislation/133/hb186/committee ................ 13

Oliver Wyman, Crew-Related Safety and Characteristic Comparison of European and US Railways, Exhibit 2 of the Association of American Railroads' Comment on the Proposed Two Crew Size Safety Requirements, Docket Number 2022-15540, available at https://www.regulations.gov/comment/FRA-2021-0032-13056 ................................................................................................ 13

Press Release, Tessenderlo Kerley, Inc., *Tessenderlo Kerley, Inc. Celebrates Groundbreaking in Ohio for Fertilizer Facility* (Aug. 31, 2022), available at https://www.tkinet.com/en/defiance-ohio-groundbreaking .............................. 4

The American Consumer Institute's Comments on the Proposed Two Crew Size Safety Requirements, 49 C.F.R. Part 218, Docket Number 2022-15540, RIN 2130-AT88, available at https://www.regulations.gov/comment/FRA-2021-0032-10337 ............................................................................................... 12, 14

iv

The American Short Line and Regional Railroad Association Comments on the Proposed Two Crew Size Safety Requirements, Docket Number FRA-2021-0032, available at https://www.regulations.gov/comment/FRA-2021-0032-13033 .............................................................................................................. 15

## CONSENT OF THE PARTIES

As required under Rule 29(a) of the Federal Rules of Appellate Procedure and the accompanying circuit rules, counsel for *amicus curiae* the Ohio Chamber of Commerce ("Ohio Chamber") has conferred with counsel for Petitioners, Respondents, and Intervenors, each of whom represented that their clients consent to the filing of this brief.

## STATEMENT OF INTEREST

Founded in 1893, the Ohio Chamber is Ohio's leading business advocacy trade organization, representing nearly 8,000 businesses and professional organizations located or operating in Ohio, ranging from sole proprietorships to some of the nation's largest companies. The Ohio Chamber's mission is to champion free enterprise, economic competitiveness, and growth on behalf of its members and all Ohioans. By promoting its pro-growth agenda with policymakers and courts around the country, the Ohio Chamber seeks a stable and predictable legal system which fosters a business climate in which enterprises and Ohioans prosper. The Ohio Chamber regularly files amicus briefs in state and federal courts in cases that, like this one, are important to its members' interests and have the potential to impact Ohio businesses' ability to compete effectively both nationally and in the global economy.

The Ohio Chamber and its members have an interest in the outcome of this case because Respondent Federal Railroad Administration has adopted a crew-size rule that will both cause economic harm to Ohio businesses and consumers and which does not, as the rule purports, enhance rail safety in Ohio or nationwide. Further, this Court's ruling will have a direct effect on Ohioans and Ohio businesses as a challenge to a crew-size mandate imposed by an Ohio statute is stayed pending the outcome of this case. *See Association of American Railroads v. Yost, et al.*, U.S. District Court, Southern District of Ohio, Eastern Division Case No. 2:23-cv-2096, Order Granting Joint Motion to Stay, ECF No. 51 (May 22, 2024). Thus, the Ohio Chamber, as the premier business advocacy organization in Ohio, has a strong interest in the outcome of this case and offers a unique perspective that will help the Court to consider the petition for review here.

## STATEMENT OF AUTHORSHIP

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, undersigned counsel certifies that: counsel for *amicus curiae* authored this brief in whole; no counsel for a party authored this brief in any respect; and no person or entity—other than *amicus curiae*, its members, and its counsel—contributed monetarily to this brief's preparation or submission.

## STATEMENT OF ISSUES

The Ohio Chamber incorporates Petitioners' Statement of Issues as outlined in its Opening Brief filed in this case. Brief of Florida East Coast/American Association of Railroads Petitioners ("Brief"), ECF No. 19, at Pg 18.

## STATEMENT OF THE CASE

The Petitioners' Opening Brief in support of its petition thoroughly addresses the primary legal arguments for invalidating the Crew Size Rule. *See* Brief at Pg 24–56. Thus, the Ohio Chamber writes separately only to emphasize three points: (1) that the Crew Size Rule does not further, and in fact may hinder efforts to improve, railroad safety; (2) that the economic costs to businesses and consumers, including the potential to reignite inflation, far outweigh any purported benefits of the Crew Size Rule; and (3) after the Supreme Court's recent decision in *Loper Bright*, the Crew Size Rule is not entitled to this Court's deference.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

In 2023, *Railway Age* recognized the Napolean Defiance & Western Railway ("NDW")—which runs from Indiana to Ohio—as its "Short Line Railroad of the Year," after it devoted more than $13 million in public and private funds to upgrading its track, transforming itself from the "Worst Railroad in America" to a promising commercial thoroughfare. Marybeth Luczak, *Railway Age's 2023 Short*

*Line and Regional Railroads of the Year: NDW, AMIC Railway*, RAILWAY AGE (Feb. 10, 2023).[1] NDW's efforts helped prompt Tessenderlo Kerley, Inc., to break ground on a new, multi-million dollar, 50,000-square-foot fertilizer plant in Defiance, Ohio. *Id.*; Press Release, Tessenderlo Kerley, Inc., *Tessenderlo Kerley, Inc. Celebrates Groundbreaking in Ohio for Fertilizer Facility* (Aug. 31, 2022).[2] The investment also brought with it visible safety improvements as NDW's track was transformed from "exceptionally degraded" and "worn" conditions requiring trains to avoid tracks altogether or move at walking speeds and leading to frequent derailments (see the photo below on the left) into a Class I line capable of carrying not only freight but also (potentially) passenger service (see the photo below on the right). Luczak, *supra*.

 

NDW's transformation is a prime example of both the commercial power of America's railways to bolster local economies and the ability of private enterprise to

---

[1] Available at: https://www.railwayage.com/freight/short-lines-regionals/railway-ages-2023-short-line-and-regional-railroads-of-the-year-ndw-amic-railway/

[2] Available at: https://www.tkinet.com/en/defiance-ohio-groundbreaking

bring both profits and safety improvements when it is allowed to invest its funds (and those of its public and private partners) in the most meaningful and cost-effective directions. Rather than partner with NDW and other railroads to both ensure safety and allow for economic growth and innovation, however, the Federal Railroad Administration ("FRA") has taken the opposite approach.

The FRA's April 9, 2024, rule establishing "Train Crew Safety Requirements" (the "Crew Size Rule"), *Final Rule—Train Crew Size Safety Requirements*, 89 Fed. Reg. 25052 (April 9, 2024), seeks, at the behest of unions and other interest groups, to lock in antiquated crew size rules that not only impose needless costs on railroads but also undermine the safety goals the FRA purports to be furthering. Worse still, the Crew Size Rule threatens to worsen inflation, harm the environment, and make the country less welcoming to businesses.

## ARGUMENT

### A. The FRA's Crew Size Rule is unnecessary for railroad safety.

The FRA invokes its statutory authority to, "*as necessary*, prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a) (emphasis added), as the legal authority justifying the Crew Size Rule. *See* 89 Fed. Reg. at 25058. But the present rule does not further safety and, in fact, undermines

it. To understand why, it helps to consider an example—in this case, one from Ohio that dominated the news last year.

In February 2023, a Norfolk Southern train derailed near East Palestine, Ohio, causing 38 railcars to leave the tracks, spilling hazardous chemicals and resulting in chemical fires. Josh Funk & Patrick Orsagos, *A Year On, a Small Ohio Town is Recovering from a Fiery Train Derailment but Health Fears Persist*, Associated Press (Feb. 2, 2024).[3] The remediation included at least $780 million in cleanup costs, a $15 million fine, and $600 million to settle a class-action civil lawsuit and required removing 176,000 tons of contaminated soil and over 44 million gallons of tainted water from the area around the derailment. *Id.*; Josh Funk, *Norfolk Southern Will Pay $15 Million Fine as Part of Federal Settlement Over Ohio Derailment*, Associated Press (May 23, 2024).[4] As regulators and commentators around the country pointed out, more than anything, this disaster highlights the ever-present need to focus on and improve the safety of our nation's railroads.

But the Crew Size Rule would not prevent disasters like East Palestine (or, for that matter, the key disasters the FRA cites in its report). The train that derailed in

---

[3] Available at: https://apnews.com/article/norfolk-southern-train-derailment-east-palestine-ohio-eab23ed0fd6577a5cf96e8fd301da681

[4] Available at: https://apnews.com/article/norfolk-southern-east-palestine-derailment-federal-settlement-7d17ffc3f3f5763c0306cf10e2012713

East Palestine on February 3, 2023, consisted of three members: an Engineer, a Conductor, and a Conductor Trainee. *See* NTSB Investigative Hearing on East Palestine, OH Derailment, Rail Public Hearing DCA23HR001, Document Number 41 "Group B – Exhibit 8 – System Safety and Human Performance Report Group Chair's Factual Report."[5] Instead, the National Transportation Safety Board's ("NTSB") preliminary report on the accident attributed the derailment to an overheated bearing on one of the railcars. National Transportation Safety Board, *Norfolk Southern Railway Train Derailment with Subsequent Hazardous Material Release and Fires*, Preliminary Report No. RRD23MR005 (Feb. 23, 2023).[6]

This is not a new problem for railroads. It has prompted operators to install "hotbox" detectors along their tracks, which use infrared sensors to detect whether bearings are exceeding normal operating temperatures. Jeff Wilson, *The Railroad Handbook* 326 (2022). Avoiding overheated bearings was also a major advantage of transitioning from solid to roller bearings starting in the 1960s. *Id.*

Trying to solve this problem—and others that could lead to accidents on modern railroads—by increasing crew size is not only misguided but also forces

---

[5]   Available at: https://data.ntsb.gov/Docket?ProjectID=106864

[6]   Available                                                                                          at: https://www.ntsb.gov/investigations/Documents/RRD23MR005%20East%20Palestine%20OH%20Prelim.pdf

railroads to adopt an outdated practice that was tried and failed in the past. Before hotbox detectors, for instance, railroads were forced to rely on human observation from a caboose or train station employees, who "were often unable to spot problems until damage had already occurred—by the time smoke was rising from a hot bearing, it was often too late." *Id.* at Pg 325. Existing safety measures thus stemmed from the ***inadequacy*** of human observation to avoid accidents like the one in East Palestine. The Crew Size Rule simply ignores these facts, asking railroads to commit to outdated safety measures that have already proven ineffective.

Which is not to say that there is not room for improvement. After all, the Norfolk Southern train that derailed in East Palestine was traveling along a route protected by infrared hotbox detectors. NTSB Board Report at 3. Those detectors—though they have generally been successful in reducing incidents related to overheated bearings—did not catch the overheated bearing in time. *Id.*; Bill Stephens, *Wheel Bearing Expert: To Prevent Derailments, Railroads Should Equip Freight Cars With Sensors*, Trains (March 6, 2023).[7] That improvement, in almost all cases, however, requires installing and developing new technologies. And it requires more nuance than the one-size-fits-all, antiquated measure the FRA has adopted.

---

[7] Available at: https://www.trains.com/trn/news-reviews/news-wire/wheel-bearing-expert-to-prevent-derailments-railroads-should-equip-freight-cars-with-sensors/

Thus, for accidents like the East Palestine derailment, newer technologies, such as acoustic bearing detectors and high-speed, high-definition cameras that "capture the sounds and appearance of passing cars" have the potential to detect worn bearings and other latent defects much earlier. Wilson, *supra*, at 326. The barrier to implementing these technologies more widely is that, in the words of a former Federal Railroad Administration official, "it's very, very expensive," requiring a major capital investment from railroads to install more than 12 million on-board sensors on the roughly 1.6 million rail cars in service across North America. Gabe Cohen, *Hot Box Detectors Didn't Stop the East Palestine Derailment. Research Shows Another Technology Might Have*, CNN (Feb. 25, 2023).[8] Time and additional research may well reduce the costs of these improvements in the years to come. And other technologies, such as positive train control systems (which allow railroads to remotely shut down trains when problems are detected, reducing operator error) may also mitigate risks like those that caused the East Palestine derailment.

But one thing is certain: requiring railroads to divert resources to finding, hiring, and paying additional operators only impedes progress toward implementing these technologies. A December 2022 report found that mandating two-person

---

[8] Available at: https://www.cnn.com/2023/02/25/us/ohio-train-derailment-bearing-vibration/index.html

crews would "not reach the overwhelming majority of rail accident causes, such as track deficiencies, nor the overwhelming majority of injuries and fatalities, such as trespasser and crossing incidents." *See* Alliance for Innovation and Infrastructure "The Safety Impact of Technology and Crew Size" Comment on the Proposed Two Crew Size Safety Requirements, Docket Number 2022-15540, at Pg 1.[9] In fact, as the Petitioners point out in their brief, even the FRA admitted in its 2022 notice of proposed rulemaking that led to the Crew Size Rule that "insufficient historical accident and incident data exist to demonstrate the potential impacts of crew size on rail safety generally." Brief at 28 (citing *Notice of Proposed Rulemaking—Train Crew Size Safety Requirements*, 87 Fed. Reg. 45564 (July 28, 2022)). And it has admitted elsewhere that it is even possible that one-man crews might have contributed to improved safety records. *See Proposed Rule—Train Crew Staffing*, 81 Fed. Reg. 13918, 13950 (Mar. 15, 2016).

To the contrary, it would address only "approximately one percent of train accidents nationwide—those arising from error on mainline track by freight operations that require a human solution to correct for human error." Alliance for Innovation and Infrastructure Comments, *supra*, at Pg 1. A category that will only shrink further as automation continues apace.

---

[9]  Available at: https://www.regulations.gov/comment/FRA-2021-0032-12313

Instead, two-person mandates (like the Crew Size Rule) prevent funds "from going to their next highest use, such as technology, safety investment, or research. In other words, [they] lock[ ] costs in place that diminish the investment and roll out of safety technology that can and do decrease incidents" *Id.* at Pg 50. "Disrupting the ability of rail carriers to invest in these technologies will result in more accidents, casualties, and costs, not fewer." *Id.* at Pg 51.

That only makes sense. After all, a dollar spent paying a redundant employee is a dollar that cannot be put towards acoustic hotbox detectors or other technological advances. It is also a dollar that responsible operators—like NDW—cannot put towards the sort of track improvements described in the introduction, which promote both safety and the economy.

Thus, at the very least, FRA has not established mandating that railroads around the country employ unnecessary operators is necessary to safety.

**B.    The Crew Size Rule Will Cause Widespread Economic Harm.**

Beyond not furthering safety, the FRA also severely underestimates the cost of its new Crew Size Rule. That is yet another reason for rejecting it.

The Supreme Court has maintained that federal administrative agencies must engage in "reasoned decision[ ]making." *See Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374

(1998)). "It follows that agency action is lawful only if it rests on a consideration of the relevant factors," including cost. *See id. at 750–51.* (internal quotation marks omitted). Here, the costs of the Crew Size Rule are substantial and are not adequately accounted for in the FRA's analysis.

As the American Consumer Institute noted in its comments on the FRA's Crew Size Rule proposal, there is already a shortage of qualified rail workers in the United States. *See* The American Consumer Institute's Comments on the Proposed Two Crew Size Safety Requirements, 49 C.F.R. Part 218, Docket Number 2022-15540, RIN 2130-AT88, at Pg 2.[10] Even before the COVID-19 pandemic, the year-over-year decline in qualified workers "put considerable strain on the domestic supply chain, increasing American consumers' prices, reducing physical goods' availability, and creating massive backlogs at the nation's ports." *Id.* The Institute correctly notes that requiring two-man crews will exacerbate that problem, driving up transportation costs for businesses and (by extension) prices for consumers at a time when inflation is already a pressing national problem. *Id.* at Pg 3.

This is not a secret: The railroad industry and other business groups have consistently made the point to regulators for nearly a decade. For example, a 2015 Analysis conducted for AAR estimated that the difference between one-man and

---

[10]  Available at: https://www.regulations.gov/comment/FRA-2021-0032-10337

two-man crews would be more than $1.5 billion in 2023. *See* Oliver Wyman, Crew-Related Safety and Characteristic Comparison of European and US Railways, Exhibit 2 of the Association of American Railroads' Comment on the Proposed Two Crew Size Safety Requirements, Docket Number 2022-15540, at Pg 49.[11] Likewise, a representative of the Ohio Chamber testified before the Ohio House Transportation and Public Safety Committee when it was debating a bill seeking to mandate a specified crew size that "[t]he Ohio rail industry is an integral part of this state's infrastructure" and "provides transportation services for countless business in" Ohio. *See* Ohio Chamber of Commerce Opponent Testimony by Kevin Shimp on Ohio House Bill 186 on October 22, 2019.[12] Mandating that all railroads in Ohio employ at least two crew members on every train would "likely increase shipping costs" on each of these businesses by increasing the cost of running a train through Ohio. *Id.* Those costs are likely to be both substantial and passed on to consumers.

Even if the added costs of two-man crews are only partially passed on to businesses using the railroads to send their goods to market, those additional costs harm those businesses' bottom line—preventing investment, discouraging growth, and limiting innovation by forcing companies to spend more on transport costs. The

---

[11]  Available at: https://www.regulations.gov/comment/FRA-2021-0032-13056

[12]  Available                                                              at: https://www.legislature.ohio.gov/legislation/133/hb186/committee

logistical issues posed by the mandate also threaten to worsen existing supply chain problems by making train scheduling and staffing harder.

Nor are the costs solely in the form of higher prices. A single train can replace up to 280 trucks on the road while routinely using less than a quarter of the fossil fuels. Christian Wolmar, *The Great Railroad Revolution: A History of Trains in America* 347 (2012). Thus, AAR has noted before that "moving freight by train instead of truck" could "reduce greenhouse gas emissions by up to 75%." Association of American Railroads, "Freight Rail & Preserving the Environment."[13] It also spares roads and highways the wear, tear, repair costs, and traffic congestion that those trucks would bring. All while costing, on average, $70.27 per net ton compared to the approximately $214.96 per net ton it costs to ship by road. *See* The American Consumer Institute's Comments at Pg 5.

The FRA tries to downplay the economic impact of the Crew Size Rule, claiming that only 75 regional and short line railroads in the country currently run trains with only one crew member. 89 Fed. Reg. at 25073. Though even this is an improvement over its original claim (in a proposed rule) that only seven such railroads exist, the American Short Line and Regional Railroad Association

---

[13] Available at: https://www.aar.org/wp-content/uploads/2020/06/AAR-Sustainability-Fact-Sheet.pdf

("ASLRRA") has shown that the actual number is more than twice the FRA's estimate. In a survey of ASLRRA's roughly 500 member railroads in 2022, 176 of the 280 responding railroads said they maintained "at least one train operation with one person in the locomotive cab." *See* The American Short Line and Regional Railroad Association Comments on the Proposed Two Crew Size Safety Requirements, Docket Number FRA-2021-0032, at Pg 7-8.[14] And further research by ASLRRA suggested that at least 414 railroads nationwide would be affected by a two-person crew mandate. *Id.* Thus, the FRA's apparent belief that their rule would affect few, if any, railroads remains inaccurate.

Worse still, as Petitioners point out, the FRA refused to even consider the costs of maintaining existing two-person crews where they are unnecessary. Brief at 50–54. That alone should be enough to support vacating the rule as arbitrary and capricious.

In short, the FRA's new Crew Size Rule is likely to substantially increase the costs of railroad operation in the United States, increasing prices for business and consumers around the country. This, when combined with the rule's failure to improve (and potential detrimental effect on) railroad safety, strongly supports the Petitioners' arguments for invalidating the rule.

---

[14] Available at: https://www.regulations.gov/comment/FRA-2021-0032-13033

**C.    This Court Should Not Defer to the FRA's "Expertise."**

Finally, this past term, the Supreme Court overturned its longstanding *Chevron* doctrine, which required federal courts to defer to agency interpretations where a statute was ambiguous. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). Instead, while courts must "respect" agency interpretations, the Court explained that the Administrative Procedure Act requires courts to use their own independent judgment in determining the meaning of a federal statute. *Id.* at 2261–62. Courts may follow an agency's interpretation only to the extent that it has the "power to persuade," including "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Id.* at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Here these factors point against deferring to the FRA.

Far from a consistent, long-standing agency interpretation, the Crew Size Rule diverges from past practice. Two-man crews may be a long-standing *railroad industry custom*, but the FRA—as it has admitted—has never required railroads to maintain them. *See Proposed Rule—Train Crew Staffing*, 84 Fed. Reg. 24735, 24740 (May 29, 2019); *see also* Josh Funk, *Freight Railroads Must Keep 2-Person Crews, According to New Federal Rule First Proposed Under Obama*, Associated Press (April

2, 2024).[15] Indeed, the FRA considered such a rule in the past but abandoned the idea in 2019. *Id.*

Concerns about deferring to this sort of inconsistent agency position, which overturns settled expectations and risks imposing new and unexpected costs, was one of the chief justifications for overturning *Chevron. Loper Bright*, 144 S. Ct. at 2272 ("Under *Chevron*, a statutory ambiguity, no matter why it is there, becomes a license authorizing an agency to change positions as much at it likes, with 'unexplained inconsistency' being 'at most . . . a reason for holding an interpretation to be . . . arbitrary and capricious.'" (quoting *Nat'l Cable & Tel. Ass'n v. Brand X Internet Servs.*, 545 U.S. 968, 981 (2005))). Now that *Chevron* has been overruled, this Court should not repeat its mistakes by blessing the FRA's flip-flopping on crew size requirements in this case.

Nor does the validity of the FRA's reasoning support deference. The FRA has determined that its Crew Size Rule is "necessary" for safety under 49 U.S.C. § 20103(a) because it "has the potential to reduce the likelihood of at least one type of foreseeable accident that is more likely to occur with a one-person train crew than a two-person train crew if a locomotive is not equipped with a safety devices device

---

[15] Available at: https://apnews.com/article/two-man-train-crew-railroad-rule-72393a8ad58584ba2c5cdda8f2361130

that will stop the train when the locomotive engineer is physically unresponsive—even if the type of accident foreseen has not yet occurred." 89 Fed. Reg. at 25053. As the Petitioners argue persuasively in their brief, this is a tenuous interpretation of the word "necessary." Brief at 24–34. That is especially so considering that the rule itself, as quoted, acknowledges that technology can be as effective in preventing this sort of hypothetical accident. Indeed, consistent with the Ohio Chamber's argument above, that technology would likely be more effective than a second crew member who may or may not be near the incapacitated employee and may or may not notice the incapacitation. At the very least, this reading of "necessary" is not the best reading and, "[i]n the business of statutory interpretation, if it is not the best, it is not permissible." *Loper Bright*, 144 S. Ct. at 2266.

More than that, there is ample evidence that the Crew Size Rule is not motivated by safety at all. The rule's adoption has been driven, from the beginning, from sustained pressure from railroad unions, which—unable to successfully negotiate to indefinitely maintain similar rules in their collective bargaining agreements—have decided to try to end run the bargaining process by getting the FRA to impose the requirement on their behalf. *See* Funk, *Freight Railroads Must Keep 2 Person Crews*, *supra*. Union concern has much more to do with concerns that automation and improved technology will reduce the number of employees

necessary to operate a railroad than those employees' safety. *See* David Kemp and Peter Van Doren*, Federal Rail Administration's New Two-Person Crew Rule is a Union Concession, Not a Legitimate Safety Rule*, CATO Institute (Apr. 5, 2024).[16]

That is to be expected. Unions promote the cause of workers, and they have every right to seek agreements and policy changes that protect their members' jobs. But the statute in question here doesn't give the FRA authority to regulate railroad practice to protect railroad jobs, it only empowers the agency to adopt regulations "necessary" for safety. And as discussed above, this new Crew Size Rule does not meaningfully make railroads safer.

## CONCLUSION

In sum, the FRA's new Crew Size Rule strays from its longstanding position on the necessity of crew-size regulations for railroad safety, will not meaningfully improve and may detrimentally affect railroad safety, was adopted largely at the behest of labor unions concerned about the effect of automation on railway jobs, and will impose widespread and unnecessary economic harm on businesses and consumers.

---

[16] Available at: https://www.cato.org/blog/federal-rail-administrations-new-two-person-train-crew-requirement-union-concession-not

For all these reasons, as well as the reasons set forth in Petitioners' brief, we urge this Court to vacate the FRA's Crew Size Rule.

Respectfully submitted,

/s/ W. Benjamin Reese

Matthew L. Jalandoni
W. Benjamin Reese
FLANNERY | GEORGALIS LLC
175 South Third Street, Suite 1060
Columbus, Ohio 43054
mjalandoni@flannerygeorgalis.com
breese@flannerygeorgalis.com

*Counsel for the Ohio Chamber of Commerce*

# CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation specified in Rules 29 and 32 of the Federal Rules of Appellate Procedure in the following respects:

a. Exclusive of the exempted portions, this brief contains 4,004 words.

b. The brief has been prepared in proportionally spaced 14-point typeface using Microsoft Word.

c. As permitted by Rule 32(g)(1) of the Federal Rules of Appellate Procedure, the undersigned has relied upon the word count feature of his word processing system in the preparation of this Certificate of Compliance.

Dated: August 2, 2024          /s/ W. Benjamin Reese
                               W. Benjamin Reese
                               *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 2, 2024, a copy of the foregoing brief was filed electronically with the Clerk of the Court using the CM/ECF system, which will serve a copy of the filing on all parties.

In compliance with the Federal Rules of Appellate Procedure and the accompanying circuit rules, I certify that I will also mail four copies of this brief to Clerk of Court, U.S. Court of Appeals for the 11th Circuit, 56 Forsyth St. N.W., Atlanta, Georgia 30303, via the United States Postal Service.

/s/ W. Benjamin Reese
W. Benjamin Reese
*Counsel for Amicus Curiae*