Nos. 24-11076, 24-11300, 24-11366, 24-11367, 24-11428, 24-11444,
24-11445, 24-12003

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
———————————

FLORIDA EAST COAST RAILWAY LLC, et al.

*Petitioners*,

v.

FEDERAL RAILROAD ADMINISTRATION, ADMINISTRATOR,
FEDERAL RAILROAD ADMINISTRATION, UNITED STATES
DEPARTMENT OF TRANSPORTATION,

*Respondents.*

———————————

On Petition for Review of a Final Rule of The Federal Railroad Administration,
Agency Docket No. FRA-2021-0032

———————————

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES
## OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS
———————————

Andrew R. Varcoe
Maria C. Monaghan
Christopher J. Walker
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Roman Martinez
William James Seidleck
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

August 2, 2024

*Counsel for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

*Florida East Coast Railway LLC, et al. v. Federal Railroad Administration*,
Nos. 24-11076, 24-11300, 24-11366, 24-11367,
24-11428, 24-11444, 24-11445, 24-12003

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, *Amicus Curiae* the Chamber of Commerce of the United States of America certifies that, in addition to those listed in Petitioners' Opening Briefs, the following listed persons and parties may have an interest in the outcome of this case:

Chamber of Commerce of the United States of America

Latham & Watkins LLP

Martinez, Roman

Monaghan, Maria C.

Seidleck, William J.

Varcoe, Andrew R.

Walker, Christopher J.

*Amicus Curiae* the Chamber of Commerce of the United States of America certifies that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

*Florida East Coast Railway LLC, et al. v. Federal Railroad Administration*,
Nos. 24-11076, 24-11300, 24-11366, 24-11367,
24-11428, 24-11444, 24-11445, 24-12003

Dated:  August 2, 2024               Respectfully submitted,

                                     */s/ Roman Martinez*
                                     Roman Martinez

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF AMICUS CURIAE .........................................................1

STATEMENT OF THE ISSUES.............................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT .......................2

ARGUMENT .........................................................................................4

I.  Administrative Law Requires A Harder Look When Federal Agencies
    Repeatedly Change Their Policies.................................................4

    A.  The APA Requires Agencies To Provide Reasoned Explanations
        For Changes Of Position .......................................................6

    B.  Courts Should Closely Scrutinize Agency Reversals That Impose
        New Regulatory Burdens And Undermine Stability............................9

II. APA Hard Look Review Of Agency Policy Changes That Upend
    Reliance Interests Is Critical For The Chamber's Members And The
    National Economy ....................................................................14

III. This Case Showcases The Need For Rigorous Scrutiny Of Agency
     Policy Reversals.......................................................................17

CONCLUSION .....................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Chevron, U.S.A, Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984).....................................................................................4

*Department of Commerce v. New York*,
588 U.S. 752 (2019).....................................................................................8

*Department of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020)................................................................................2, 9, 11

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)...............................................................7, 8, 9, 10, 11

*In re Estate of McFarland*,
167 S.W.3d 299 (Tenn. 2005) ..................................................................12

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).................................................................................2, 7

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021).....................................................................................6

*Harner v. Social Security Administration, Commissioner*,
38 F.4th 892 (11th Cir. 2022) ....................................................................6

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024)........................................................................*passim*

*Mingo Logan Coal Co. v. EPA*,
829 F.3d 710 (D.C. Cir. 2016)............................................................13, 16

*Motor Vehicle Manufactures Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983)..............................................................................*passim*

*Ohio v. EPA*,
144 S. Ct. 2040 (2024)............................................................................2, 6

ii

|  | Page(s) |
|---|---|

*Perez v. Mortgage Bankers Association*,
575 U.S. 92 (2015)...........................................................................7

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947).........................................................................8

*Smiley v. Citibank (S.D.), N.A.*,
517 U.S. 735 (1996)......................................................................8, 11

*United States Telecom Association v. FCC*,
825 F.3d 674 (D.C. Cir. 2016).........................................................16

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950).........................................................................14

*West Virginia v. EPA*,
597 U.S. 697 (2022).........................................................................8

## STATUTES

5 U.S.C. § 706(2)(A).............................................................................6

## OTHER AUTHORITIES

84 Fed. Reg. 24,735 (May 29, 2019) ...................................................17

89 Fed. Reg. 25,052 (Apr. 9, 2024) .....................................................17

Nicole V. Crain & W. Mark Crain, *The Cost of Federal Regulation to the U.S. Economy, Manufacturing and Small Business*, Nat'l Ass'n of Manufacturers (Oct. 2023), https://nam.org/wp-content/uploads/2023/11/NAM-3731-Crains-Study-R3-V2-FIN.pdf....................................................................................14, 15

Fed. R. App. P. 29(a)(4)(E)....................................................................1

Bryan A. Garner et al., *The Law of Judicial Precedent* (2016).........11, 12

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118 (2016) ..............................................................................14

Randy J. Kozel, *Settled Versus Right, a Theory of Precedent* (2017)..............12, 15

Richard J. Pierce, Jr., *The Combination of* Chevron *and Political Polarity Has Awful Effects*, 70 Duke L.J. Online 91 (2021), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1083 &context=dlj_online ...................................................................12, 16

Richard A. Posner, 1998 Symposium, *The Effects of Deregulation on Competition: The Experience of the United States*, 23 Fordham Int'l L.J. S7 (2000)...............................................................................14

Cristina M. Rodríguez, *Forward: Regime Change*, 135 Harv. L. Rev. 1 (2021)...............................................................................................12

Francesco Trebbi et al., *The Cost of Regulatory Compliance in the United States*, CESifo Working Papers, Paper No. 10589 (2023), https://www.cesifo.org/DocDL/cesifo1_wp10589.pdf......................................15

# INTEREST OF AMICUS CURIAE[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It directly represents approximately 300,000 members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Here, the Federal Railroad Administration (FRA) reversed course on a major policy position without adequately considering conflicts with prior agency findings or the harm the change would inflict to the reliance interests of regulated parties. Agency flip-flopping on major policies is hardly uncommon and is not, in and of itself, unlawful. But when an agency abruptly changes its position, it must stay within the bounds established by Congress, including the guardrails set out in the Administrative Procedure Act (APA). The Chamber submits this *amicus* brief to explain how the Court should apply the APA's reasoned decision-making

---

[1] The parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

requirement in this case and to other agency flip-flops that create regulatory instability for the Chamber's members.

## STATEMENT OF THE ISSUES

1.      Whether the FRA failed to offer a reasoned explanation for disregarding the facts and circumstances that underpinned its prior policy.

2.      Whether the FRA failed to consider an important aspect of the problem by ignoring the interests of regulated entities who ordered their affairs around prior agency findings.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In recent years, the Supreme Court has repeatedly emphasized the need for meaningful judicial review of agency action under the APA.  Last Term, it decisively rejected judicial deference to administrative agencies on issues of law.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2264, 2273 (2024).  The Court has also noted the need to scrutinize agency decisions in other ways, including when responding to public comments, *see Ohio v. EPA*, 144 S. Ct. 2040, 2053-54 (2024), rescinding longstanding policies, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020), making other changes of position, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), and exercising delegated policymaking authority, *Loper Bright*, 144 S. Ct. at 2262-63, 2268.

This case provides an opportunity for this Court to reaffirm the importance of judicial scrutiny in a key context—where an agency repeatedly flip-flops on a policy in a way that heightens uncertainty and imposes significant costs on the regulated public. When an agency has previously decided that the need for regulation is unsupported by the relevant facts, courts must closely examine an abrupt change in position that would impose the same regulatory burdens previously found to be unjustified.

As the Supreme Court just reconfirmed in *Loper Bright*, agencies cannot operate beyond their congressionally given authority. 144 S. Ct. at 2262-63. The APA makes clear that when agencies promulgate new regulations, they must act reasonably, in accordance with the evidence before them—and must also properly explain their actions. Flip-flops that disregard prior agency findings or increase burdens on private parties raise special concerns. Such circumstances suggest that the agency's decisions may not be the product of an appropriate exercise of technical expertise or a fair assessment of the facts. Courts must ensure that agencies do not reverse course based on impermissible or insufficient considerations, without a firm basis in law and fact. Such hard-look APA review is the only way to protect the public from the uncertainty and instability that springs from unwarranted changes in regulation.

This case squarely implicates these concerns. Here, the FRA, for the first time, has adopted a rule generally requiring a minimum of two-person crews on most trains, with one-person operation exceptions allowed only in specified circumstances. Florida East Coast Railway Br. 19-20; *see also* American Short Lines Br. 31-32 (discussing additional new requirements for trains allowed to operate with only one crew member). It did so without attempting to reconcile prior FRA factual findings that no data supported the conclusion that two-person crews are more safe than one-person crews—and without accounting for the costs to railroads of maintaining two-person crews. Florida East Coast Railway Br. 14-15, 21. The FRA's unsubstantiated flip-flop disregards the APA's requirements that agencies reasonably—and specifically—justify actions that upset the settled expectations of regulated parties.

The court should grant the petition for review and vacate the FRA's unlawful rule.

## ARGUMENT

### I. Administrative Law Requires A Harder Look When Federal Agencies Repeatedly Change Their Policies

In overruling *Chevron, U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, 476 U.S. 837 (1984), *Loper Bright* taught several key lessons. One is the importance of stability in the law as it impacts regulated parties. A major problem with the *Chevron* doctrine was the way it promoted regulatory whiplash. The

4

Supreme Court explained that so long as the agency could find a statutory ambiguity, *Chevron* provided license "to change positions as much as it likes," with only the APA's prohibition on unexplained inconsistencies as a check. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2272 (2024). *Chevron* required courts to defer to agency flip-flops on the meaning of relevant statutes, so long as successive agency interpretations (even if contradictory) remained within an ill-defined zone of ambiguity. As the Court explained, this capacious authority "foster[ed] unwarranted instability in the law, leaving those attempting to plan around agency action in an eternal fog of uncertainty." *Id.*

Rigorous arbitrary-and-capricious review is also important to prevent this kind of regulatory uncertainty. When an agency abruptly changes its position, courts must ensure that the agency is doing so based on a fair assessment of the facts and on a proper use of its expertise. An agency may of course change its policy preference—and often does from one presidential administration to the next—but if the agency also changes its view of critical facts or fails to account for serious reliance interests, a more detailed justification is necessary to withstand challenge. And demanding strict adherence to that requirement is especially important when the change destabilizes the law and increases regulatory burdens on the public. Enforcing these requirements is essential to upholding the rule of law and protecting the rights of American businesses.

**A.    The APA Requires Agencies To Provide Reasoned Explanations For Changes Of Position**

The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  That means agency actions must be "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 897-98 (11th Cir. 2022).  An agency violates the APA's requirements to consider evidence and offer reasoned explanations when its justification for acting is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024) (explaining that an agency's failure to balance the real-world circumstances with the burdens imposed both fails to consider "'an important aspect of the problem'" and "supply 'a satisfactory explanation for its action'" (citation omitted)).  Just as courts must exercise their independent judgment in rendering legal interpretations, *Loper Bright*, 144 S. Ct. at 2262, so too must they "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Ohio*, 144 S. Ct. at 2053 (alteration in original) (citation omitted).

The Supreme Court has long recognized that when an agency wants to change course and abandon a position the agency has previously embraced, the agency must

"supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 42. This means two things. First, the agency must "at least 'display awareness that it is changing position.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Second, the agency must also "show that there are good reasons for the new policy." *Id.* (citation omitted).

This standard does not always require agencies to "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* (citation omitted). But the Supreme Court has recognized two instances when a "more substantial justification" for a new position *is* required: (1) when the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy," and (2) when the agency's "prior policy has engendered serious reliance interests that must be taken into account." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) (citation omitted). In these circumstances, the agency cannot merely acknowledge its change in position and explain its new stance. Rather, the agency must provide a meaningful account of why and how its assessment of the facts has changed—and why the benefits of the new policy outweigh the reliance interests of regulated parties.

To satisfy these standards, agency explanations must be "genuine" and not "contrived." *Dep't of Com. v. New York*, 588 U.S. 752, 784-85 (2019). They must be substantial—not "summary" or "conclusory." *Encino Motorcars*, 579 U.S. at 222, 224. And they must be offered at the time the regulatory action is taken, not through post-hoc rationalizations when defending the regulatory action in court. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). Courts must probe the agency's reasoning to ensure that the ends sought actually reflect the agency's reasons for changing course. The agency's rationale cannot reflect "a significant mismatch between" the chosen course and the rationale provided. *New York*, 588 U.S. at 783. Initiatives preselected for implementation regardless of relevant facts—including supporting needs and the impact on regulated parties—present a real danger. Courts must remain vigilant to ensure that agency changes of position flow from appropriate consideration of the law and facts.[2]

To be clear, agency reversals in position are not per se illegitimate. *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996). The politically accountable Executive Branch may make changes and implement new value judgments so long

_____

[2]    Courts must also ensure that such regulatory changes are consistent with Congress's statutory commands. *Cf. West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (requiring clear congressional authorization when "agencies assert[] highly consequential power beyond what Congress could reasonably be understood to have granted"); *see also Loper Bright*, 144 S. Ct. at 2268 (requiring courts to "police the outer statutory boundaries of [congressional] delegations").

as the agency explains itself and fairly considers the interests and evidence running counter to the desired change. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020); *Encino Motorcars*, 579 U.S. at 221; *see also State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." (footnote omitted)). As the Supreme Court has emphasized, it is not the "mere fact of policy change" that demands "further justification." *Encino Motorcars*, 579 U.S. at 222 (citation omitted). Rather, it is the agency's potential disregard for either the "facts and circumstances that underlay or were engendered by the prior policy," or for the "serious reliance interests" around "longstanding policies" that warrants more searching review. *Id.* (citations omitted). The APA empowers courts to examine the agency's reasoning and ensure the agency's flip-flop is properly justified.

**B.  Courts Should Closely Scrutinize Agency Reversals That Impose New Regulatory Burdens And Undermine Stability**

Close scrutiny of an agency's change in position is especially important when the change destabilizes the law and increases regulatory burdens on the public. Because "the removal of a regulation may not entail the monetary expenditures and

other costs of enacting a new standard," it "may be easier for an agency to justify a deregulatory action" than a regulatory one. *State Farm*, 463 U.S. at 42. The reason for this asymmetry is simple—new, intrusive regulations upset the settled order and threaten the interests and liberties of regulated parties. Deregulatory efforts rarely present such problems.

The Supreme Court has repeatedly noted the importance of certainty and predictability in regulatory law. When an agency "explain[s] its changed position," the Court has said, agencies must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars*, 579 U.S. at 221-22 (citation omitted).

Sure enough, the Court has often invalidated agency action as arbitrary when agencies have disregarded the reliance interests of regulated parties. In *Encino Motorcars*, for example, the Court concluded that it was arbitrary and capricious for the Department of Labor to reverse a decades-old position that certain car-dealership employees were exempt from federal overtime-payment requirements under the Fair Labor Standards Act. *Id.* at 216-18, 223-24. The Court emphasized the expectations that dealerships had built up over time, and how they had "structured their compensation plans against" the backdrop of the Department's prior position. *Id.* at 222-23. It held that "[i]n light of the serious reliance interests at stake, the

Department's conclusory statements [about its new interpretation of the statute being reasonable] do not suffice to explain its decision." *Id.* at 224.

Even more prominently, in 2020 the Supreme Court struck down the Trump Administration's efforts to rescind the Obama Administration's DACA program, which offered removal forbearance and other benefits to undocumented immigrants who entered the United States as children. *See Regents*, 591 U.S. at 9, 30. Repeating its prior admonitions, the Court noted that an agency shifting policies must account for the "legitimate reliance" of regulated parties on the status quo. *Id.* at 30 (quoting *Smiley*, 517 U.S. at 742). Specifically, the Court emphasized that undocumented childhood immigrants had ordered their lives in the United States around the DACA program's ongoing viability, arranging everything from employment to family relationships. *Id.* at 31. The Court noted that paying lip service to reliance interests is not enough; the agency must also "determine whether [the interests] were significant, and weigh any such interests against competing policy concerns." *Id.* at 33. Because the government had not considered the impact to regulated parties' interests and their ordering their lives against the backdrop of the prior policy, the Court invalidated the rescission of DACA as arbitrary and capricious. *Id.* at 32-33.

Administrative law is hardly unique in accounting for fairness, continuity, and the importance of stability in the law. Various other legal doctrines, such as stare decisis, recognize such interests as well. *See* Bryan A. Garner et al., *The Law of*

*Judicial Precedent* 408-09 (2016); Randy J. Kozel, *Settled Versus Right, a Theory of Precedent* 47-48 (2017); *see also Loper Bright*, 144 S. Ct. at 2272 (explaining that stare decisis "exists to secure" reliance interests and stability). The law cares about these interests because "[t]he assumption is that people shape their lives according to the rule of law, which should not be subject to flux: 'Stability in the law allows individuals to plan their affairs . . . .'" Garner, *supra*, at 408-09 (quoting *In re Estate of McFarland*, 167 S.W.3d 299, 306 (Tenn. 2005)); *accord* Kozel, *supra*, at 116 ("[T]he disruption of reliance interests is undesirable, impairing the value of prior behaviors and requiring the modification and revision of plans.").

Nonetheless, the administrative state uniquely endangers reliance interests. Specifically, because the Executive Branch can implement regulatory change much more quickly than Congress can typically legislate, it poses the greatest threat to "values of stability and fairness." Cristina M. Rodríguez, *Forward: Regime Change*, 135 Harv. L. Rev. 1, 80 (2021). Notably, the potential for agencies to inflict such rapid, destabilizing change played a significant role in undermining support for *Chevron* deference. As Professor Richard Pierce explained in 2021—in an influential article retracting his prior support for *Chevron*—"[r]adical and vacillating changes in law . . . make it impossible for Americans to be able to rely on any stable legal regime as the basis for their decisionmaking in many important contexts." Richard J. Pierce, Jr., *The Combination of* Chevron *and Political Polarity Has Awful*

*Effects*, 70 Duke L.J. Online 91, 92 (2021), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1083&context=dlj_online. And the Supreme Court itself emphasized *Chevron*'s creation of "unwarranted instability in the law" that left members of the public "in an eternal fog of uncertainty" when trying to plan around agency action. *Loper Bright*, 144 S. Ct. at 2272.

For these reasons, "when an agency changes position in a way that frustrates reliance interests," the agency's action is "more costly" to businesses and other regulated parties than "when the agency develops a policy or announces a decision on a clean slate." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 736 (D.C. Cir. 2016) (Kavanaugh, J., dissenting). In everyday life, "declining to hire someone is usually less disruptive to the individual than firing someone." *Id.* As a result, "[i]n the administrative context, the presence of [reliance costs] triggers a heightened burden of agency justification: The agency must consider the reliance cost and must justify its action despite that additional cost." *Id.*; *accord State Farm*, 463 U.S. at 42 (recognizing that agencies must account for the "costs of enacting a new standard" against the backdrop of a prior standard). Rigorous judicial review polices agency compliance with these principles.[3]

---

[3] To be clear, not all agency reversals necessarily harm reliance interests in the way discussed above. In particular, efforts to eliminate regulatory burdens will typically make compliance less burdensome and costly. In those circumstances, it will usually be easier for an "agency to justify a deregulatory action," because "the

## II. APA Hard Look Review Of Agency Policy Changes That Upend Reliance Interests Is Critical For The Chamber's Members And The National Economy

The bedrock principles of administrative law discussed above are essential to protecting the rights of American businesses and promoting economic innovation and growth. In enacting the APA, Congress sought to impose "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950). Often, when looking to further policy goals, agencies possess an "inherent aggressiveness" to see their goals met. Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2151 (2016). An agency crossing the line from implementing legitimate policy into arbitrary bureaucratic behavior can disrupt the settled expectations of America's business community.

The costs of regulatory compliance on the American economy are already astronomically high. In 2022, such compliance cost about $3.079 trillion—12% of U.S. GDP. Nicole V. Crain & W. Mark Crain, *The Cost of Federal Regulation to the U.S. Economy, Manufacturing and Small Business* 4, Nat'l Ass'n of Manufacturers (Oct. 2023), https://nam.org/wp-content/uploads/2023/11/NAM-3731-Crains-

---

removal of a regulation may not entail the monetary expenditures and other costs of enacting a new standard." *State Farm*, 463 U.S. at 42; *see also, e.g.*, Richard A. Posner, 1998 Symposium, *The Effects of Deregulation on Competition: The Experience of the United States*, 23 Fordham Int'l L.J. S7, S8, S18 (2000) (discussing benefits of deregulation).

Study-R3-V2-FIN.pdf.  Small businesses felt the biggest brunt, with about $14,700 in compliance costs per employee compared to about $12,800 in compliance costs per employee for larger businesses.  *Id.*

Regulatory growth has helped turbocharge these costs.  Whereas the overall cost of regulations to the economy in 2012 was $2.6 trillion (in 2023 inflation-adjusted dollars), those costs have swelled to more than $3 trillion today.  *Id.* at 4, 6.  Another study found that between 2002 and 2014, regulatory-compliance costs for businesses grew by about 1% per year.  Francesco Trebbi et al., *The Cost of Regulatory Compliance in the United States* 28, CESifo *Working Paper No. 10589* (2023), https://www.cesifo.org/DocDL/cesifo1_wp10589.pdf.

Given these real-world, substantial impacts, American businesses have a particularly strong interest in ensuring that legal and regulatory frameworks remain stable over time.  Businesses depend on clear, predictable rules—and fair and nonarbitrary administrative processes—when planning their operations and investing for their enterprises.  They rely on an understanding of existing legal rules when engaging in all manner of "commercial activities like the formation of contracts, the allocation of investments, and the organization of business operations."  Kozel, *supra*, at 48.

Arbitrary regulatory flip-flops can disrupt businesses' settled expectations and investments, with profound economic consequences for the country.  Agency

disregard for legal stability "significantly undercut[s] the productivity and value of past investments, made in reasonable reliance on the old regime." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 746-47 (D.C. Cir. 2016) (Williams, J., concurring in part and dissenting in part); *accord Mingo Logan*, 829 F.3d at 736 (Kavanaugh, J., dissenting) ("[W]hen an agency changes position in a way that frustrates reliance interests, the agency's action is more costly to regulated parties than when the agency develops a policy or announces a decision on a clean slate, all else being equal."). More generally, unwarranted flip-flops create business uncertainty that "deter[s] investment in regulated industries" in the first place. Pierce, *supra*, at 92. Understandably, "[p]rospective investors hate uncertainty." *Id.* at 99.

This does not mean, of course, that federal agencies can never alter the regulatory landscape in ways that affect American companies. But when changing existing regulations in a manner that "undermines serious reliance interests," agencies must provide "a 'more reasoned' or 'more detailed' justification." *Mingo Logan*, 829 F.3d at 736 (Kavanaugh, J., dissenting). This helps curb agency zeal that could otherwise "undermine[] serious reliance interests [and] disrupt[] settled expectations" in ways that impose "significant cost[s] on regulated parties." *Id.* Enforcing the APA's limits on unjustified regulatory flip-flops is essential to protecting American businesses, the jobs and innovation those businesses promote, and ultimately consumers as well.

### III. This Case Showcases The Need For Rigorous Scrutiny Of Agency Policy Reversals

This case squarely implicates the concerns discussed above. As petitioners have explained, *see* Florida East Coast Railway Br. 45-54, the FRA violated the APA in numerous ways when it went from finding "that no regulation of train crew staffing is necessary or appropriate" to issuing a final rule generally "requir[ing] railroads to staff every train operation with a minimum of two crewmembers." *Compare* 84 Fed. Reg. 24,735, 24,737 (May 29, 2019), *with* 89 Fed. Reg. 25,052, 25,054 (Apr. 9, 2024). The FRA changed position without showing changed circumstances or explaining how the existing data could justify opposite decisions on the same issue. *See* Florida East Coast Railway Br. 2, 17, 20-21. It didn't account for significant costs to railroads of maintaining two-person crews or evidence that forcing the use of two-person crews threatened to put railroads at a competitive disadvantage to other carriers. *Id.* at 20-21, 51-53. And it has disrupted the status quo for railroads after previously (and recently) saying that two-person crews were unnecessary and could increase costs and stifle innovation. *Id.* at 14-15, 17.

Similarly, the FRA's rule made another abrupt change despite prior findings. Specifically, for instances where one-person crew operations are permitted, the FRA now generally requires installation of "alerter" devices. *See* 89 Fed. Reg. at 25,054 & n.7; American Short Lines Br. 31-32. But this comes after a 2012 finding that the devices were not required in low-speed train operations. American Short Lines Br.

32.  The FRA failed to even acknowledge the change it was making, let alone provide a sound justification for the change.  *See id.* at 32.

In short, the FRA has reversed its prior position and now seeks to impose more onerous requirements on regulated parties without considering actual costs and without explaining its departure from prior findings.  This is precisely the kind of scenario in which courts should take particular care to ensure that agencies are complying with the APA's reasoned-explanation requirement.

*          *          *

When axing *Chevron*, the Supreme Court highlighted the "eternal fog of uncertainty" the doctrine had created for regulated parties.  *Loper Bright*, 144 S. Ct. at 2272.  But that fog has not lifted entirely:  Uncertainty remains a problem, due in part to the pervasive phenomenon of regulatory shifts from one presidential administration to the next.  Fortunately, judicial review under the APA helps mitigate the problem:  Courts must ensure that "an agency changing its course" has supplied "a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."  *State Farm*, 463 U.S. at 42.  That explanation must account for the disruptive effects of the agency's reversal, and it must justify new factual conclusions based on expert technical judgments where appropriate.

Here, the FRA failed to supply an appropriate explanation for its change of position. This Court should provide the APA-mandated oversight and vacate the FRA's Train Crew Size Safety Requirements rule as arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for review and vacate the final rule.

Dated: August 2, 2024    Respectfully submitted,

           */s/ Roman Martinez*

Andrew R. Varcoe     Roman Martinez
Maria C. Monaghan    William James Seidleck
Christopher J. Walker    LATHAM & WATKINS LLP
U.S. CHAMBER LITIGATION  555 Eleventh Street, NW
CENTER        Suite 1000
1615 H Street, NW     Washington, DC 20004
Washington, DC 20062   (202) 637-2200
(202) 463-5337      roman.martinez@lw.com

*Counsel for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(5), (6), and (7)(B), the foregoing brief is proportionally spaced, has a typeface of 14 point and contains 4,288 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

/s/ Roman Martinez
Roman Martinez

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2024, a true and correct copy of the foregoing brief was served on all counsel of record through the CM/ECF system.

/s/ Roman Martinez
Roman Martinez