Nos. 24-11076, 24-11300, 24-11366, 24-11367,
24-11428, 24-11444, 24-11445 & 24-12003

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

FLORIDA EAST COAST RAILWAY LLC, *et al.*,

Petitioners,

v.

FEDERAL RAILROAD ADMINISTRATION, *et al.*,

Respondents.

———————————

On Petition for Review of a Final Rule of the
Federal Railroad Administration

———————————

## BRIEF FOR RESPONDENTS

———————————

*Of Counsel:*

SUBASH IYER
  *Acting General Counsel*
PAUL M. GEIER
  *Acting Assistant General Counsel*
  *for Litigation and Enforcement*
PAULA LEE
  *Senior Trial Attorney*

  *U.S. Department of Transportation*

ALLISON ISHIHARA FULTZ
  *Chief Counsel*
CHRISTOPHER S. VAN NOSTRAND
  *Deputy Chief Counsel*
REBECCA S. BEHRAVESH
  *Senior Attorney*
SAMUEL GILBERT
  *Senior Attorney*

  *Federal Railroad Administration*

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
ABBY C. WRIGHT
MARTIN TOTARO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*

*Florida East Coast Railway LLC, et al. v. Federal Railroad Administration, et al., Nos. 24-11076, 24-11300, 24-11366, 24-11367, 24-11428, 24-11444, 24-11445 & 24-12003*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for respondents certify that they are aware of no additional persons that have an interest in the outcome of this appeal, other than those listed on petitioners' and amici's Certificates of Interested Persons and Corporate Disclosure Statements.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to its broad statutory authority to engage in rulemaking, the Federal Railroad Administration promulgated a modest, but important, final rule that that will require many railroads, including Class I railroads that routinely operate miles-long trains with well over 100 cars that travel thousands of miles, to demonstrate through a special-approval process that operating a one-person crew without a separate crewmember will be as safe or safer than the current, standard two-person crew.  Respondents stand ready to present oral argument to explain why the arguments offered by petitioners and their amici do not justify the relief they seek.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................... 1

STATEMENT OF JURISDICTION ................................................. 4

STATEMENT OF THE ISSUE ........................................................ 5

STATEMENT OF THE CASE ......................................................... 5

    A.    Statutory and Regulatory Background ....................................... 5

    B.    Prior Efforts To Address Crew Size ........................................... 8

    C.    The Rulemaking Under Review ................................................ 10

    D.    Standard of Review .................................................................... 26

SUMMARY OF ARGUMENT ........................................................ 27

ARGUMENT ................................................................................... 30

I.    The Class I Railroads' Petition for Review Should Be Denied .......... 30

    A.    The Rule Falls Comfortably Within FRA's Statutory Authority .................................................................................. 30

        1.    FRA Reasonably Exercised Its Authority To Prescribe Rules "As Necessary" for "Every Area of Railroad Safety" ............................................................................. 30

        2.    Class I Petitioners Fail To Show That FRA Unreasonably Exercised Its Broad Authority .................. 35

        3.    Class I Petitioners Misconstrue the Special-Approval Process .................................................................................. 51

i

B.  Class I Petitioners' Procedural Challenges Do Not Warrant Relief ................................................................. 55

    1.  The Agency Adequately Explained Why It Chose To Regulate the Safety of Crew Size When It Had Not Done So Previously ............................................. 55

    2.  FRA Did Not Violate Reasoned Decisionmaking By Declining To Pause Its Rulemaking for Additional Data Collection .................................................. 62

    3.  The Agency Properly Accounted for Labor Costs ............. 65

    4.  There Is No Basis for Setting Aside the Rule as Untimely ..................................................... 68

C.  The Risk Reduction Statute and Regulations Do Not Displace the Agency's Authority To Establish a Process Before Trains Can Operate Without a Second Crewmember Who Is Typically a Conductor ............................ 72

II.  The Shortline Railroads' Petition for Review Should Be Denied ....... 77

A.  FRA's Decision To Exempt Certain Legacy Operations Satisfies Reasoned Decisionmaking ......................................... 78

B.  FRA Engaged in Reasoned Decisionmaking By Requiring Alerters To Prevent Accidents on Trains Using One-Person Crews ........................................................... 81

C.  FRA Reasonably Addressed the Transportation of Hazardous Materials ................................................. 85

D.  FRA's Guidance Document Comports with the Legacy Exception ......................................................... 91

E.  Shortline Petitioners' Additional Complaints About Costs Are Unavailing ................................................. 94

III.  Petitioners' Request for Relief Is Overbroad .................................... 95

ii

CONCLUSION ............................................................................................... 98

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Advocates for Highway & Auto Safety v. Federal Motor Carrier*
 *Safety Admin.*, 41 F.4th 586 (D.C. Cir. 2022) .................................... 47, 48

*Agostini v. Felton*,
 521 U.S. 203 (1997) ................................................................................71

*Alabama Ass'n of Realtors v. Department of Health & Human Servs.*,
 594 U.S. 758 (2021) ............................................................................... 40

*Alabama ex rel. Siegelman v. EPA*,
 911 F.2d 499 (11th Cir. 1990) ........................................................... 69, 79

*American Farm Bureau Fed'n v. EPA*,
 559 F.3d 512 (D.C. Cir. 2009) .................................................................. 47

*American Great Lakes Ports Ass'n v. Schultz*,
 962 F.3d 510 (D.C. Cir. 2020) ............................................................. 44, 48

*American Hosp. Ass'n v. NLRB*,
 499 U.S. 606 (1991) ............................................................................... 73

*Armour & Co. v. Wantock*,
 323 U.S. 126 (1944) ................................................................................ 37

*\*Barnhart v. Peabody Coal Co.*,
 537 U.S. 149 (2003) ........................................................................69, 70, 71

*Barr v. American Ass'n of Political Consultants*,
 591 U.S. 610 (2020) ............................................................................... 97

*BBX Capital v. Federal Deposit Ins. Corp.*,
 956 F.3d 1304 (11th Cir. 2020) .........................................................26-27

*BG Gulf Coast LNG, LLC v. Sabine-Neches Navigation Dist. of Jefferson*
 *Cty.*, 49 F.4th 420 (5th Cir. 2022),
 *cert. denied*, 143 S. Ct. 2577 (2023) ...................................................... 37

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) .................................................. 98

*Board of Cty. Comm'rs of Washington Cty. v. U.S. Dep't of Transp.*,
  955 F.3d 96 (D.C. Cir. 2020)...................................................... 44

*Board of Cty. Comm'rs of Weld Cty. v. EPA*,
  72 F.4th 284 (D.C. Cir. 2023) .................................................... 96

*Califano v. Yamasaki*,
  442 U.S. 682 (1979).................................................................... 96

*Chamber of Commerce of the U.S. v. SEC*,
  412 F.3d 133 (D.C. Cir. 2005)................................................... 45

*City of N. Miami v. FAA*,
  47 F.4th 1257 (11th Cir. 2022)................................................. 26

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993) .................................................................... 31

*CTIA-The Wireless Ass'n v. FCC*,
  530 F.3d 984 (D.C. Cir. 2008) .................................................. 52

*E.I. du Pont de Nemours & Co. v. Train*,
  430 U.S. 112 (1977).................................................................... 39

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016).................................................................... 57

*\*FCC v. National Citizens Comm. for Broad.*,
  436 U.S. 775  (1978) .................................................... 37, 38, 45

*\*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ....................................................... 44, 45-46

*Federal Mar. Comm'n v. South Carolina State Ports Auth.*,
  535 U.S. 743 (2002) ............................................................ 69, 79

ii

*Federal Power Comm'n v. Texaco, Inc.*,
    377 U.S. 33 (1964) ...............................................................37-38

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
    45 F.4th 127 (D.C. Cir. 2022) .................................................. 46

*Florida Mun. Power Agency v. FERC*,
    315 F.3d 362 (D.C. Cir. 2003) .................................................. 48

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................. 92

*Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*,
    448 U.S. 607 (1980) .................................................................. 39

*Mayo Found. for Med. Educ. & Research v. United States*,
    562 U.S. 44 (2011) ....................................................................80

*McIntosh v. United States*,
    601 U.S. 330 (2024) ............................................................ 71, 72

*Miccosukee Tribe of Indians of Fla. v. United States*,
    566 F.3d 1257 (11th Cir. 2009) ........................................... 26, 44

*Michigan v. EPA*,
    576 U.S. 743 (2015) .................................................................. 66

*\*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................... 44

*\*Mourning v. Family Publn's Serv., Inc.*,
    411 U.S. 356 (1973) ............................................................ 37, 74

*Nasdaq Stock Mkt. LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022) ........................................... 46, 47

*National Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) ...................................................... 47

*National Ass'n of Mfrs. v. SEC,*
    105 F.4th 802 (5th Cir. 2024) .................................................. 97

*National Broad. Co. v. United States,*
    319 U.S. 190 (1943) .................................................................38

*National Mining Ass'n v. United Steel Workers,*
    985 F.3d 1309 (11th Cir. 2021)...........................................39, 40

*National Parks Conservation Ass'n v. U.S. Dep't of the Interior,*
    835 F.3d 1377 (11th Cir. 2016) ................................................ 52

*National Shooting Sports Found., Inc. v. Jones,*
    716 F.3d 200 (D.C. Cir. 2013) ............................................80-81

*Nielsen v. Preap,*
    586 U.S. 392 (2019) ................................................................. 69

*Pierce v. SEC,*
    786 F.3d 1027 (D.C. Cir. 2015)................................................61

*Ragsdale v. Wolverine World Wide, Inc.,*
    535 U.S. 81 (2002).................................................................... 75

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009)................................................ 45

*Sacora v. Thomas,*
    628 F.3d 1059 (9th Cir. 2010).................................................. 44

*Sierra Club v. Jackson,*
    648 F.3d 848 (D.C. Cir. 2011) ................................................. 36

*Stilwell v. Office of Thrift Supervision,*
    569 F.3d 514 (D.C. Cir. 2009) ................................................. 47

*Sunshine State Bank v. Federal Deposit Ins. Corp.,*
    783 F.2d 1580 (11th Cir. 1986)................................................ 44

iv

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
    940 F.2d 685 (D.C. Cir. 1991) ................................................. 74

*Thorpe v. Housing Auth. of the City of Durham*,
    393 U.S. 268 (1969) ............................................................... 37

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail
    v. FRA*, 40 F.4th 646 (D.C. Cir. 2022) .......................... 36, 69, 70

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air,
    Rail, & Transp. Workers v. FRA*,
    988 F.3d 1170 (9th Cir. 2021) ............................ 9, 10, 23, 56, 65

*United States v. Rodriguez*,
    588 F.2d 1003 (5th Cir. 1979) ................................................. 36

*United States v. Storer Broad. Co.*,
    351 U.S. 192 (1956) ............................................................... 38

*United States v. Texas*,
    599 U.S. 670 (2023) ............................................................... 97

*U.S. Postal Serv. v. Gregory*,
    534 U.S. 1 (2001) .................................................................. 52

**Statutes:**

Pub. L. No. 89-670, §6(f)(3)(A), 80 Stat. 931, 940 (1966) ............................ 6

5 U.S.C. §703 ................................................................................ 97

5 U.S.C. §706 ................................................................................ 70

5 U.S.C. §706(1) ............................................................................ 70

5 U.S.C. §706(2) ............................................................................ 97

5 U.S.C. §706(2)(A) ....................................................................... 26

28 U.S.C. §2112(a)(3) ................................................................. 4-5

28 U.S.C. § 2342(7) ............................................................. 5

28 U.S.C. § 2344 ................................................................. 5

*49 U.S.C. § 103(c) ......................................................... 5, 36

*49 U.S.C. § 20101 ............................................................ 30

*49 U.S.C. § 20103(a) ................................................ 5, 30, 72

49 U.S.C. § 20103(b) ......................................................... 70

49 U.S.C. § 20103(d) ......................................................... 94

49 U.S.C. § 20106(a)(2) ..................................................... 18

49 U.S.C. § 20114(c) ........................................................... 5

*49 U.S.C. § 20135(a) ................................................. 6, 31, 72

49 U.S.C. § 20156 ............................................................. 73

49 U.S.C. § 20156(c) ..................................................... 73, 74

49 U.S.C. § 20156(d)(1) ..................................................... 73

49 U.S.C. § 20156(h) ......................................................... 74

*49 U.S.C. § 20163(a) ................................................. 6, 31, 72

**Regulations:**

49 C.F.R. § 1.89(a) ............................................................. 5

49 C.F.R. pt. 174 ............................................................... 85

49 C.F.R. pt. 200 *et seq.* .................................................... 6

49 C.F.R. § 211.13 ......................................................... 70, 72

49 C.F.R. §§ 211.41-211.45 ........................................... 94

49 C.F.R. § 213.135 ........................................................ 6

49 C.F.R. § 218.123 ......................................................13

49 C.F.R. § 218.123(c) ................................................. 87

49 C.F.R. §§ 218.125-218.129 ....................................13

49 C.F.R. § 218.129 .................................................... 78

49 C.F.R. § 218.129(a)(1) ......................................13, 93

49 C.F.R. § 218.129(a)(1)(i)(A) .................................. 94

49 C.F.R. § 218.129(a)(1)(ii) ....................................... 83

49 C.F.R. § 218.129(a)(3)(iii) ...................................... 83

49 C.F.R. § 218.129(a)(4)(ii) ....................................... 83

49 C.F.R. § 218.129(a)(5)(ii) ....................................... 83

49 C.F.R. § 218.129(b) ................................................ 94

*49 C.F.R. § 218.131 ...............................14, 15, 87, 90

49 C.F.R. § 218.131(a)(2) ....................................... 78, 79

49 C.F.R. § 218.131(a)(3) ............................................15

49 C.F.R. § 218.131(b) .............................................14-15

49 C.F.R. § 218.133.....................................................15

49 C.F.R. § 218.133(a)(3)(iv) .................................. 15, 88

49 C.F.R. § 218.133(a)(4) ............................................15

49 C.F.R. §218.135 ..................................................................... 16

49 C.F.R. §218.135(d)(2)-(3) ............................................... 16, 53

49 C.F.R. §218.137 ............................................................... 16, 17

49 C.F.R. §219.601 ........................................................................ 6

49 C.F.R. §220.1 ............................................................................ 6

49 C.F.R. pt. 229 ........................................................................... 6

49 C.F.R. §229.5 ..................................................................... 15, 81

49 C.F.R. §229.140 ...................................................................... 83

49 C.F.R. §238.237 ...................................................................... 83

49 C.F.R. pt. 240 ........................................................................... 7

49 C.F.R. §240.101 ........................................................................ 6

49 C.F.R. pt. 242 ........................................................................... 8

49 C.F.R. §§242.101-242.103 ..................................................... 6-7

49 C.F.R. §242.103(b) ................................................................... 7

49 C.F.R. §271.301(d)(4) ............................................................. 76

49 C.F.R. subtitle B, ch. I, subchapter C ................................... 85

**Rule:**

Fed. R. Crim. P. 32.2 ................................................................... 71

**Legislative Materials:**

116 Cong. Rec. 27594 (1970) ...................................................... 32

116 Cong. Rec. 34579 (1970) ........................................................ 32

H. Rep. No. 91-1194 (1970) ..........................................................31

S. Rep. No. 91-619 (1969) ...................................................... 31, 41

## Other Authorities:

Ass'n of Am. R.Rs., *Rigorously Trained Engineers & Conductors Keep Rail Safe*, https://perma.cc/A98Y-8QEZ.................................................. 42

BNSF, *Glossary of Railroad Terminology & Jargon*, https://perma.cc/3HDM-RLZN .......................................................42-43

Exec. Order No. 12,866, 58 Fed. Reg. 51735 (Oct. 4, 1993)........................50

41 Fed. Reg. 54181 (Dec. 13, 1976) ............................................... 72

77 Fed. Reg. 21312 (Apr. 9, 2012)................................................. 83

81 Fed. Reg. 13918 (Mar. 15, 2016) ............................................... 9

84 Fed. Reg. 24735 (May 29, 2019) ................................................ 9

85 Fed. Reg. 9262 (Feb. 18, 2020)..............................................75, 76

Marybeth Luczak, *Missouri Rep. Burlison Eyes Nullification of FRA Crew Size Rule*, Railway Age (Apr. 29, 2024), https://perma.cc/C2YR-K3C9.................................................77

Office of R.R. Safety, FRA, *Compliance Guide for Train Crew Size Safety Requirements* (May 3, 2024)................................................. 91, 94

Union Pac., *Train Dispatching Terms and Their Definitions* (Mar. 30, 2021), https://perma.cc/BXV9-W5G7 .................................... 42

U.S. Gov't Accountability Office, GAO-19-443, *Rail Safety: Freight Trains Are Getting Longer, and Additional Information Is Needed To Assess Their Impact* (May 2019)........................................................7-8

**INTRODUCTION**

The Federal Railroad Administration (FRA) issued a final rule in 2024 that will require many railroads—including Class I railroads that operate trains that can reach up to three miles in length with well over 100 cars—to demonstrate through a special-approval process that operating with a one-person crew will be as safe or safer than a two-person crew. *Train Crew Size Safety Requirements*, 89 Fed. Reg. 25052 (Apr. 9, 2024). Safety demands nothing less. And FRA's commitment to safety is matched by its commitment to reasoned decisionmaking. FRA promulgated the rule after a nearly five-month comment period during which it conducted a public hearing and received over 10,000 comments. The public's participation in that process, which included helpful comments by stakeholders from all facets of the railroad industry, provided valuable information and insight into rail operation safety that allowed FRA to refine some proposed requirements while retaining the rule's core safety objectives. For example, in response to comments, FRA revised the special-approval process that requires railroads to show that their proposed one-person crews will be as safe or safer than larger crews.

Two sets of petitioners challenge the rule. The first set includes Class I railroads, which are the largest railroads operating in the United States

(Class I petitioners).  The second set includes Class II (regional) and Class III (shortline) railroads (collectively, Shortline petitioners).

Right now—and as Class I petitioners concede—no Class I train operates with a one-person crew.  *See* Class I Br. 8.  But no source of law other than the final rule expressly addresses whether a train that stretches over 50 football fields in length can operate with only a single crewmember.  In addressing the question, the agency could have taken a categorical approach and required two crewmembers (typically an engineer and a conductor) for all Class I railroads, which (1) have more complex operations than Class II or Class III railroad operations, as the Class I railroads employ thousands of people in train operations and prioritize long-haul transportation; and (2) lack an established safety record to review, as no Class I railroad has initiated a one-person crew operation.  89 Fed. Reg. at 25078.  Instead, the rule adopts a tailored approach by establishing a process for a railroad to obtain approval from the agency responsible for rail safety before the railroad can operate with only a single crewmember.

In attacking the rule, Class I petitioners discount entirely this key feature of the rule, including the agency's own estimates that numerous train operations will be able to meet this standard.  In plain terms, Class I petitioners challenge the rule because they want to remove their trains'

conductors as separate crewmembers—leaving only a single crewmember on a train—without having to show to FRA how doing so would be safe.

To succeed in their challenge, Class I petitioners must demonstrate that the agency's decision to proceed cautiously and on the basis of a special-approval process is arbitrary and capricious or in violation of the governing statute. This they cannot do. Because Class I trains do not operate with one-person crews, the agency cannot know that such crews are currently and unambiguously less safe than two-person crews. The absence of conclusive data, however, does not strip the agency of its ability to regulate before a tragedy occurs.

FRA also explained why it decided to regulate now in contrast to the past, including troubling increases in train accidents caused by human factors; Class I railroads operating longer trains; and uncertainty about how new technologies can affect train safety as industry and crews learn to adjust. Class I petitioners cannot succeed by criticizing past rulemaking efforts or the proposed rule; they must engage with FRA's reasoning in *this* final rule. And although Class I petitioners and their amici also suggest that political motivations improperly influenced the rule, that speculation ignores the proposed and final rule's special-approval process to allow for

one-person crews and the numerous changes made to the rule as a result of persuasive comments by industry.

The rule treats Class II and III railroad operations differently. For those smaller operations, FRA permitted certain exceptions based on the amount of time those railroads have been safely operating one-person crews. Shortline petitioners object to the ways in which FRA drew those lines when it decided whether and how certain smaller railroads should be exempt from the two-crewmember baseline. But the agency's choices are reasonable and reasonably explained. As Shortline petitioners candidly state, "[i]n the final rule now before the court, FRA agreed with a number of" their concerns and "significantly expanded the exceptions from the two-person crew requirement, acknowledging that short line railroads are small businesses that operate differently than Class I railroads." Shortline Br. 12. Shortline petitioners, like Class I petitioners, can demonstrate no error in the final rule.

## STATEMENT OF JURISDICTION

Several petitioners filed timely petitions for review of the rule in different courts of appeals. FRA sent a notice to the Judicial Panel on Multidistrict Litigation that included petitions for review filed in the Fifth Circuit, Seventh Circuit, Eighth Circuit, and this Court. Pursuant to 28

4

U.S.C. § 2112(a)(3), the Panel randomly selected this Court to consolidate the petitions for review.  Those petitions, along with petitions filed after the Panel conducted its lottery, were all consolidated in this Court.  This Court has jurisdiction to review the final rule under 49 U.S.C. § 20114(c) and 28 U.S.C. § 2342(7).  Under those provisions, "[a]ny party aggrieved . . . may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies."  28 U.S.C. § 2344.

## STATEMENT OF THE ISSUE

Whether the Federal Railroad Administration properly exercised its authority when it promulgated a rule establishing minimum safety requirements for the size of train crews depending on the type of operation.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

The Federal Railroad Safety Act provides that "[t]he Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety."  49 U.S.C. § 20103(a); *see id.* § 103(c) (recognizing the agency's responsibility to further "the highest degree of safety in railroad transportation").  The Secretary has delegated that authority to the Federal Railroad Administration, *see* 49 C.F.R. § 1.89(a), an agency within the U.S. Department of Transportation charged with "carry[ing] out the functions, powers, and duties" of the Secretary

pertaining to railroad safety, Pub. L. No. 89-670, §6(f)(3)(A), 80 Stat. 931, 940 (1966).

Exercising its responsibility under the statute, FRA has issued many regulations governing the railroad industry. *See generally* 49 C.F.R. pt. 200 *et seq.* The regulations touch on every area of railroad safety and cover such diverse topics as track switches, *id.* §213.135, railroad employee drug and alcohol random testing, *id.* §219.601, minimum requirements for wireless communications used during railroad operations, *id.* §220.1, and safety requirements for all aspects of locomotives, including brake, suspension, and electrical systems, *id.* pt. 229.

Much of the statutory and regulatory scheme governing rail safety is premised on the assumption that most trains will have, at a minimum, a locomotive engineer and a conductor. For example, Congress obligated FRA to "prescribe regulations and issue orders to establish a program requiring the . . . certification . . . of any operator of a locomotive," 49 U.S.C. §20135(a), and "the certification of train conductors," *id.* §20163(a). And the agency has promulgated regulations requiring "[e]ach railroad" to "have in effect a written program for certifying the qualifications of" both engineers and conductors. 49 C.F.R. §240.101 (engineers); *id.* §§242.101-

242.103 (conductors).  Those programs must be approved and in effect "prior to commencing operations."  *Id.* § 242.103(b).

Engineers and conductors perform different, but sometimes-overlapping, duties.  The "engineer's main task is to operate the train safely."  *Train Crew Size Safety Requirements*, 87 Fed. Reg. 45564, 45567 (July 28, 2022).  The engineer "ensur[es] that the locomotive mechanical requirements are met; coordinat[es] with the conductor about operational details; and, under the conductor's supervision, interpret[s] train orders, signals, and operating rules."  *Id.*  The agency has promulgated extensive regulations addressing the qualification and certification of engineers.  *See* 49 C.F.R. pt. 240.

The train conductor likewise plays an integral role in rail safety.  The conductor interacts with dispatchers, roadway workers, and others outside the cab; deals with exceptional situations such as people or vehicles at railroad crossings; and coordinates with the engineer for safe and efficient operation while the train is moving.  87 Fed. Reg. at 45568.  Conductors also address problems with the train itself.  For example, "if the crew detects a train maintenance issue, the conductor may need to leave the locomotive and walk the length of the train to address the problem."  U.S. Gov't Accountability Office, GAO-19-443, *Rail Safety: Freight Trains Are*

7

*Getting Longer, and Additional Information Is Needed To Assess Their Impact* 9 (May 2019) (observing that "[f]reight trains in the United States generally operate with two crew members—the conductor and the engineer," and "[t]he conductor is responsible for the train, freight, and crew").  And, as the rail industry becomes more automated, conductors also "assist a locomotive engineer by responding to technology prompts or conveying information displayed that will allow the engineer to focus on the train's controls and movement."  87 Fed. Reg. at 45568.  Further, "conductors are often completing safety tasks independently of a locomotive engineer."  89 Fed. Reg. at 25077.  The agency has promulgated comprehensive regulations addressing the qualification and certification of conductors.  *See* 49 C.F.R. pt. 242.

## B.    Prior Efforts To Address Crew Size

Although various statutes and regulations contemplate that trains will have engineers and conductors, before the rule challenged here there was no requirement that even Class I railroads, which may have trains with hundreds of cars and reach several miles in length, either include a conductor as part of the crew or show why a one-person crew would be as safe or safer than a two-person crew.

8

FRA has addressed train crew size twice in the past.  In 2016, it issued a notice of proposed rulemaking aimed at establishing "minimum requirements for the size of train crew staffs depending on the type of operation."  *Train Crew Staffing*, 81 Fed. Reg. 13918, 13918 (Mar. 15, 2016).  The agency proposed a "minimum requirement of two crewmembers . . . for all railroad operations" and also included exceptions "for those operations that [the agency] believes do not pose significant safety risks to railroad employees, the general public, and the environment by using fewer than two-person crews."  *Id.*

FRA withdrew the proposed rule in May 2019.  The agency at that time decided no rule was necessary based on its view that data did not "establish that one-person operations are less safe than multiperson train crews."  *Train Crew Staffing*, 84 Fed. Reg. 24735, 24739 (May 29, 2019).  The agency also announced its intention "for the withdrawal to preempt all state laws attempting to regulate train crew staffing."  *Id.* at 24741.

The U.S. Court of Appeals for the Ninth Circuit vacated the agency's 2019 withdrawal of the proposed rule, as well as the agency's preemption determination contained within that withdrawal.  *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. FRA*, 988 F.3d 1170 (9th Cir. 2021).  The court stated that the withdrawal's "real and

intended effect is to authorize nationwide one-person train crews and to bar any contrary state regulations," based in large part on the agency's safety determinations. *Id.* at 1182. But the opinion questioned the agency's safety analysis. "It is not clear," the court concluded, "that there is a sound factual basis for the [withdrawal]'s suggestion that two-member crews are less safe than one-person crews." *Id.* The withdrawal "*fail[ed] to address the multiple safety concerns raised by the majority of the comments*," including crew fatigue and the difficulties of operating a one-person crew on mountainous terrain. *Id.* at 1183 (emphasis added). The court contrasted the agency's approach in 2016 versus 2019, observing that it "went from proposing, as required by safety concerns, a national minimum two-person train crew rule, to imposing a maximum one-person train crew rule and preempting state safety laws." *Id.* at 1184 (emphases omitted).

### C.    The Rulemaking Under Review

1.    The agency revisited the issue in 2022, proposing a rule that, among other things, would have imposed certain regulatory requirements before a railroad could change from a two-person crew to a one-person crew. 87 Fed. Reg. at 45564. The agency undertook a comment period that lasted 146 days and conducted a public hearing. 89 Fed. Reg. at 25059.

The agency received thousands of comments, with "13,377 express[ing] support" for the proposed rule while "64 opposed it." 89 Fed. Reg. at 25059. "[A]bout 99 percent of the written comments submitted to the docket were from individual commenters who were not filing their comment officially on behalf of an organization, group, or business." *Id.* A comment signed by 54 Members of the U.S. House of Representatives also voiced support, "view[ing] the rule as necessary to ensure the safety of communities." *Id.* at 25066. Some commenters did not believe the proposed rule went far enough, urging that the agency require more than two crew members for passenger trains or freight trains carrying hazardous materials and eliminate exceptions to the two-person crew minimum. *Id.* at 25067. Other commenters viewed the proposed rule as unnecessary and too costly. *Id.* at 25068, 25075-76.

2.    After considering the extensive input from individuals, industry, members of Congress, and rail unions, the Federal Railroad Administration promulgated the rule "to ensure that trains are adequately staffed for their intended operation and railroads have appropriate safeguards in place for safe train operations whenever using a one-person train crew." 89 Fed. Reg. at 25052.

The rule accomplishes four major goals. *First*, it establishes minimum train crew size safety standards, requiring two crewmembers unless an exception applies, while allowing for railroads to petition for one-person crews if doing so would be as safe as the status quo. 89 Fed. Reg. at 25052; *see id.* at 25053 ("This final crew size rule is necessary for FRA to proactively protect railroad employees, the public, and the environment during train operations with a one-person train crew, including trains transporting hazardous materials."); JPA Doc.13201, at 36 (Regulatory Impact Analysis addressing this point) (citations to the Joint Petitioners' Appendix follow the citation format in Class I petitioners' brief). *Second*, it creates a method for the public to be able to comment on a railroad's petition to operate a train with a one-person crew before the agency approves the request. 89 Fed. Reg. at 25053. *Third*, it institutes a process for the agency to collect information about one-person train crew operations so that it "will be better informed to respond to questions about how to maintain the safety of such an operation and be better positioned to take actions that ensure future safety improvements." *Id.* And *fourth*, by adopting a national, uniform standard governing train crew size, the rule will preempt States from regulating in a manner that would subject railroads to conflicting rules that change whenever a train crosses from one

12

state or local jurisdiction into the next and preclude railroads from safely experimenting with one-person crews.  *Id.*; *see id.* at 25061 ("FRA recognizes that, if the issue of crew size safety is left to be governed by a patchwork of State laws, logistically it may become impossible for a railroad to even consider operations with fewer than two crewmembers.").

To achieve those goals, the rule sets a default that railroads must staff every train with at least two crewmembers (including a locomotive engineer and an additional crewmember who will typically be a conductor) but establishes the circumstances in which railroads may use one-person crews. 49 C.F.R. § 218.123.  For example, the rule exempts some types of passenger, tourist, and freight trains from the two-person baseline.  *Id.* §§ 218.125-218.129.  And the rule includes a "legacy" exception that conditionally exempts Class II (regional) and Class III (shortline) railroads that have used one-person crews for at least two years, if they meet certain safety conditions and have provided the agency with information about their operations by September 6, 2024.  *Id.* § 218.129(a)(1).

The rule also establishes a process for other railroads, including large Class I railroads, non-legacy Class II and III railroads looking to establish one-person crews for the first time, and Class II and III railroads seeking to transport certain types of hazardous materials without a demonstrated

safety record of at least two years, to petition the agency to operate a one-person train crew.  49 C.F.R. §218.131.  Although FRA established a default two-crew minimum in most situations, it did not want to close the door to safe and effective one-person crew operations and rejected commenters who supported more stringent requirements that would permit no exceptions to a two-person train crew.  In an effort to meet the agency's safety obligations while at the same time promoting technological innovation, the rule sets forth a straightforward special-approval process for a railroad to request that the agency allow a train to operate a one-person train crew rather than a crew operated by an engineer and a second crewmember "who will typically be a conductor."  89 Fed. Reg. at 25054.  The process specifies the petition requirements, risk-assessment procedures, and the way in which FRA will review these petitions.

For example, if one of the Class I railroads wants to change course and use one-person crews while operating long-haul trains, it must ask the agency and include in its petition basic information, such as the maximum number of cars and tonnage of the train, as well as the location of the operation to allow FRA to identify where there are hazards, such as densely populated or environmentally sensitive areas, areas where the track grade is steep, and whether the freight will include hazardous materials.  49 C.F.R.

§ 218.131(b).  The petition must also include a risk assessment that will "evaluate risk in an objective manner by following a decision-making process designed to systematically identify hazards, assess the degree of risk associated with those hazards, and based on those assessed risks, identify and implement measures to minimize or mitigate the risks to an acceptable level."  89 Fed. Reg. at 25055 (citing 49 C.F.R. § 218.131); *see* 49 C.F.R. § 218.133 (providing the minimum content that must be included in a railroad's risk assessment).  The risk assessment must show that the one-person train crew operation is as safe or safer than a two-person minimum train crew operation.  49 C.F.R. § 218.133(a)(3)(iv), (4).  Those same petition requirements apply to a shortline railroad's freight operation that does not fall under an exception.

The railroad must further agree to have operating rules ensuring that the controlling locomotive of its one-person train crew operation has a working "alerter" installed if the train does not already include one.  *See* 49 C.F.R. § 218.131(a)(3); *id.* § 229.5.  If the alerter does not detect activity after a certain amount of time, a sequence of audible and visual alarms is activated to prompt a response by the engineer, and if the engineer fails to react after enough time, the brake will be applied, and the train will eventually stop.  As the agency explained, "[w]ithout a working alerter on

the controlling locomotive, if a one-person train crew becomes incapacitated while the train is moving, the train would continue to operate down the track out of control without another crewmember on-board who could apply the emergency brake." 89 Fed. Reg. at 25054. Before this rule took effect, FRA did not have an alerter requirement based on the size of the train crew (although regulations already require alerters in controlling locomotives unless a train operates only up to 25 miles per hour and was placed in service before June 2013, *see id.* at 25093).

After FRA receives a petition, it will publish a notice in the Federal Register, soliciting public comment for the agency to consider as it decides whether to approve the petition. 49 C.F.R. § 218.135. The agency also "encourages railroads to approach [it] should they have any questions or concerns about demonstrating compliance with the requirements for train operations staffed with a one-person crew." 89 Fed. Reg. at 25096. The agency intends to decide petitions within 120 days. 49 C.F.R. § 218.135(d)(2)-(3).

If the agency approves the petition, the railroad must comply with annual reporting requirements that will inform the agency about the safety of the one-person crew operation. 49 C.F.R. § 218.137. Those requirements include such basic data as the number of employee and passenger injuries

16

and fatalities as well as the number of times when a dispatcher or operator unexpectedly lost communication with the one-person crew. *Id.* The reporting requirements "ensure[ ] that each railroad will regularly review the safety of its operation and the accuracy of its risk assessment and will provide [the agency] with sufficient data to identify and analyze any safety trends in the approved operation." 89 Fed. Reg. at 25055.

FRA does not expect that the rule's requirements, such as the special-approval process, will prevent railroads from moving to one-person train crew operations but does expect that the rule will "prohibit[ ] railroads from taking on unacceptable levels of safety risks with the potential to detrimentally impact railroad employees, the public, or the environment." 89 Fed. Reg. 25098. For example, the agency "estimate[d] that all Class I railroads will submit a petition for special approval" within a year. JPA Doc.13201, at 13. The agency stated that it "does not expect the rule to prevent *any* railroad from implementing train operations with a one-person crew, so long as it has considered and addressed any potential safety implications." *Id.* at 3 (emphasis added). And the Regulatory Impact Analysis estimates that, over the course of a decade, 107 new one-person train crew operations will commence; 53 of those operations will result from the special-approval process, including 17 operations by Class I

17

railroads.  *Id.* at 13-14.  The remaining estimated 54 Class II and III railroad operations are only required to notify FRA of their operations and therefore will not require the agency approval.

If a railroad receives special approval to operate with one-person crews, no State would be permitted to require those crews to have two or more members.  The agency announced its intent for the "final rule to create a nationwide standard and anticipate[d] that it will preempt State laws covering the same subject matter."  89 Fed. Reg. at 25061; *see* 49 U.S.C. § 20106(a)(2) ("Preemption" provision requiring that laws, regulations, and orders "related to railroad safety" be nationally uniform, with federal law preempting state law once FRA "prescribes a regulation or issues an order covering the subject matter of the State requirement").  In doing so, the agency rejected the views of "[m]any individuals and labor organizations [who] commented that they supported the [proposed rule] but wanted FRA to consider a way to avoid preempting State laws that have more stringent requirements."  89 Fed. Reg. at 25060.

3.    FRA's justifications for the rule were considerable.  For example, FRA's reasoning included discussion of why the rule was necessary to promote rail safety; explanation of why the agency decided to

18

regulate at this juncture; and consideration of alternatives the agency rejected.  We address each below.

### Safety Concerns

The agency in its preamble and Regulatory Impact Analysis relied on quantitative and qualitative information to justify the rule.  The preamble explained that "this final rule is necessary because the latest annual rail safety data reflects some troubling trends that point toward a need for heightened caution and awareness in railroad safety and operational planning."  89 Fed. Reg. at 25053.  The rate for human-factor-caused accidents increased over 40% between 2013 and 2022, and over 13% in a single year from 2021 to 2022.  *Id.*  The "percentage of train accidents attributed solely to human factors . . . increased from 38.5 percent to 45.6 percent between 2013 and 2022."  *Id.*; *see also id.* (documenting the recent rise in the "number of main track train handling and make-up accidents attributed to human factor[s]").  The agency concluded that those figures undermine industry commenters' arguments that railroads should be allowed to remove the second crewmember (typically a conductor) from their trains without the agency responsible for rail safety determining that doing so will not pose a risk to the public or the remaining crewmember.

The agency also explained that there is "uncertainty regarding whether railroads consider all relevant risks prior to adopting one-person crews" because of the lack of regulatory oversight on this issue. JPA Doc.13201, at 6. "Further exacerbating the safety concerns regarding any reduction in crew size," FRA explained, "is that the average length of a Class I freight train has grown substantially in recent years, to nearly 3 miles in some cases, as train length and tonnage add to the complexity and safety challenges of these operations." 89 Fed. Reg. at 25053. The rule "will proactively ensure that railroads incorporate safety risk information before implementing one-person operations, thereby reducing the risk of needing to take corrective actions retroactively, perhaps in response to a high consequence event." JPA Doc.13201, at 6.

FRA also relied on numerous commenters who explained why a two-crewmember baseline promotes safety. Commenters noted "how trains are routinely slowed by unplanned events that require someone other than the locomotive engineer to troubleshoot the problem before the train can continue and how a conductor and a locomotive engineer work as a team during any necessary troubleshooting." 89 Fed. Reg. at 25062. For example, one commenter described an incident where a young child was on train tracks and did not move even after an engineer rang the warning bell,

only to leave after the conductor "ran out on the nose of the engine and waved." *Id.*; *see also id.* at 25064 (similar example). Commenters further explained that a "second crewmember can mitigate the risk of a sick or tired crewmember," especially if that other crewmember has a medical emergency. *Id.* at 25063; *see id.* at 25064 ("[T]wo crewmembers keep each other alert and on task, and that having an accountability partner is the number one tool used by crews to combat fatigue"). Commenters also stated that "the workforce is already strained and the recent doubling of one-and-a-half-mile-long trains would make a complex job unsafe with a one-person train crew." *Id.* at 25063.

Commenters further described how the introduction of Positive Train Control systems, which are designed to prevent train-to-train collisions, derailments from speeding, incursions into established work zones, and movements of trains through switches left in the wrong position, have "introduced new complexities" and an "added level of distraction." 89 Fed. Reg. at 25062 (quotation marks omitted); *see id.* ("even when there is a low incidence of rail accidents, the consequence of an accident can be high and thereby justify an additional fail-safe measure"). And a "conductor can identify washouts, rockslides, fires, vehicles, and pedestrians, but [Positive Train Control] cannot." *Id.* Moreover, a second crewmember would

mitigate any risk of a train "encounter[ing] difficulties when one or more technologies fail," *id.* at 25065, as "railroads continue to experience unplanned outages and planned outages of their [Positive Train Control] systems, in addition to various initialization failures, cut outs, and malfunctions," *id.* at 25078; *see id.* ("For example, in March 2023, BNSF and Amtrak experienced unplanned outages of their [Positive Train Control] systems, and [Norfolk Southern Railway Company] experienced an unplanned outage of its [Positive Train Control] system in August 2023."). The agency viewed these comments as "corroborat[ing]" the proposed rule's statement that "conductors and other crewmembers not assigned to operate the locomotive or train play an active role in maintaining the safe operation of the train and safeguarding their fellow employees and the public." *Id.* at 25067; *see* JPA Doc.13201, at 9, 36-37.

### *Agency Justifications for Its Change in Position*

In addition to justifying the rule on the basis of safety, the Federal Railroad Administration provided a detailed explanation of why it departed from its prior position in 2019 that safety considerations did not warrant federal regulation, offering "two independent reasons" for its reassessment in the final rule. 89 Fed. Reg. at 25083. *First*, consistent with the Ninth Circuit's opinion calling into question FRA's safety analysis, *see*

22

*Transportation Division*, 988 F.3d at 1182-84, the agency reevaluated comments to the 2016 proposed rule discussing the demands placed on a one-person train crew member. *Id. Second*, the agency justified the rule based on information, discussed above, "not analyzed in the 2019 withdrawal, such as technological trends and operational changes on Class I freight railroads since 2019." 89 Fed. Reg. at 25083. The agency observed that "[t]rain accidents can impose enormous and sometimes incalculable costs on individuals, communities, and the environment, and recent industry changes, such as utilizing longer trains than the historical norm, introduce variables that may make it challenging for the industry to continue the past two decades' general trend of improved safety in rail operations." *Id.* Freight train length "has increased in recent years, and this trend may have cascading safety impacts unless mitigated by technology, training, or other processes." *Id.* Moreover, "the latest rail safety data reflects some troubling industry trends that suggest heightened caution and awareness are needed in rail safety and operational planning." *Id.* The agency acknowledged the "relatively strong safety record" of trains but noted that "the rate for all human factor caused accidents has increased in recent years, notably after the 2019 withdrawal." *Id.* The agency also explained that "uncertainty related to new operating technologies can affect

23

train safety" as crews learn to adjust to new requirements imposed by, for example, Positive Train Control systems designed to prevent accidents. *Id.*

Based on those two independent justifications—one focused on a reconsideration of previous information and one addressing "additional relevant information, including safety data indicating potentially worsening trends since the 2019 withdrawal was issued"—the agency "determined that it needed to change its position from the 2019 withdrawal and concluded that the regulatory requirements in this final rule are necessary to ensure that trains are adequately staffed for their intended operation and railroads have appropriate safeguards in place for safe train operations whenever using a one-person train crew." 89 Fed. Reg. at 25083-84.

### *Alternatives Considered*

In addition to explaining the safety rationales for the rule and why the landscape has changed since 2019, the Federal Railroad Administration considered five alternatives to the final rule. These options, however, "failed to adequately address safety concerns, failed to address the non-uniform patchwork of State laws, or were disproportionately burdensome" on industry. JPA Doc.13201, at 38.

*First*, the agency rejected doing nothing because that approach would allow railroads to be "generally free to operate trains with one

24

crewmember" without "performing any safety analysis or giving FRA the opportunity to review" whether removing a second crewmember would be safe, and "States would be allowed to enforce crew size safety requirements with no Federal requirements." JPA Doc.13201, at 38-39. *Second*, the agency rejected a process where railroads could request a waiver to operate a train without a risk assessment of whether a one-person crew would be safe. *Id.* at 39. The waiver process would take longer than the time in which FRA expects to resolve special-approval petitions, "and the final rule's exceptions will permit some one-person train crew operations without any interruption." *Id.* *Third*, the agency did not adopt an approach that would have imposed a minimum of two crewmembers for trains carrying hazardous materials without allowing railroads the opportunity to show that they can transport those materials safely even with a one-person train crew, because such an approach would have foreclosed the possibility of safely transporting those materials with one-person crews. *Id.* at 39-40. *Fourth*, the agency rejected a requirement for two-person crews on all trains without a special-approval process because that approach "would be more burdensome on railroads and would not provide insight into each operation's hazards or risks." *Id.* at 40. *Finally*, FRA declined to allow all one-person train crews to operate upon notification to the agency because

that would not provide for an agency safety review; would not require the railroad to complete a risk assessment that would lead each railroad "to better assess the safety of train operations with one crewmember"; and would not include minimum safety requirements like operating rules, alerters, or any safeguards to protect the one-person train crew and the public.  *Id.* at 41.

### D.    Standard of Review

Under the Administrative Procedure Act, the Federal Railroad Administration's decision to issue a final rule should be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).  "This standard of review is 'exceedingly deferential' and provides the reviewing court with limited discretion to reverse an agency's decision." *City of N. Miami v. FAA*, 47 F.4th 1257, 1266 (11th Cir. 2022) (applying the standard to a case involving a direct-review provision and quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009)).  "So long as the agency's conclusions are rational, [this Court] will not set them aside," and "[t]hat deference is enhanced when the agency is making decisions within its area of special expertise, as opposed to simple findings of fact." *BBX*

26

*Capital v. Federal Deposit Ins. Corp.*, 956 F.3d 1304, 1314 (11th Cir. 2020) (per curiam).

## SUMMARY OF ARGUMENT

I.    The Class I railroads' petition for review should be denied because FRA properly exercised what the Supreme Court has described as the agency's broad rulemaking authority over every area of railroad safety. The final rule requires Class I railroads to demonstrate to the agency that shifting their operations from two-person to one-person crews is safe before they can pull the second crewmember, typically a conductor, from their trains.  FRA reasonably concluded that the final rule was necessary because of safety data reflecting troubling industry trends in rail accidents attributed to human-factor causes; a lack of safety information from railroads seeking to switch to one-person crews; a multitude of comments explaining why removing separate conductors from long-haul trains is dangerous; the benefit of a second crewmember if the other crewmember becomes incapacitated; and uncertainties introduced by new technologies. Although Class I petitioners fault the agency for promulgating a rule despite the lack of empirical data conclusively showing that Class I one-person crews are less safe than two-person crews, no Class I train uses a crew with only a single person on board.  And if Class I railroads can adequately show

in the future that switching to one-person crews will be as safe or safer than multiperson crews, FRA will allow them to do so.

Class I petitioners' other claims similarly lack merit. They state that FRA did not adequately explain why it departed from a prior decision not to impose a default minimum crew size requirement, but that ignores the agency's two independent justifications for doing so that reexamined earlier information and relied on new information the agency did not previously have before it. They assert that FRA did not properly account for future savings to railroads that would result from eliminating a crewmember, but those are not out-of-pocket costs and also will not be incurred if Class I railroads obtain approval to operate one-person crews. Class I petitioners' suggestion that the rule should be vacated as untimely would be unprecedented and is squarely inconsistent with prior positions Class I petitioners have taken when they support FRA regulations. And they claim that the final rule conflicts with other congressional and agency efforts to address the general issue of crew size, but no statute or regulation strips FRA of its authority to establish a process before trains can operate without a second crewmember who is typically a conductor.

II.    The Shortline railroads' petition for review should also be denied because the final rule reasonably draws regulatory lines about which

28

trains should be exempt from the default two-person crew requirement. The rule allows Class II and III legacy freight train operations with currently existing one-person crew operations established for at least two years to continue those operations if they meet certain safety conditions and provide the agency with information about their operations. The agency reasonably concluded that trains without established safety records—including those transporting certain hazardous materials—must obtain special approval from FRA before operating with one-person crews. Shortline petitioners also cite a guidance document FRA's Office of Railroad Safety issued after the rule was promulgated, but nothing in that nonbinding statement contradicts the rule. And their complaints about costs cannot be reconciled with their repeated concessions that the final rule is significantly less costly due to changes FRA made from the proposal.

III. No part of the final rule is unlawful, but if this Court concludes otherwise, it should limit any remedy to the invalid provision. It should also make clear that any relief would not apply to non-parties or petitioners that did not challenge the invalid provision.

## ARGUMENT

### I. The Class I Railroads' Petition for Review Should Be Denied

For Class I petitioners, who operate the largest and longest trains over the greatest distance, the case boils down to whether the agency responsible for rail safety may promulgate a rule requiring agency approval before they can operate their enormous and ever-lengthening trains without a second crewmember who is typically a conductor. FRA reasonably concluded that Class I railroads should not be permitted to depart from the status quo and operate their trains with one-person train crews unless they can first demonstrate that it would be safe to do so.

#### A. The Rule Falls Comfortably Within FRA's Statutory Authority

##### 1. FRA Reasonably Exercised Its Authority To Prescribe Rules "As Necessary" for "Every Area of Railroad Safety"

Section 20103(a) provides that "[t]he Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a); *see id.* § 20101 ("The purpose of this chapter is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."). Congress also provided FRA with authority to "prescribe regulations and issue orders to establish a program requiring the . . . certification . . . of any operator of a locomotive,"

30

*id.* §20135(a), and "the certification of train conductors," *id.* §20163(a). Those authorities are "broad," *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662 (1993), and Congress's choice to empower the Secretary to prescribe regulations that reach to "every" area of railroad safety includes crew size.

The legislative history of FRA's statutory authority confirms the expansive scope of the agency's ability to promulgate rules. Congress sought to delegate to the Secretary "general authority over all areas of railroad safety" because "[v]oluntary efforts on the part of the railroads have failed to meet the need." S. Rep. No. 91-619, at 5 (1969). Through that delegation, "[t]he Secretary of Transportation [wa]s granted power to issue rules, regulations, and standards for the purpose of achieving railroad safety." *Id.* at 6. Congress provided the Secretary with broad authority "particularly in view of the fact that with the introduction of higher speed, *longer and heavier trains*, the increased carriage of deadly and dangerous materials, the possibility of a major catastrophe is ever present." *Id.* (emphasis added).[1]

---

[1] *See also* H. Rep. No. 91-1194, at 14 (1970) (the legislation "authorizes the Secretary of Transportation to prescribe regulations for all areas of railroad safety (supplementing existing rail safety statutes and regulations) and to conduct necessary research, development, testing, evaluation, and training"); *id.* at 16 ("The Secretary's authority to regulate

*Continued on next page.*

Pursuant to its statutory authority, FRA offered several reasonable and independent explanations for why, in its view, the rule was necessary to promote rail safety.  For example, the agency noted that current safety data regarding the increased rate of "human factor caused accidents" reflects "troubling trends that point toward a need for heightened caution and awareness in railroad safety and operational planning."  89 Fed. Reg. at 25053.  Those trends would be exacerbated, the agency noted, with one-person crews, because "a second crewmember provides the opportunity to secure a train with hand brakes, as a one-person train crew could not do so without violating railroad air brake and train handling requirements."  *Id.*; *see id.* at 25058 ("The loss of a second crewmember to perform safety functions creates new hazards and/or increases the risk of certain existing hazards unless mitigating actions are taken.").  And although ground-based employees not located in the train "might be able to assist with some"

---

extends to all areas of railroad safety.  This legislation is intended to encompass all those means of rail transportation as are commonly included within the term."); 116 Cong. Rec. 34579 (1970) (statement of Sen. Prouty) ("For the first time in the nation's history, the Federal Government will be able to make rules and regulations relating to all aspects of railroad operations so as to insure maximum safety."); 116 Cong. Rec. 27594 (1970) (statement of Rep. Springer) ("The bill gives the Secretary of Transportation authority to issue regulations covering the broadest range of railroad safety.").

conductor functions, they do not "offer an identical safety substitute for a traditional, second crewmember." *Id.* at 25077.

The agency also explained that, without regulatory oversight into when and how railroads plan on operating one-person crews, there is "uncertainty regarding whether railroads consider all relevant risks prior to adopting one-person crews." JPA Doc.13201, at 6. Instead of waiting to regulate until after a tragedy, the rule "will proactively ensure that railroads incorporate safety risk information before implementing one-person operations, thereby reducing the risk of needing to take corrective actions retroactively." *Id.*

FRA separately relied on comments that corroborated its determination that "conductors and other crewmembers not assigned to operate the locomotive or train play an active role in maintaining the safe operation of the train and safeguarding their fellow employees and the public." 89 Fed. Reg. at 25067; *see also* JPA Doc.13201, at 9, 36-37. For example, "[n]umerous individual commenters provided first-hand accounts of close calls and lives saved by the action of two crewmembers working as a team." 89 Fed. Reg. at 25064; *see id.* at 25065 (commenter "express[ing] frustration that railroads do not keep track of incidents in which trains with two crewmembers saved lives or prevented accidents"). Having a second

33

crewmember decreases the risk of tragedy if the other crewmember is tired or sick or having a medical emergency. *Id.* at 25063-64; *see id.* at 25052 (if a train engineer becomes "physically unresponsive," an accident "is more likely to occur with a one-person train crew than a two-person train crew"); *id.* at 25063 (commenter noting that, even with multiperson crews, "the workforce is already strained and the recent doubling of one-and-a-half-mile-long trains would make a complex job unsafe with a one-person train crew"). Further, "trains are routinely slowed by unplanned events that require someone other than the locomotive engineer to troubleshoot the problem," with conductors and engineers "work[ing] as a team during any necessary troubleshooting." *Id.* at 25062.

FRA additionally concluded that the introduction of Positive Train Control—which is a computerized system that delivers real-time information to train crews and monitors train location, speed, and direction—justifies a two-person crew baseline. Crews are learning to effectively use Positive Train Control, but as with many new technologies, it has at least initially "introduced new complexities" and an "added level of distraction." 89 Fed. Reg. at 25062 (quotation marks omitted). Commenters also explained that although a "conductor can identify washouts, rockslides, fires, vehicles, and pedestrians," Positive Train

34

Control "cannot." *Id*.; *see* JPA Doc.13201, at 36 ("The need for these safeguards is particularly acute as railroads adjust to technological trends and operational changes such as introduction and use of Positive Train Control (PTC) and increased train length.").  And if the technology fails for even a moment, a second crewmember mitigates risk in a way a single crewmember cannot.  89 Fed. Reg. at 25065, 25078.

### 2. Class I Petitioners Fail To Show That FRA Unreasonably Exercised Its Broad Authority

Seemingly of the view that FRA must await tragedy before promulgating safety regulations, Class I petitioners seek to flip Congress's broad grant of authority on its head to preclude the Secretary from addressing a safety issue unless doing so would be, in their words, "essential."  Class I Br. 25-27.  As explained, the agency reasonably concluded that the final rule is "necessary" for rail safety, and Class I petitioners' attempts to demonstrate otherwise fail.

a. Class I petitioners focus on handpicked dictionary definitions of the term "necessary" but in doing so ignore the phrase Congress actually used.  The phrase "as necessary" in Section 20103(a) is directed toward the exercise of rulemaking authority rather than whether the rule itself is necessary to ensure rail safety.  When Congress mandates that an agency act "as necessary," that decision "leaves it to the [agency]'s discretion to

determine what action is 'necessary.'" *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011); *see United States v. Rodriguez*, 588 F.2d 1003, 1006 n.10 (5th Cir. 1979) ("The language of the statute 'may order additional names . . . as necessary' clearly contemplates allowing the District Judge discretion to determine when and if such addition is necessary."). FRA, moreover, has the added responsibility to further "the highest degree of safety in railroad transportation." 49 U.S.C. § 103(c). "An agency with such a broad mandate to assign, maintain, and enhance safety as the highest priority must affirmatively consider and give substantial weight to any plausible safety concerns a policy proposal implicates." *Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail v. FRA*, 40 F.4th 646, 656 (D.C. Cir. 2022) (alterations and quotation marks omitted). FRA reasonably exercised its discretion, based on evidence developed in this rulemaking, when it determined that a Class I railroad operating long-haul trains must first demonstrate through a special-approval petition that it can operate one-person trains as safely or safer than a two-person crew before changing its operations from the status quo.

Class I petitioners' focus on "necessary" in isolation fails even on its own terms. "The word 'necessary' has a range of meanings in various contexts, but it can mean simply 'convenient, useful, appropriate, suitable,

or conducive to the end sought.'" *BG Gulf Coast LNG, LLC v. Sabine-Neches Navigation Dist. of Jefferson Cty.*, 49 F.4th 420, 428 (5th Cir. 2022) (quoting *Black's Law Dictionary*), *cert. denied*, 143 S. Ct. 2577 (2023); *see Armour & Co. v. Wantock*, 323 U.S. 126, 129-30 (1944) ("necessary" has "always been recognized as a word to be harmonized with its context").  As the Supreme Court has long held, unless Congress says otherwise, where the empowering provision of a statute states that the agency may "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act," regulations issued under such statutes will be sustained so long as they are "reasonably related" to the purposes of those statutes.  *Mourning v. Family Publn's Serv., Inc.*, 411 U.S. 356, 369 (1973); *Thorpe v. Housing Auth. of the City of Durham*, 393 U.S. 268, 277, 280-81 (1969) (statute authorizing the Department of Housing and Urban Development to "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act"); *see FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775 793-94 (1978) (a regulation is "necessary to carry out the provisions" of the statute if it is "based on consideration of permissible factors and is otherwise reasonable"); *Federal Power Comm'n v. Texaco, Inc.*, 377 U.S. 33, 41 (1964) (provision allowing agency to

prescribe "necessary or appropriate" regulations grants authority to promulgate rules that "effectuat[e] the aim of the Act").

Class I petitioners' contrary interpretation, which would effectively rewrite Section 20103(a) to read, "the Secretary of Transportation shall only prescribe regulations and issue orders that are essential for railroad safety," is thus especially inappropriate for statutory delegations of rulemaking authority. The Supreme Court has, time and again, upheld regulations as "necessary" that it did not deem as "essential." For example, the Court rejected a challenge to a rule codifying the Federal Communication Commission's view of the public-interest licensing standard without concluding that the regulation was essential to carrying out the provisions of the Communications Act. *National Citizens*, 436 U.S. at 779, 793-94. The Court also upheld regulations based on that agency's policies of promoting diversification of ownership, *see United States v. Storer Broad. Co.*, 351 U.S. 192 (1956); *National Broad. Co. v. United States*, 319 U.S. 190 (1943), without ruling that the particular policies were essential rather than suitable. And the Court upheld the Environmental Protection Agency's authority to issue rules limiting discharges by existing chemical manufacturing plants by citing a statutory provision giving the agency the ability to make "such regulations as are necessary to carry out"

38

its functions, again without concluding that those particular regulations were essential.  *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 132, 136 (1977).  Those examples demonstrate the folly of petitioners' unduly restrictive definition.

To support their cramped view of "necessary," petitioners cite *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) (plurality opinion), but that case has no bearing here. In that case, the Supreme Court reviewed a statutory requirement that workplace standards be "reasonably necessary or appropriate to provide safe or healthful employment and places of employment" and ruled that, before regulating a toxic substance, the agency needed to determine that substance posed a "significant risk" to employees under the statutory standard.  *Id.* at 642, 644.  As this Court has explained, the Supreme Court's decision rested on several factors.  *See National Mining Ass'n v. United Steel Workers*, 985 F.3d 1309 (11th Cir. 2021).  For example, the Court "derived its requirement of a threshold finding of 'significant risk' from the [statutory] term 'safe.'"  *Id.* at 1316.  And the decision relied on a requirement that the Secretary of Labor "establish priorities to ensure that the most serious [workplace] hazards are addressed first."  *Id.* at 1318. None of the factors involved the meaning of "necessary."

39

Nor does *Alabama Ass'n of Realtors v. Department of Health & Human Services*, 594 U.S. 758 (2021) (per curiam), support petitioners.  In that case, the Supreme Court concluded that an agency likely exceeded its authority in issuing a nationwide moratorium on evictions of any tenants who live in a county that is experiencing substantial or high levels of COVID-19 transmission and who make certain declarations of financial need.  The Court interpreted the scope of agency authority by examining the statute's reference to "the kinds of measures that could be necessary: inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of contaminated animals and articles."  *Id.* at 763.  The Court concluded that those "measures directly relate to preventing the interstate spread of disease by identifying, isolating, and destroying the disease itself," but the moratorium likely exceeded the agency's authority because, in the Court's view, the "downstream connection between eviction and the interstate spread of disease is markedly different from the direct targeting of disease that characterizes the measures identified in the statute."  *Id.* at 763-64.  In contrast to that case, this case presents no textual markers or other indications that Congress intended to circumscribe the Secretary's broad authority to promulgate rail-safety regulations.

The textual markers here point in the opposite direction for the reasons described above.  Indeed, the version of the bill considered by the Senate shortly before passage did not include the "as necessary" language when describing the Secretary's authority to promulgate rules but did include that phrase in a separate provision.  *See* S. Rep. No. 91-619, at 20 ("§ 102. Rail safety regulations (a) The Secretary of Transportation shall (1) prescribe appropriate rules, regulations, and standards for all areas of railroad safety and (2) conduct, as necessary, research, development, testing, evaluation, and training . . . .").  Congress's choice to add "as necessary" to ensure parallelism with the provision that immediately followed cannot fairly be read as a severe restriction on the Secretary's broad discretion to promulgate rules the Secretary deems necessary for railroad safety, particularly when the Supreme Court repeatedly embraced more expansive definitions of "necessary" when addressing statutory delegations of rulemaking authority in cases decided during the time period when Congress enacted Section 20103, *see* Class I Br. 25.

b. Class I petitioners stand on no firmer ground by claiming that the rule is not "necessary" because of the lack of conclusive "data or evidence showing that one-person crews are unsafe or less safe than two-person crews" that, in Class I operations, typically consist of one person who is a

locomotive engineer and a second crewmember who is a conductor.  Class I
Br. 28.  To begin with, although Class I petitioners downplay in this
litigation the importance of separate conductors to the safe operation of
trains to support their claim, elsewhere they repeatedly take the opposite
view by highlighting a conductor's role in their operational practices.

For example, petitioner Union Pacific has explained that "[a] train
conductor's job is to manage the safety of the train."  Union Pac., *Train
Dispatching Terms and Their Definitions* (Mar. 30, 2021),
https://perma.cc/BXV9-W5G7; *see id.* ("It is a conductor's job to ensure
the engineer complies with safety regulations.").  Petitioner the Association
of American Railroads has declared—in a post titled "Rigorously Trained
Engineers & Conductors Keep Rail Safe"—that "[t]he conductor is
responsible for safely switching railcars, monitoring and reporting daily
work and organizing the placement of cars to facilitate the loading and
unloading of freight."  Ass'n of Am. R.Rs., *Rigorously Trained Engineers &
Conductors Keep Rail Safe*, https://perma.cc/A98Y-8QEZ; *see id.*
("Nothing is more important to rail companies than safeguarding the
communities trains travel through and the employees that operate those
trains.").  And petitioner BNSF has likewise stated that the conductor is the
"[p]erson responsible for the safe and proper management of the

42

train." BNSF, *Glossary of Railroad Terminology & Jargon*, https://perma.cc/3HDM-RLZN; *see* 89 Fed. Reg. at 25077 ("[T]he reason that [Union Pacific] and other railroads hold conductors accountable for safe train operations is that conductors are often completing safety tasks independently of a locomotive engineer."). Yet through this litigation they wish to be free to eliminate the second crewmember whenever they decide in their judgment that it would be prudent to do so instead of demonstrating to FRA that one-person crews are at least as safe as a two-person train crew operation.

Even apart from Class I petitioners' concessions, the rule's modest requirement that Class I railroads demonstrate in a special-approval petition that they can operate safely with one-person crews before undertaking those operations satisfies reasoned decisionmaking. The absence of conclusive, unambiguous empirical data did not leave the agency with mere "speculation" or "[a]gnosticism" about rail safety. Class I Br. 30. FRA instead relied on all the reasons above to require that, before Class I railroads move from the status quo to a one-person crew operating without a second crewmember, they need to show that doing so would be safe.

Petitioners' contrary position conflicts with venerable, fundamental principles of administrative law. It "is not unusual" that an agency "d[oes]

43

not have perfect empirical or statistical data," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021), and "[i]t is not infrequent that the available data does not settle a regulatory issue," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). And the Administrative Procedure Act "imposes no general obligation on agencies to produce empirical evidence." *American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020).

Further, judgments made by an agency within its area of special expertise may not be "susceptible to strict 'proof' because they involve the exercise of discretion, technical expertise, and informed prediction about the likely course of future events." *Sunshine State Bank v. Federal Deposit Ins. Corp.*, 783 F.2d 1580, 1582 (11th Cir. 1986); *see Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1271 (11th Cir. 2009) (similar); *Sacora v. Thomas*, 628 F.3d 1059, 1068-69 (9th Cir. 2010) (Bureau of Prisons may rely on "experience" rather than "having [a] quantified . . . form of a study" to support decision on the length of inmate placements). And agencies should "be given a wide berth when making predictive judgments." *Board of Cty. Comm'rs of Washington Cty. v. U.S. Dep't of Transp.*, 955 F.3d 96, 99 (D.C. Cir. 2020). When "an agency's decision is primarily predictive," the "limited" role for courts is to "require

44

only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). Even in the context of rulemakings subject to separate statutory obligations regarding economic analysis, "an agency need not—indeed cannot—base its every action upon empirical data; depending upon the nature of the problem, an agency may be entitled to conduct a general analysis based on informed conjecture." *Chamber of Commerce of the U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005) (quotation marks and alterations omitted).

Those principles apply with full force to statutes delegating authority to agencies to act when "necessary." In *National Citizens*, for example, the Supreme Court addressed a statute allowing an agency to promulgate rules "as may be necessary to carry out the provisions" of a statute where "public convenience, interest, or necessity requires." 436 U.S. at 793. The Court did not fault the agency's lack of conclusive data for "judgmental or predictive" factual determinations. *Id.* at 813. The Court instead stated that, "[i]n such circumstances complete factual support in the record for the [agency's] judgment or prediction is not possible or required." *Id.* at 814.

The agency comfortably met its obligations here by reaching a reasonable "judgment based on the evidence it had." *Prometheus Radio*,

592 U.S. at 427. This is not a case where an agency rule will require sweeping changes across the industry. No Class I railroad currently operates with a one-person crew. FRA instead exercised its predictive judgment when it regulated modestly and incrementally, by establishing a two-person baseline along with a clear, speedy process for railroads to show that future one-person crews will be as safe as the status quo.

Although Class I petitioners note that FRA "has not identified accidents that previously occurred that would be avoided by this new rulemaking," Class I Br. 32 (quoting JPA Doc.13201 at 36), that is not surprising. In the part of that acknowledgment omitted by Class I petitioners, the agency explained that "one-person train crew operations have been limited to Class II and III railroads and their less complex operations." JPA Doc.13201 at 36. There is incomplete data on the safety of one-person train crews operating on Class I railroads because it has never happened before. *See Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022) ("[T]he absence of incident reports involving baby boxes hardly proves anything, given their tiny share of the U.S. market."). Yet it does not matter whether irrefutable statistical evidence of danger "has not yet manifested." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1143 (D.C. Cir. 2022). An agency has latitude to "adopt

46

prophylactic rules to prevent potential problems before they arise" because "[a]n agency need not suffer the flood before building the levee." *Id.*; *see Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (making the same point while rejecting the "forceful submission" that the agency "failed to present any substantial empirical evidence justifying the new regulation," because of "the deferential nature of arbitrary and capricious review of agency rules" and the "reasoned explanation" supplied by the agency); *cf. American Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 533 (D.C. Cir. 2009) (per curiam) ("the agency need not wait for conclusive findings before regulating a pollutant it reasonably believes may pose a significant risk to public health"); *National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 15 (D.C. Cir. 2015) (similar).

Petitioners also ignore FRA's reliance on comments discussed above, including comments that provided first-hand accounts of why two crewmembers are typically better than one.  It is well established that an agency may rely on comments as support for its action.  *E.g.*, *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 41 F.4th 586, 607 (D.C. Cir. 2022); *Stilwell*, 569 F.3d at 519 (sanctioning the agency's reliance on its "long experience of supervising" regulated entities and "support in various comments submitted in response to the proposed

rule"); *American Great Lakes Ports*, 962 F.3d at 516.  Although petitioners

may have "voiced the contrary view," "balancing conflicting evidence is the

agency's job, not [the courts], as long as the agency reasonably weighs

evidence both supporting and undermining its final conclusion."

*Advocates for Highway & Auto Safety*, 41 F.4th at 607; *see Florida Mun.*

*Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003) (upholding

agency decision despite "some contradictory evidence").

Instead of engaging with FRA's rationale for this final rule, Class I

petitioners cite stale discussions from prior proceedings.  Class I Br. 31-33.

And when they do address that rationale, their criticisms fall flat.  They

downplay FRA's conclusion that increased freight-train length justifies the

rule on the ground that it cited "nothing that links the length of freight

trains to any safety issues arising from crew size," *id.* at 33, but the absence

of empirical evidence that does not exist does not preclude the agency from

reasonably concluding that Class I railroads that operate miles-long trains

that may pose foreseeable safety hazards first need to demonstrate to the

agency that the operations are safe before taking the unprecedented step of

allowing a train to operate with a one-person crew.  Class I petitioners,

moreover, do not dispute the increased rates for human-factor-caused

accidents, citing instead the lack of connection between accidents and crew

size. *Id.* But the agency relied on those troubling trends as a reason for "heightened caution and awareness in railroad safety and operational planning." 89 Fed. Reg. at 25053. That heightened caution and awareness supports the agency's conclusion that trains seeking to shift from two- to one-member crews must first show that doing so is safe.

FRA's decision to allow one-person crews once a Class I railroad sufficiently demonstrates that it can do so safely confirms the reasonableness of the rule. FRA considered and rejected the option of imposing an across-the-board two-person minimum crew size for all Class I railroads. The agency concluded that a no-exceptions minimum crew size rule would be unduly "burdensome on railroads." JPA Doc.13201, at 40. It instead required those trains to keep a second crewmember unless the railroad can demonstrate to FRA through a special-approval petition that operating a train without a second crewmember would be as safe or safer than operating with a two-person crew. As the agency explained, each railroad operation "is unique, and a risk assessment, as required by this final rule, will allow FRA to determine whether, under a railroad's particular operating conditions, a one-person train crew will be as safe or safer than the same operation with a two-person train crew." *Id.* That

49

modest regulatory effort protects against Class I railroads unsafely departing from the status quo of using two-person crews.

Again refusing to grapple with the actual rationale for the final rule, Class I petitioners claim that the Office of Management and Budget "recogniz[ed] that the government could not credibly claim that railroad safety might be threatened if railroads moved to one-person crews" and "ordered FRA to delete" a contrary statement. Class I Br. 34. As discussed above, however, FRA did not need to make a conclusive finding that lives will in absolute certainty be saved before regulating consistent with the statute and the Administrative Procedure Act. Petitioners also seriously misconstrue the interagency coordination process. Executive Order 12,866, as amended by Executive Order 14,094, provides that significant regulatory actions be submitted for interagency review to the Office of Information and Regulatory Affairs in the Office of Management and Budget. Among other things, that interagency review process seeks "to enhance planning and coordination with respect to" agency regulations while recognizing "the primacy of Federal agencies in the regulatory decision-making process." Exec. Order No. 12,866, 58 Fed. Reg. 51735, 51735 (Oct. 4, 1993). It provides for centralized review of regulations and is collaborative by design, with a back-and-forth between executive branch decisionmakers—all in

pursuit of strengthening agency rulemaking. Changes made during that process reflect the agency's considered view in light of the information it receives through interagency review. Here again, Class I petitioners seek to divert this Court's focus from the final rule and the reasonable explanations provided by the agency. It is that rule, approved by FRA and signed by its Administrator, that sits before this Court for review.

### 3.    Class I Petitioners Misconstrue the Special-Approval Process

Class I petitioners conceded during the comment period that FRA has authority to "requir[e] railroads to explain how they would mitigate . . . risks in the context of one-person operations" but urged that FRA should not impose "a two-person crew mandate." JPA Doc.13056, at 37-38 (comment by petitioner Association of American Railroads). FRA heeded that request. Class I petitioners nonetheless treat the final rule as if it had adopted an across-the-board two-person crew mandate with no exceptions based on safety.

And when Class I petitioners acknowledge the special-approval process, they do so only by suggesting that FRA will unfairly evaluate petitions for a one-person train crew operation. That argument is not only premature, as FRA has not yet decided a single petition; it is also inconsistent with the core principle that "a presumption of regularity

51

attaches to the actions of Government agencies," *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001), because courts "have long presumed that executive agency officials will discharge their duties in good faith," *CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 989 (D.C. Cir. 2008); *see also National Parks Conservation Ass'n v. U.S. Dep't of the Interior*, 835 F.3d 1377, 1385 (11th Cir. 2016) ("Agency decisions are entitled to a presumption of regularity.").

Class I petitioners nonetheless claim that the special-approval process will be "virtually impossible to satisfy in practice." Class I Br. 43. But that premature statement overlooks the way the process works. In response to comments on the proposal questioning the feasibility of the special-approval process, the agency made several significant changes to "simplify the requirement." 89 Fed. Reg. at 25060. Most significantly, it "changed the review standard for a special approval petition from determining that an operation is 'consistent with railroad safety' to determining whether approving the operation described in the petition is 'as safe or safer' than a two-person train crew operation." *Id.* at 25056. That revision "will more clearly allow each railroad to compare the operation to the baseline of a two-crewmember operation." *Id.*; *see id.* at 25094.

52

Class I petitioners (Br. 43) speculate that "the agency has no intention of approving any Class I operations with fewer than two crew members," by focusing on the proposal rather than the final rule's preamble and Regulatory Impact Analysis that include changes the agency made in response to industry comments. FRA itself expects that all Class I railroads will submit a special-approval petition within a year, JPA Doc.13201, at 13, and estimates approval over the next decade of 53 operations from Class I railroads, passenger railroads initiating one-person crew operations, and Class II and III railroads initiating one-person crew operations hauling hazardous materials that will obtain special approval for their new one-person operations, *id.* at 14. And the agency provided an example of what a railroad could do to meet that standard: "The combination of ground-based employees, [Positive Train Control], and other mitigating actions taken in conjunction with the special approval petition and risk assessment . . . could support a showing that a one-person train crew operation, with the risk mitigations in place, is as safe or safer than a two-person train crew operation." 89 Fed. Reg. at 25076. The agency also intends to decide petitions within 120 days. *See* 49 C.F.R. § 218.135(d)(2)-(3).

That timeline and those estimates, which are entitled to a presumption of good faith and regularity, confirm that the process is

anything but a sham.  If Class I petitioners cannot in the future show through their risk assessments that one-person train crew operations are as safe or safer than two-person operations, that is a problem with their proposed operation rather than the agency's special-approval process.  And Class I petitioners may seek judicial review of a final agency action denying a special-approval petition if they are not satisfied with the outcome.

If this Court disagrees with Class I petitioners that the special-approval process is a charade, most of their arguments fall apart.  If Class I railroads can demonstrate that particular one-person crews are as safe or safer than two-person crews, they will be able to have them approved for operation, undermining their argument that the rule mandates multiperson crews even though they are no safer and too costly (Part I of Class I petitioners' brief).  As discussed in more detail below, moreover, the availability of the special-approval process also severely undercuts Class I petitioners' other arguments because: (1) there would be no even arguable conflict with the risk reduction statute and accompanying regulation because—even under petitioners' misguided view of the statute and regulation—one-person crews are allowed under this rule (Part II); (2) the agency's prior statements about safety and crew size have no relevance because Class I railroads will be able to operate with one-person crews

54

(Part III); and (3) Class I railroads operating one-person crews will not incur potential labor costs of paying a second crewmember (Part IV). And amicus Chamber of Commerce's stated concerns about reliance interests (Br. 17-19) likewise fall by the wayside because—setting aside the validity of an argument based on reliance interests when no Class I railroad currently operates with one-person crews—even the longest trains will be able to operate with one-person crews *when it can be done safely*.

### B. Class I Petitioners' Procedural Challenges Do Not Warrant Relief

#### 1. The Agency Adequately Explained Why It Chose To Regulate the Safety of Crew Size When It Had Not Done So Previously

FRA recognized that its decision to promulgate a rule addressing crew size safety differed from its choice in 2019 to withdraw a prior, different, proposed crew size rule, and the agency provided a comprehensive explanation offering "two independent reasons" for why it did so. 89 Fed. Reg. at 25083-84. The first independent justification involved a reconsideration of previous information. As the agency explained, "the 2019 withdrawal de-emphasized safety concerns" raised by (1) FRA-sponsored research on the demands placed on crewmembers and; (2) those who submitted comments to the 2016 proposed rule. *Id.* at 25083. That reassessment comported with the Ninth Circuit's criticism that the 2019

withdrawal did not adequately "address the multiple safety concerns raised by the majority of the comments," including crew fatigue and the difficulties of operating a train on difficult terrain with a one-person crew. *Transportation Division*, 988 F.3d at 1182-83.

The second independent justification addressed "information not analyzed in the 2019 withdrawal, such as technological trends and operational changes on Class I freight railroads since 2019." 89 Fed. Reg. at 25083. As the agency explained, "recent industry changes, such as utilizing longer trains than the historical norm, introduce variables that may make it challenging for the industry to continue the past two decades general trend of improved safety in rail operations." *Id.* And "the latest rail safety data reflects some troubling industry trends that suggest heightened caution and awareness are needed in rail safety and operational planning." *Id.* Further, "uncertainty related to new operating technologies can affect train safety" as crews learn to adjust to new requirements imposed by, for example, Positive Train Control systems designed to prevent accidents. *Id.* As discussed above, those conclusions were amply supported by evidence— including comments developed in the record in these proceedings that petitioners ignore—and relied on by the agency to justify the rule.

In light of those two separate justifications, FRA "determined that it needed to change its position from the 2019 withdrawal and concluded that the regulatory requirements in this final rule are necessary to ensure that trains are adequately staffed for their intended operation and railroads have appropriate safeguards in place for safe train operations whenever using a one-person train crew."  89 Fed. Reg. at 25083.  Class I petitioners do not deny that "the agency acknowledged the change."  Class I Br. 45; *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  And their argument (Br. 45) that the agency did not adequately explain its departure from "the factual determinations underpinning its prior policy" falls apart in the face of the agency's rationale for the final rule.

To support their argument, petitioners devote a section of their brief (pp. 45-50) shooting at the wrong target, aiming at the proposed rulemaking rather than the final rule.  Not once in that section do petitioners cite the final rule.  Yet it is the final rule and the agency's explanation for the final rule that sits before this Court.  Petitioners' arguments should be rejected on that basis alone.

For example, Class I petitioners claim that "FRA now contends" that train derailments at Lac-Mégantic and Casselton "provide a basis for a crew-size regulation," Class I Br. 47-48, *see also id.* at 32-33, but cites only

57

the proposed rule. The agency did not rely on those tragedies in the final rule. Casselton is not mentioned, and Lac-Mégantic is referenced only once when the preamble notes the Transportation Safety Board of Canada's response to that derailment. 89 Fed. Reg. at 25079.

Petitioners similarly err by claiming that FRA previously stated that a crew size rule would stifle innovation but now departs from that position, Class I Br. 49, citing the proposed rulemaking. As an initial matter, the final rule's preamble noted that the agency's prior position lacked data to support it. 89 Fed. Reg. at 25082 n.265. The preamble further observed that the agency continues to "support[] technological advancement through research and funding." *Id.* at 25081. And the preamble explained that the final rule "differ[s] in approach from the previous rulemakings addressing train crew size." *Id.* at 25084. Rather than "broadly mandating two crew members," the final rule requires "two crew members for the most complex operations until a railroad analyzes an operation and persuasively demonstrates that risks associated with eliminating the second crew member are reasonably mitigated." *Id.* "By allowing railroads to petition for a one-person crew," FRA reasonably explained, "this final rule accommodates the development of new technology while also ensuring the safety of crews and the public by requiring an analysis that shows that these

58

innovations will not make trains less safe." *Id.* The agency's "incremental approach" provided "latitude for railroads to explore benefits from advances in technology." *Id.*; *see id.* at 25082 n.265 ("[T]his final rule does not prohibit any specific type of one-person train crew operation or prohibit the use of technology to perform duties typically performed by a second crewmember."). Petitioners' contrary view, joined by amici, *see* Nat'l Taxpayer Union Br. 3-9; Ohio Chamber Br. 3-15, depends on accepting that the agency's special-approval process is a mirage, yet it is anything but. *See* pp. 51-55, *supra*.

Class I petitioners again quibble with the notice of proposed rulemaking, this time with its discussion of research reports that the agency previously stated do not indicate that one-person crews are unsafe. Class I Br. 49-50. Even if the proposed rulemaking (rather than the final rule) were relevant, that preamble explained that when the Ninth Circuit vacated the prior withdrawal of a crew size rule, the court did so in part because it found that FRA did not "address the multiple safety concerns raised by commenters and the research." 87 Fed. Reg. at 45572. The proposed rulemaking both concluded that the 2019 withdrawal gave too much weight to a lack of data and "explain[ed] how the safety concerns the research raises helped in the development of the proposed requirements for this

59

rulemaking." *Id.* FRA did not err by addressing the concerns identified by a court decision vacating the agency's prior action addressing crew size.

Petitioners also claim that the agency inadequately explained why the rule was necessary in the absence of conclusive data establishing that one-person crews are unsafe, again citing the proposed rulemaking. Class I Br. 47-49. As discussed above, however, the final rule preamble discusses in detail why this crew size rule is necessary for safety based on the information the agency has before it.

Petitioners likewise do not advance their argument by claiming that one-person crews are sometimes used on shorter tracks; when carrying passengers; and in Europe. Class I Br. 11-12. The agency explained why those examples do not preclude it from requiring Class I trains to demonstrate that removing a second crewmember (typically a conductor) from their massive trains would be safe. Smaller trains traveling shorter distances through terrains such as, for example, Indiana—where non-Class I operations sometimes use one-person crews—present materially different circumstances from miles-long trains traveling long distances through more challenging environments such as mountains. *See* 89 Fed. Reg. at 25078 ("[W]ithout a special approval process, a Class I freight railroad, with a more complex operation than a Class II or III freight railroad . . .

60

would not be required to demonstrate that it considered all the hazards and mitigated the risks for a one-person train crew operation before initiating implementation . . . .").  Further, FRA did not need to require a two-person crew baseline for passenger trains because "multiple train crewmembers are typically necessary to meet the requirements of FRA's passenger train emergency preparedness rule so that passenger operations' data is not comparable to a one-person train crew operation."  *Id.* at 25080.  And FRA found that "one-person operations in other countries are either not comparable because of different operational factors that contrast with U.S. operations or because effective government regulation in other countries has established minimum safety standards in the same way this final rule will for U.S. operations."  *Id.* at 25079; *see id.* at 25079-80 (discussing the issue in detail).

Even if this Court were to conclude that the agency's reassessment of factual information was flawed in some respect, that would not provide a basis to set aside the rule.  "It is well understood in administrative law that a reviewing court will uphold an agency action resting on several independent grounds if any of those grounds validly supports the result." *Pierce v. SEC*, 786 F.3d 1027, 1034 (D.C. Cir. 2015).  Here, the agency expressly stated that it offered "two independent reasons" for its

61

reassessment, one based on information before the agency in 2019 and one addressing information not analyzed in the withdrawal—including recent technological trends and operational changes, as well as multiple commenters with firsthand knowledge who explained why a second crewmember serves a valuable purpose on large trains.  If the Court views one set of reasons as invalid for any reason it should still uphold the rule because of the other valid and plainly independent ground.

### 2.    FRA Did Not Violate Reasoned Decisionmaking By Declining To Pause Its Rulemaking for Additional Data Collection

After a lengthy comment period where FRA received thousands of comments, the agency concluded that it had sufficient information to address whether trains should have second crewmembers on board unless a railroad can demonstrate that it can operate just as safely without that additional person.  Although FRA received thousands of comments on the proposed rule, the National Transportation Safety Board did not offer its views in these proceedings.  Class I petitioners still argue that FRA should have paused its proposal because the Board had previously recommended that FRA collect more data.  Class I Br. 34-39.  But that view mischaracterizes what the Board said, and regardless, any Board recommendation does not limit FRA's statutory and regulatory authority.

Contrary to Class I petitioners' statement that the Board recommended that FRA first collect data before issuing a regulation, the Board in 2016 concluded only that FRA's "accident database is inadequate for comparing relevant accident rates based on crew size because the information about accident circumstances and number of crewmembers in the controlling cab is insufficient."  84 Fed. Reg. at 24,737 n.9.  It said nothing about whether FRA should issue a crew size rule or what that regulation should require if it did.  And the statement has especially no bearing on a rule that collects information based on one-person crews and allows for a special-approval process based on a safety analysis.  In any event, the Board's recommendation was just that, a recommendation.  The Board does not regulate rail safety and lacks authority to order FRA to collect data before addressing train crew size.

Petitioners claim that, even though the Board did not comment on the proposed rule, FRA needed to squarely address a near-decade-old Board recommendation because commenters cited it.  Class I Br. 35.  But the agency explained and relied on evidence developed *in these proceedings* to justify this rule.  FRA referenced the increase in rail accidents attributed to human factor causes, even with a two-person crew; a lack of information from railroads that want to switch to one-person crews showing that they

have considered relevant safety risks; numerous comments explaining why pulling second crewmembers, who are typically conductors, off long-haul trains is a bad idea; the benefit of a second crewmember if the other crewmember becomes incapacitated; and the uncertainties introduced by Positive Train Control. *See* pp. 32-35, *supra*. And FRA noted the impossibility of developing an accident database comparing accident rates when no Class I railroad currently uses a one-person crew. JPA Doc.13201 at 36. Class I petitioners cannot seriously contend that the rule should be vacated based on a lack of response to a different agency's near-decade-old recommendation when FRA explained in painstaking detail why the rule was necessary for rail safety, even absent data that does not exist.

In a similar vein, Class I petitioners note that Congress also directed FRA to collect more accident information. Class I Br. 36-37. Here again, however, an instruction to collect information cannot fairly be read to preclude the agency from regulating pursuant to its statutory authority. Nor is there any reason to interpret Congress's direction as a decision to enshrine railroads with the ability to reduce crew size to one person without seeking approval from that agency.

And Class I petitioners' interpretation of the Ninth Circuit's decision vacating the agency's 2019 withdrawal of the proposed rule and preemption

determination contained within that withdrawal defies reality. In vacating

the agency action, the court did not state "in no uncertain terms" that FRA

"should not issue a crew-size rule until it had collected the relevant data."

Class I Br. 36. The court doubted the agency's prior determination "that

two-member crews are less safe than one-person crews" because the

withdrawal "fail[ed] to address the multiple safety concerns raised by the

majority of the comments," including crew fatigue, and the difficulties of

operating a one-person crew train on mountainous terrain. *Transportation

Division*, 988 F.3d at 1182-83. Those safety concerns were confirmed by

commenters in these proceedings—a point Class I petitioners ignore.

### 3. The Agency Properly Accounted for Labor Costs

FRA adequately considered labor costs when it promulgated the rule.

For example, the agency recognized that, for railroads currently operating

with two-person crews, the rule will not impose new costs absent action by

a Class I railroad. JPA Doc.13201, at 5-6. A Class I railroad operating with

a two-person crew today does not incur any additional costs as a result of

the rule by continuing to do so tomorrow.

Class I petitioners resist the agency's findings, but their arguments hit

wide of the mark. The Administrative Procedure Act imposes no obligation

to measure costs in a way industry prefers instead of examining direct

compliance costs.  Petitioners disagree and cite *Michigan v. EPA*, 576 U.S. 743 (2015), but that case supports FRA.  There, the changes required by the rule would "cost power plants, according to the Agency's own estimate, nearly $10 billion a year."  *Id.* at 750.  Those types of out-of-pocket costs are a far cry from the way in which petitioners frame costs as the amount of money they could save if, at some indeterminate point in the future, they can freely reduce their crews to a single person.  And the Regulatory Impact Analysis accounted for out-of-pocket costs "to initiate a new operation with a one-person train crew."  JPA Doc.13201, at 24.  It examined the costs of following the rule's special-approval procedure, including the costs of developing a risk assessment to show that a one-person crew would be as safe and preparing the special-approval petition.  *Id.*

The agency also acknowledged the argument that preserving the status quo while allowing exceptions to a two-person train crew may "shift freight shipments from rail to truck."  89 Fed. Reg. at 25081.  But the agency explained that those "concerns do not undermine the basis for this rulemaking, which focuses on the rail safety hazards introduced by reducing crew size."  *Id.*  The Regulatory Impact Analysis "shows that the final rule's costs are lower than the commenters' projections."  *Id.*  For example, "the final rule's costs are relatively small compared to the

66

revenues of the impacted Class I railroads and therefore" the agency does not "expect there to be significant price increases, if any, for rail freight, attributed directly to costs of complying with this final rule."  JPA Doc.13201, at 11.  The agency also explained that "rail and trucking are likely more competitive for shorter trips, most of which are completed by short line railroads that face the least burden from this rule."  *Id.*  And if a railroad faced such a threat from the trucking industry, the rule provides a mechanism to petition the agency to operate a one-person crew—as long as doing so would be safe.  Petitioners' argument to the contrary assumes, again incorrectly, that they will not be able to successfully seek special approval where warranted.

Nor does it matter that a prior Regulatory Impact Analysis from a proposed rule nearly a decade ago that would have required two-person crews included estimated costs from the "delay or prevention of instituting new one-person crew operations in the future."  Class I Br. 53.  Any estimate of those costs would be speculative because it would need to assume that railroads would forego the special-approval process or a particular approval petition would be denied—issues irrelevant to that prior proposed rule.  It is premature to make either assumption, and the agency should not be faulted for failing to take into account hypothetical costs that

67

may never come to pass, particularly where the rule provides a way in which regulated entities can avoid those costs.

Class I petitioners also reference (Br. 51) costs incurred by "[r]ailroads forced to add an additional crew member to an existing one-person operation," but they cannot claim to incur those costs because they do not have any one-person crews (Br. 8). In all events, the rule accounted for the costs to Class II and III one-person operations that must add a crewmember because those operations have not been established for at least two years before the final rule's effective date. The agency explained that those operations may continue with a one-person crew "pending FRA's decision on the railroad's special approval petition." JPA Doc.13201, at 9. It also estimated the costs of special approvals and risk assessments for those railroads. *Id.* at 28. And the agency explained that those railroads "would not need to add additional crewmembers unless the railroad does not exercise the option or fails to demonstrate in its petition that the one-person train crew operation will be as safe or safer than a two crewmember operation." *Id.* at 9.

### 4.    There Is No Basis for Setting Aside the Rule as Untimely

Class I petitioners incorrectly contend that the agency's rule is invalid because the agency took longer than 12 months to promulgate the rule.

Class I Br. 54-56. As an initial matter, petitioners forfeited this argument by failing to raise it at any point before the agency. *Alabama ex rel. Siegelman v. EPA*, 911 F.2d 499, 505 (11th Cir. 1990); *Federal Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 762 (2002) (applying the "general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice" (quotation marks omitted)); *Transportation Division*, 40 F.4th at 659 (applying forfeiture to an argument raised on appeal not presented during FRA rulemaking).

Even if petitioners had preserved the argument, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003). As the Supreme Court explained, federal courts may not "construe[ ] a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later." *Id.* at 158. "That is so because, as [the Court] ha[s] held time and again, an official's crucial duties are better carried out late than never." *Nielsen v. Preap*, 586 U.S. 392, 411 (2019) (plurality opinion).

69

Congress provided that the "time limit for disposition of a proceeding may not be more than 12 months after the date it begins," 49 U.S.C. § 20103(b), and the agency's implementing regulation states that "[e]ach rulemaking proceeding shall be completed [within] 12 months," 49 C.F.R. § 211.13. Those provisions do not prescribe a "consequence for noncompliance," *Barnhart*, 537 U.S. at 159, eliminating the argument that the agency had authority to promulgate the rule but then lost it. Instead, if an agency fails to comply with a deadline, "the proper remedy is for an aggrieved party to seek a court order 'compel[ling] agency action unlawfully withheld or unreasonably delayed.'" *Transportation Division*, 40 F.4th at 666 (quoting 5 U.S.C. § 706(1)). Petitioners did not do so. The D.C. Circuit relied on those principles to reject an argument that a rule promulgated by FRA after the 12-month deadline should be invalidated. *See id.*

Nor do petitioners attempt to show any "prejudic[e]" from the amount of time the agency took to promulgate the rule. 5 U.S.C. § 706. For example, they do not claim that the record has gone stale, or that the timeframe precluded them from offering their views to the agency.

Petitioners' efforts to avoid *Barnhart*'s holding fail. They contend that since *Barnhart*, the Supreme Court has paid more attention to "the boundaries of an agency's rulemaking authority." Class I Br. 55. None of

70

those cases addressed *Barnhart*'s square holding about agency timing

provisions, and it is the Supreme Court's "prerogative of overruling its own

decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Instead of doing

so, the Court recently reaffirmed the holdings of *Barnhart* and similar cases

applied to timing provisions. *See McIntosh v. United States*, 601 U.S. 330,

338-40 (2024) (*Barnhart* reasoning applies to the district court's failure to

comply with the timing provisions in Federal Rule of Criminal Procedure

32.2).

Nor are Class I petitioners correct that *Barnhart* is distinguishable,

an argument they previously disclaimed. *See* Class I Br. 56 n.3. Petitioners

state that *Barnhart* did not involve a question of statutory authority, but

that is wrong: the case involved a statute stating that the Commissioner of

Social Security "shall" complete all assignments before October 1, 1993; the

Commissioner did not; and the coal companies in that case argued that the

failure to comply with the deadline left "the Commissioner with no

authority" under the statute to act. 537 U.S. at 158; *see id.* at 163 ("if

Congress had meant to set a counterintuitive limit on authority to act, it

would have said more than it did").

Petitioners stand on no firmer footing by noting (Br. 56) that this case

involves FRA self-imposing a regulatory deadline of 12 months. Agency

71

regulations, promulgated against the background that statutory deadlines not specifying consequences for noncompliance do not strip agencies of their ability to act, should not be construed to impose harsher limitations. *Cf. McIntosh*, 601 U.S. at 338-40.  It is uncontested that the regulation at issue here does not provide a sanction on FRA for noncompliance, and the agency in the preamble when the regulation was issued did not suggest one either.  *See* 49 C.F.R. § 211.13; 41 Fed. Reg. 54181 (Dec. 13, 1976).

### C. The Risk Reduction Statute and Regulations Do Not Displace the Agency's Authority To Establish a Process Before Trains Can Operate Without a Second Crewmember Who Is Typically a Conductor

As explained, FRA has broad statutory authority, "as necessary," to "prescribe regulations" addressing "every area of railroad safety."  49 U.S.C. § 20103(a).  And Congress gave FRA authority to "prescribe regulations and issue orders to establish a program requiring the . . . certification . . . of any operator of a locomotive," *id.* § 20135(a), as well as "the certification of train conductors," *id.* § 20163(a).  The agency's decision to establish a process that requires Class I railroads to demonstrate that removing a second crewmember (typically a conductor) is as safe as keeping that second crewmember falls comfortably within those authorities.

Class I petitioners correctly note that Congress has addressed rail safety through a multi-pronged approach. Class I Br. 39-42. For example, in 2008, Congress enacted the railroad safety risk reduction program. *See* 49 U.S.C. § 20156. The statute requires Class I railroads to develop a program that mitigates aspects "that increase risks to railroad safety" and enhances aspects "that decrease risks to railroad safety." *Id.* § 20156(d)(1). Railroad programs must "identify and analyze the aspects of its railroad, including operating rules and practices, infrastructure, equipment, employee levels and schedules, safety culture, management structure, employee training, and other matters, including those not covered by railroad safety regulations or other Federal regulations, that impact railroad safety." *Id.* § 20156(c).

The risk reduction statute, which says nothing about one-person crews, does not limit FRA's broad authority under Section 20103(a) to prescribe crew size regulations addressing railroad safety. "[I]f Congress had intended to curtail in a particular area the broad rulemaking authority granted in [that section], we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section." *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991). Even "a congressional decision to prohibit certain activities

73

does not imply an intent to disable the relevant administrative body from taking similar action with respect to activities that pose a similar danger." *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) (emphasis omitted).  The risk reduction statute does not even do that, instead supplementing the agency's authority by allowing FRA to assess civil penalties for railroads that "fail[] to submit, certify, or comply with a safety risk reduction program" as outlined in that statute.  49 U.S.C. § 20156(h).

Interpreting that statute to preclude FRA from regulating on any topic the statute touches "would undermine the flexibility sought in vesting broad rulemaking authority in" Section 20103(a), *Mourning*, 411 U.S. at 372, and would threaten the agency's ability to regulate crew size directly. Petitioners' interpretation that the risk reduction statute displaces FRA's general rulemaking authority would also threaten the agency's ability to promulgate rules involving other topics addressed by the risk reduction statute, including "operating rules and practices, infrastructure, equipment, employee . . . schedules, safety culture, management structure, employee training, and other matters . . . that impact railroad safety."  49 U.S.C. § 20156(c).  Congress could not possibly have intended to silently achieve that result through a statute designed to promote railroad safety.  For those

74

reasons, the rule does not effect "an impermissible alteration of the statutory framework" that "contradicts and undermines" the risk reduction statute or FRA's broad authority under Section 20103(a). *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92, 96 (2002).

Nor do other FRA regulations implementing the railroad safety risk reduction program displace the agency's ability to promulgate a crew size regulation. As the agency explained, "the final rule is an element of FRA's holistic approach to address a range of hazards related to the operation of trains." 89 Fed. Reg. at 25059. "[N]o other FRA regulatory effort focuses on the specific hazards and risks associated with a one-person train crew operation, and railroads are currently not required to specifically mitigate any such hazards or risks." JPA Doc.13201, at 6. For example, the risk reduction program rule is only "part of [FRA's] efforts to continually improve rail safety," 85 Fed. Reg. 9262, 9262 (Feb. 18, 2020), not the *exclusive* way in which the agency addresses safety issues. And although Class I petitioners contend that railroads wishing to reduce crew staffing levels "must identify the precise steps they will take to mitigate any risks," Class I Br. 41, FRA does not "approve specific mitigation measures in a railroad's [risk reduction program] plan" under the risk reduction program rule, 85 Fed. Reg. at 9273. The rule therefore affirmatively states that

approval of a plan does not constitute agency approval of "the specific actions the railroad will implement under its [risk reduction program] plan." 49 C.F.R. §271.301(d)(4). Similarly, no provision in the risk reduction program rule requires a railroad to seek agency authorization for any specific action it intends to take pursuant to its risk reduction program plan. A railroad's approved risk reduction program plan accordingly does not include agency approval of safety mitigation measures related to crew size. The risk reduction program rule and the rule under review thus complement rather than contradict each other: Under the risk reduction program rule, Class I railroads must address railroad safety hazards as part of their risk-based hazard management programs and analysis, 85 Fed. Reg. at 9263, while the rule under review focuses on what Class I railroads must show to obtain approval before moving from the status quo to trains operating with only a one-person crew.

Class I petitioners' claim is further belied by the changes the agency made in response to comments and the way in which it integrated the final rule under review into the existing regulatory scheme. Those changes "provide consistency with existing requirements, specifically, consistency with both the System Safety Program requirements in part 270 and the Risk Reduction Program requirements in part 271." 89 Fed. Reg. at 25084;

76

*see id.* at 25095 ("These changes are consistent with the system safety program and risk reduction program rules, which require a risk-based hazard analysis as part of the risk-based hazard management program. Providing for use of a similar form of analysis will help address concerns regarding the complexity and burden of the risk assessment.").  The changes allow "railroad[s] to build upon existing analyses when preparing the required risk-based hazard analysis as part of a petition for a one-person crew." *Id.* at 25084.  Put simply, there is no conflict between the risk reduction program rule, which does not require FRA authorization before a Class I railroad can remove second crewmembers, and this rule, which does.

## II. The Shortline Railroads' Petition for Review Should Be Denied

Shortline petitioners include Class II and III railroads, which are smaller than Class I railroads.  In response to the unique concerns Class II and III railroads presented at the comment phase, FRA made significant changes to the final rule.  Those changes addressed many of Shortline petitioners' concerns with the proposed rule's scope and costs.  Shortline Br. 4, 12-13, 21; *see also* Marybeth Luczak, *Missouri Rep. Burlison Eyes Nullification of FRA Crew Size Rule*, Railway Age (Apr. 29, 2024), https://perma.cc/C2YR-K3C9 (quoting American Short Line and Regional

Railroad Association President Chuck Baker: "We appreciate that the FRA took some feedback from small business short line railroads into account and made the final rule significantly less onerous on small businesses than its original proposal."). And their complaints about where the agency drew its regulatory lines provide no basis to set aside the final rule.

### A. FRA's Decision To Exempt Certain Legacy Operations Satisfies Reasoned Decisionmaking

The final rule allows Class II and III legacy freight train operations with currently existing one-person crew operations established for at least two years before the effective date of the final rule to continue those operations if they meet certain safety conditions and provide the agency with information about their operations. 49 C.F.R. §218.129. Existing railroad one-person crew operations established for less than two years, even if they transport specific types and quantities of certain hazardous materials, can continue to do so even while the agency decides those railroads' special-approval petitions filed by August 7, 2024. *Id.* §218.131(a)(2). Similarly, the rule requires Class II and III freight railroads with a legacy one-person train crew operation that did not previously transport certain types and quantities of hazardous materials as part of its two-year legacy operation to also petition FRA for special approval by

78

August 7, 2024 to continue hauling hazardous materials with a one-person operation while FRA decides the petitions.  *Id.*; *see* 89 Fed. Reg. at 25089.

Shortline petitioners claim that FRA acted arbitrarily when it chose two years to determine legacy status.  They forfeited that argument by not challenging the timeframe before the agency.  *E.g.*, *Siegelman*, 911 F.2d at 505 (argument forfeited if not raised before the agency); *South Carolina State Ports Authority*, 535 U.S. at 762.  Even if preserved, Shortline petitioners candidly acknowledge that "there may well be sound reasons for an agency to place limits on eligibility for legacy status" because, "in the absence of a time limit, parties would try to qualify days or weeks before the deadline, leaving no meaningful record of safe one-person crew operations."  Shortline Br. 22-23.

FRA reasonably explained that a two-year track record allows it to determine whether the legacy operation is safe.  The proposed rule stated that, "[w]ithout at least two years of one-person train crew operations, a railroad would not have established an accident/incident safety record of a reasonable length on which FRA could base any determination of the level of safety the operation provides."  87 Fed. Reg. at 45595.  No commenter persuaded FRA that the proposed timeline was arbitrary or unduly burdensome.  Shortline petitioners, for example, explained that "the

79

majority of short line legacy operators have been operating trains with a single person in the locomotive cab for decades." JPA Doc.13033, at 40. By allowing these operations to continue while requiring them to implement safety measures and inform the agency about their activities, FRA will have "the opportunity to review the operation's safety record." JPA Doc.13201, at 7; *see also* 89 Fed. Reg. at 25074 ("FRA's decision to permit Class II and III legacy one-person train crew freight operations, including those transporting hazardous materials, to continue without a risk assessment or special approval was based on the final rule's imposition of minimum requirements on these legacy operations."). At the same time, the agency explained that it "will closely monitor this legacy exception and will scrutinize data or observations showing that the legacy operations may not be as safe as currently described." 89 Fed. Reg. at 25074. But FRA reasonably concluded that railroads without an established two-year safety record will need to seek approval to continue an existing operation with one-person crews.

"Regulation, like legislation, often requires drawing lines," *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 59 (2011), and agencies have "wide discretion in making line-drawing decisions" as long as the line is not "patently unreasonable," *National Shooting Sports*

*Found., Inc. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013) (quotation marks omitted).  FRA's explanation satisfies that standard, particularly in light of Shortline petitioners' decision not to challenge the line before the agency and its concession that a line should be drawn to promote safety.

### B.    FRA Engaged in Reasoned Decisionmaking By Requiring Alerters To Prevent Accidents on Trains Using One-Person Crews

The final rule requires an "alerter" for railroads operating with a one-person train crew that do not already have alerters installed in the controlling locomotives used in their trains.  A functioning alerter ensures that if the engineer becomes unresponsive, the train will apply emergency brakes—a safety action typically performed by the second crewmember.  It monitors the engineer's attentiveness, warning the engineer through a sequence of audible and visual alarms if the engineer does not respond, and then applying the train's brakes if there continues to be no response.  *See* 49 C.F.R. §229.5 (defining alerter).  With a second crewmember present, the alerter would be a secondary or redundant safety measure, but without a second crewmember, the alerter is the primary or sole measure of stopping the train if the lone crewmember becomes incapacitated.  An alerter is a necessary safety protection for a one-person crew operation, but it is not the only protection required by the final rule to mitigate harm to

81

the one-person crewmember and the public.  These additional protections

include: maintaining communication between a railroad employee and the

on-board engineer; tracking the location of the one-person crew train; and

establishing protocols to ensure that railroads can mitigate risk in a manner

comparable to two-person crews.  89 Fed. Reg. at 25054.

As FRA explained, "[w]ithout a working alerter on the controlling

locomotive, if a one-person train crew becomes incapacitated while the

train is moving, the train would continue to operate down the track out of

control without another crewmember on-board who could apply the

emergency brake."  89 Fed. Reg. at 25054; *see id*. at 25052 (explaining that

the rule has "the potential to reduce the likelihood of at least one type of

foreseeable accident that is more likely to occur with a one-person train

crew than a two-person train crew if a locomotive is not equipped with a

safety device that will stop the train when the locomotive engineer is

physically unresponsive—even if the type of accident foreseen has not yet

occurred").  Accordingly, "an alerter or a second crewmember to stop the

train in an emergency is a necessary precaution to prevent the potential for

catastrophic harm due to an uncontrolled train movement."  *Id*. at 25075.

FRA discussed in detail the costs of installing alerters in the final rule.

Class I and II railroads, as well as most passenger trains, that already have

alerters installed in their locomotives will not incur any extra costs.  *See* 49 C.F.R. §§ 229.140, 238.237.  FRA estimated total costs for legacy one-person operations at $2.3 million, and $2.7 million for installing alerters on railroads initiating one-person operations that do not already have alerters installed.  JPA Doc.13201, at 16-17.  To ease the burden on regulated entities, FRA gave railroads until June 9, 2026 to install alerters on already-existing one-person legacy operations, allowing operations in the meantime to continue without alerters.  89 Fed. Reg. at 25057; 49 C.F.R. § 218.129(a)(1)(ii), (3)(iii), (4)(ii), (5)(ii).  At the same time, FRA "encourage[d] each railroad with a one-person train crew operation to act more quickly than required by the schedule when possible," and "urge[d] each railroad not to delay alerter installation."  89 Fed. Reg. at 25075.

Shortline petitioners challenge the alerter requirement, but they do not dispute that if an engineer on a one-person train crew becomes incapacitated, the train would continue to operate without an alerter or a second crewmember.  Instead, they urge that the rule should be vacated because FRA did not adequately justify departing from its prior conclusion that "there is a reduced safety need for requiring alerters" on trains traveling short distances at under 25 miles per hour.  Shortline Br. 32 (quoting 77 Fed. Reg. 21312, 21330 (Apr. 9, 2012)).  But even if alerters are

83

not as important on slower-moving trains relative to high-speed trains, that does not mean that requiring them is arbitrary and capricious or unnecessary for rail safety. As the rule explains, without alerters a one-person crew on a train operating at any speed will continue to move if an engineer suffers a medical emergency or is otherwise incapacitated; that is sufficient explanation of the agency's decision to require alerters on all trains with one-person crews even though it did not before. 89 Fed. Reg. at 25054-55; *see* 87 Fed. Reg. at 45592.

It is, in any event, clear that before the comment period FRA was not aware of the scope of train operations with only one crew member and no alerter. As FRA explained, "the operational status quo" in the past has always been "a minimum of two train crewmembers." 89 Fed. Reg. at 25075 n.194. A single comment from a decade ago stating that "many" trains run by one particular Class II railroad operated with one-person crews, Shortline Br. 16 n.16, does not undermine the conclusion that FRA believed most trains had two-person crews and does not address how many one-person crews operated without alerters. In these very proceedings, for example, the agency became aware of significantly more one-person crew operations. 89 Fed. Reg. at 25073 (in contrast to the "seven freight railroads FRA identified by name in the [proposed rulemaking] as known to

84

operate a one-person train crew operation," "FRA estimates that there are 75 Class II and III railroad legacy freight one-person train crew operations"); *see* Class I Br. 48. The fact that the agency responsible for railroad safety did not have an accurate count of Class II and III one-person train crew operations only underscores the need for regulation on this topic. FRA will now be able to count and monitor those operations to ensure that they are being conducted safely.

### C.   FRA Reasonably Addressed the Transportation of Hazardous Materials

1.     Some railroads haul extremely dangerous hazardous materials, and when they do, they are subject to extensive regulatory requirements directed toward mitigating the risk of tragic accidents. *See generally* 49 C.F.R. subtitle B, ch. I, subchapter C (Hazardous Materials Regulations); *id.* part 174 (Carriage By Rail). For example, FRA coordinates with other federal agencies to regulate and enforce the safe and secure transportation of hazardous materials by rail and requires "specific types of training based on the dangers posed by hazardous materials generally and the additional dangers of a release in transit due to an accident, derailment, theft, or attack." 89 Fed. Reg. at 25082. At the same time, "hazardous materials are essential to the U.S. economy," which requires agencies to vigilantly balance economic and safety concerns. *Id.*

85

In the notice of proposed rulemaking, FRA proposed a blanket prohibition on one-person crews carrying high-risk hazardous materials. *See* 87 Fed. Reg. at 45617.  In support of that proposal, some commenters "were generally concerned about the safety of hazardous materials being transported by a train with a one-person crew or potential delays to mitigation measures with only a one-person crew."  89 Fed. Reg. at 25082. But the railroad industry opposed such a categorical approach.  *Id.*

After carefully evaluating the comments, FRA adopted a more nuanced approach.  *See* 89 Fed. Reg. at 25082 ("In response to various rail industry commenters, the final rule does not contain the proposed overarching prohibition on one-person train crew operations transporting certain quantities and types of hazardous materials.").  The final rule recognizes that the transportation of hazardous materials raises numerous safety hazards, "such as the potential for an accidental or non-accidental release of a hazardous material, that would typically create additional tasks for a train crew to communicate information about an immediate or developing safety situation."  *Id.* at 25055.  These additional risks present "the potential for a greater negative consequence than when a train does not contain such materials."  *Id.*  But FRA determined that legacy operations with an established multiyear record of safety could continue to

carry hazardous materials as long as those operations comply with the safety requirements set forth in the final rule. For example, the final rule requires those operations to adopt operating rules that: (1) establish regular and effective communication with a one-person train crew to ensure the safety of the train and crewmember; and (2) safeguard the public after an incident. *Id.* at 25074. And the final rule requires railroads to install alerters on one-person crews to ensure that the train can be stopped if the single crewmember becomes incapacitated. *Id.*

The final rule also creates a path for Class II and III railroads to transport hazardous materials with a one-person train crew in the future, even if the railroad does not have a two-year safety record of transporting hazardous materials with a one-person crew or did not establish a one-person crew operation before the effective date of the final rule. All railroads, including Class II and III railroads, seeking to initiate such an operation transporting certain hazardous materials, *see* 49 C.F.R. § 218.123(c), will be required to conduct a risk assessment and obtain special approval, *see id.* § 218.131; 89 Fed. Reg. at 25074.

2.    Shortline petitioners claim that the final rule arbitrarily distinguishes between shortlines that were carrying hazardous materials for at least two years before the rule's promulgation and shortlines that have

87

not, on the ground that "there [i]s no safety difference between short lines with one-person crews carrying hazmat or not." Shortline Br. 12; *see* Shortline Br. 24-27, 28-31. But it was not unreasonable for the agency to conclude that a railroad that has a demonstrated safety record transporting hazardous materials for at least two years is differently situated from a railroad that does not have a comparable record. Class II and III trains without a history of transporting those materials safely must first demonstrate to FRA that they can safely do so.

For similar reasons, Shortline petitioners (Br. 29-31) are wrong to contend that FRA erred by requiring a risk assessment for smaller railroads to carry certain hazardous materials if they do not have a demonstrated safety record of at least two years. The risk assessment must include "a statement with supporting evidence that the one-person train crew operation with a fully implemented mitigation plan is as safe or safer than a two-person minimum train crew operation." 49 C.F.R. § 218.133(a)(3)(iv). For railroads that operate with two-person crews but wish to use one-person crews, the risk assessment will allow the agency "to accurately assess whether a railroad has taken appropriate measures to compensate for the removal of a second train crewmember." 89 Fed. Reg. at 25055; *see* Shortline Br. 29-30. And for railroads seeking to continue using a one-

person crew but also wishing to haul hazardous materials without a two-year safety record, the risk assessment will allow the agency "to evaluate risk in an objective manner by following a decision-making process designed to systematically identify hazards, assess the degree of risk associated with those hazards, and based on those assessed risks, identify and implement measures to minimize or mitigate the risks to an acceptable level." 89 Fed. Reg. at 25055.

Although Shortline petitioners claim (Br. 30) that "the required risk assessment serves no safety purpose," that is self-evidently wrong. Class II and III railroads without a demonstrated record of safely transporting hazardous materials must show to the agency that they can safely do so through a risk assessment that evaluates safety. And although Shortline petitioners state that FRA concluded that "it is safe for legacy one-person crews to carry hazmat," *id*., that conclusion applies only to those operations that have established a safety record of at least two years. Shortline petitioners' argument would require this Court to ignore that distinction. Further, although Shortline petitioners claim that risk assessments are "unreasonably burdensome," Shortline Br. 29, they do not contest—or even address—FRA's estimate of the costs of submitting special-approval petitions with risk assessments, JPA Doc.13201, at 28-29. They also

recognize that "FRA is willing to work with the short line industry in developing a model risk assessment that could potentially reduce the paperwork burden on short lines and accelerate the petition process." 89 Fed. Reg. at 25074.

Shortline petitioners' other arguments likewise fall flat. FRA's safety determination should not be upset because railroads may sometimes be "obligated to carry goods, including hazmat." Shortline Br. 26. The agency reasonably found that the safety risks associated with hazardous materials precluded it from easing restrictions merely because a railroad may not have had a choice to carry those materials. As the final rule reasonably explains, given "the known safety and security risks associated with operating trains transporting large amounts of hazardous materials," 89 Fed. Reg. at 25074, a railroad without a proven track record of carrying hazardous materials must conduct a risk assessment and obtain special approval from the agency before doing so, *see* 49 C.F.R. § 218.131. Moreover, although petitioners state that "a railroad otherwise qualifying for legacy status, and that has no control over whether it may be required to carry hazmat, will lose its legacy status," Shortline Br. 26, that legacy operation can continue as a one-person crew whenever it is not hauling hazardous materials. The rule is appropriately tailored for legacy

90

operations to address the unique dangers posed by the transportation of hazardous materials.

Shortline petitioners also wrongly criticize the rule (Br. 25, 29, 31) as imposing duplicative reporting requirements.  FRA explained that "[a]lthough current regulations require the railroad to report certain 'accidents/incidents' to FRA, FRA cannot accurately determine from that reported information which, if any, reportable accidents/incidents are attributable to a railroad's one-person train crew operation."  89 Fed. Reg. at 25092; *see id.* (discussing the types of information FRA requests specific to one-person operations).  New reporting requirements will allow the agency to learn more information about one-person crew accidents.

### D.    FRA's Guidance Document Comports with the Legacy Exception

As part of their effort to attack the rule, Shortline petitioners cite a guidance document FRA's Office of Railroad Safety issued in May 2024 and claim that its issuance requires the entire rule to be set aside.  They do not challenge the document itself, which "do[es] not have the force and effect of law" and is "not meant to bind the public in any way."  Office of R.R. Safety, FRA, *Compliance Guide for Train Crew Size Safety Requirements* 2 (May 3, 2024) (*Compliance Guide*).  The guidance "provides information to assist organizations in complying with the rule, especially small businesses."  *Id.*

Shortline petitioners claim that the guidance "contradicts the rule," Shortline Br. 24 (emphasis omitted), because it announced that FRA, in an exercise of enforcement discretion, would relax some of the compliance deadlines for existing non-legacy one-person Class II and III operations that do not carry hazardous materials. *Compare Compliance Guide* 10, *with* 89 Fed. Reg. at 25057.  FRA did so in response to a query from petitioner the American Short Line and Regional Railroad Association, which now complains about that decision even though the agency's action benefitted petitioner's members.  That exercise of inherent discretion demonstrates flexibility, not a basis to invalidate a rule.  *Cf. Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("an agency's decision not to take enforcement action should be presumed immune from judicial review").

Shortline petitioners also cite the guidance in an effort to demonstrate that the rule is arbitrary and capricious on the ground that it does not clarify "whether simple changes in ownership, common in the industry, but involving no changes in operations, would cause a carrier to lose its legacy status."  Shortline Br. 27-28.  According to petitioners, the guidance "suggest[ed] that even if a railroad's operation of a one-person crew does not change, a change in ownership" might result "in forfeiture of

the exemption." *Id.* at 15.  The guidance is consistent with the rule and reasoned decisionmaking.

The proposed rule did not indicate that the agency intended to allow a legacy exception to transfer to a new owner of the one-person operation. Instead, as proposed, the exception for legacy operations applied only to the specific railroad meeting the two-year requirement.  *See* 87 Fed. Reg. at 45618 (proposed Section 218.131(a): "Except as provided in § 218.123(c), a one-person train operation that has been established for at least two years before [EFFECTIVE DATE OF FINAL RULE], may continue if the railroad files a special approval petition under § 218.137, containing a description of the operation no later than [DATE 90 DAYS AFTER EFFECTIVE DATE OF FINAL RULE]."); *id.* at 45566.  Shortline petitioners did not address this issue in any comment during the rulemaking and have forfeited the ability to do so now.

Any timely challenge would also lack merit.  Consistent with the proposal, the agency in the final rule applies the legacy exception to the particular railroad establishing the legacy operation.  *See, e.g.*, 49 C.F.R. § 218.129(a)(1) ("Each Class II or III railroad's legacy one-person train crew freight operation that has been established for at least two years before June 10, 2024, may continue to operate with a one-person train crew" if it

93

meets certain requirements).  The final rule requires legacy operations to notify FRA with basic, critical information about those operations.  *See id.* § 218.129(a)(1)(i)(A), (b).  It is not arbitrary or capricious, or vague, for an agency to refuse to automatically continue to provide a legacy exception to an operation that changes ownership in ways that may render that information inaccurate—for instance, if the new owner wants to alter the number of miles and hours a one-person train crew will operate in a single day.  And, as the guidance explained, the final rule still allows a new owner to file for a waiver of one or more of the requirements.  *Compliance Guide* 17; *see* 49 U.S.C. § 20103(d); 49 C.F.R. §§ 211.41-211.45.  For example, a new owner could seek a waiver if the ownership change will have no impact on the one-person train crew operation and the ownership transfer will not result in significant changes in the operation that impact the hazards and risks different from the way in which the operation had been described previously to FRA.

### E.    Shortline Petitioners' Additional Complaints About Costs Are Unavailing

Shortline petitioners state (Br. 34) that they adopt and incorporate Parts I.A. and IV of Class I petitioners' brief, and those arguments fail for all the reasons addressed above.  As relevant to Shortline petitioners, FRA's Regulatory Impact Analysis addresses costs at length, including Shortline

94

petitioners' estimated costs for alerters, operations costs, notification costs, and special approval and risk assessment costs. *See* JPA Doc.13201, at 16-36. Shortline petitioners acknowledge that those compliance costs will be significantly lower because of changes FRA made to the final rule in response to comments. Shortline Br. 4, 12-13, 21. For example, legacy operations meeting FRA's minimum requirements will be allowed to continue those operations with notification to FRA and compliance with deadlines to phase in minimum safety requirements. The costs arising from notification are minimal in comparison to the benefit of the information to the agency, as the final rule will enable FRA to collect sufficient data to analyze the safety impact of crew size on different types of railroad operations. And Shortline petitioners offer no other criticism of the rule's estimated costs.

## III. Petitioners' Request for Relief Is Overbroad

Both sets of petitioners ask this Court to vacate the rule. For the reasons explained above, the rule is lawful, and none of petitioner's contrary arguments withstands scrutiny. In any event, petitioners are incorrect that the final rule should be vacated in its entirety and universally.

*First*, if this Court concludes that a particular provision of the final rule is unlawful, it should limit any remedy to the invalid provision.

95

"[R]egulations—like statutes—are *presumptively severable*: If parts of a regulation are invalid and other parts are not, [a court] set[s] aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together." *Board of Cty. Comm'rs of Weld Cty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) (emphasis added).  Severability comports with the fundamental principle that "judicial remedies should be 'no more burdensome to the defendant than necessary to provide complete relief' to the plaintiffs or petitioners." *Id.* (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

FRA announced its intent that the rule's provisions operate by themselves even if a court were to invalidate part of the rule.  The agency "recognize[d] that certain provisions focus on unique factors" and found "that the various provisions of this final rule are severable and able to operate functionally if severed from each other."  89 Fed. Reg. at 25059.  The agency likewise stated its intent that, "[i]n the event a court were to invalidate one or more of this final rule's unique provisions, the remaining provisions should stand, thus allowing FRA to continue to fulfill its congressionally authorized role."  *Id.*  This severability discussion "dispels any doubt about what the [agency] would have done" if any particular

96

disclosure "were subtracted." *National Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 816 (5th Cir. 2024); *see also Barr v. American Ass'n of Political Consultants*, 591 U.S. 610, 624 (2020) (courts generally "should adhere to the text of [a] severability or nonseverability clause"). For example, the validity of provisions specific to Class II and III railroads should not affect the validity of provisions specific to Class I railroads.

*Second*, the Administrative Procedure Act does not reference vacatur, instead remitting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. §703, and there is little indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions," *id.* §706(2); *see United States v. Texas*, 599 U.S. 670, 693-703 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment). Even assuming vacatur were an available remedy for a successful challenge to a regulation under the Administrative Procedure Act, such a remedy would not apply to non-parties or different petitioners. *See id.* at 704. Nor does it follow that petitioners are entitled to that equitable remedy in the circumstances of this case. Instead, the matter should be remanded to the agency without vacatur of the challenged provisions unless any error "incurably tainted the agency's decisionmaking

97

process." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

*Of Counsel:*

SUBASH IYER
  *Acting General Counsel*
PAUL M. GEIER
  *Acting Assistant General Counsel*
  *for Litigation and Enforcement*
PAULA LEE
  *Senior Trial Attorney*

  *U.S. Department of Transportation*

ALLISON ISHIHARA FULTZ
  *Chief Counsel*
CHRISTOPHER S. VAN NOSTRAND
  *Deputy Chief Counsel*
REBECCA S. BEHRAVESH
  *Senior Attorney*
SAMUEL GILBERT
  *Senior Attorney*

  *Federal Railroad Administration*

September 2024

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
ABBY C. WRIGHT
MARTIN TOTARO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
  *martin.v.totaro@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of this Court's July 1, 2024 Order because it contains 20,937 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*s/ Martin Totaro*
Martin Totaro

**ADDENDUM**

# TABLE OF CONTENTS

49 U.S.C. § 103 (excerpts)...........................................................A1

49 U.S.C. § 20101 ......................................................................A1

49 U.S.C. § 20103 (excerpts) ....................................................A1

49 U.S.C. § 20135 (excerpts) ....................................................A1

49 U.S.C. § 20163 (excerpts) ....................................................A1

## 49 U.S.C. § 103. Federal Railroad Administration (excerpts)

**(c) Safety as highest priority.**—In carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in railroad transportation.

## 49 U.S.C. § 20101. Purpose

The purpose of this chapter is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.

## 49 U.S.C. § 20103. General authority (excerpts)

**(a) Regulations and orders.**—The Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970. When prescribing a security regulation or issuing a security order that affects the safety of railroad operations, the Secretary of Homeland Security shall consult with the Secretary.

## 49 U.S.C. § 20135. Licensing or certification of locomotive operators (excerpts)

**(a) General.**—The Secretary of Transportation shall prescribe regulations and issue orders to establish a program requiring the licensing or certification, after one year after the program is established, of any operator of a locomotive.

## 49 U.S.C. § 20163. Certification of train conductors (excerpts)

**(a) Regulations.**—Not later than 18 months after the date of enactment of the Rail Safety Improvement Act of 2008, the Secretary of Transportation shall prescribe regulations to establish a program requiring the certification of train conductors. In prescribing such regulations, the Secretary shall require that train conductors be trained, in accordance with the training standards developed pursuant to section 20162.

A1