Nos. 24-11076, 24-11300, 24-11366, 24-11367,
24-11428, 24-11444, 24-11445 & 24-12003

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

FLORIDA EAST COAST RAILWAY LLC, et al.,

*Petitioners*,

*v.*

FEDERAL RAILROAD ADMINISTRATION, et al.,

*Respondents*.

On Petition For Review Of A Final Rule Of The Federal Railroad Administration

## REPLY BRIEF FOR PETITIONERS FLORIDA EAST COAST RAILWAY LLC, ASSOCIATION OF AMERICAN RAILROADS, INDIANA RAIL ROAD COMPANY, UNION PACIFIC RAILROAD COMPANY, AND BNSF RAILWAY COMPANY

Kathryn D. Kirmayer
Stephen N. Gordon
Association of American Railroads
425 Third Street SW, Suite 1000
Washington, DC 20024
(202) 639-2100

Thomas H. Dupree Jr.
Jacob T. Spencer
David A. Schnitzer
Gibson, Dunn & Crutcher LLP
1700 M Street NW
Washington, DC 20036
(202) 955-8500

*Florida East Coast Railway et al.*, 24-11076

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 28(b) and Eleventh Circuit Rules 26.1-1, 26.1-2(b), and 26.1-3, the Petitioners joining this brief state that the following is an interested person who was omitted from the CIPs filed to date:

1. Reiter, Harvey

Pursuant to Circuit Rule 26.1-2(c), Petitioners submitting this brief certify that the CIP contained herein is complete to the best of their knowledge.

Dated: November 14, 2024                    /s/  Thomas H. Dupree Jr.
                                            Thomas H. Dupree Jr.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................5

    I.     A Crew-Size Rule Is Not "Necessary" For Railroad Safety ...............5

         A.     FRA Exceeded Its Statutory Authority In Issuing The Rule .....5

         B.     FRA Ignored Recommendations To Collect The
              Relevant Data *Before* It Regulates ..........................................16

    II.    The Rule Conflicts With The Existing Statute And Regulation
        Establishing The Process For Reducing Crew Size ...........................19

         A.     FRA's New Arguments Are Foreclosed Under *Chenery* ........19

         B.     FRA's New Arguments Are Meritless.....................................20

    III.   FRA Did Not Adequately Explain Its Disregard Of The
        Factual Determinations Underpinning Its Prior Policy.....................24

    IV.   FRA Did Not Consider The Labor Costs The Rule Will Impose ......29

    V.    FRA Failed To Comply With The Statutory And Regulatory
        12-Month Deadline.............................................................................31

CONCLUSION ..................................................................................33

# TABLE OF CITATIONS

## Cases

\*    *United States ex rel. Accardi v. Shaughnessy*,
     347 U.S. 260 (1954)...................................................................5, 33

\*    *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
     594 U.S. 758 (2021)...................................................................7, 32

*Am. Hosp. Ass'n v. NLRB*,
     499 U.S. 606 (1991)........................................................................20

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
     789 F.3d 1206 (11th Cir. 2015) .......................................................29

*Barnhart v. Peabody Coal Co.*,
     537 U.S. 149 (2003)........................................................................32

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
     781 F.3d 1271 (11th Cir. 2015) .......................................................33

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*,
     98 F.4th 220 (5th Cir. 2024) ...........................................................33

*City of St. Louis v. Dep't of Transp.*,
     936 F.2d 1528 (8th Cir. 1991) ...........................................................9

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
     144 S. Ct. 2440 (2024)....................................................................33

*Dep't of Transp. v. Ass'n of Am. Railroads*,
     575 U.S. 43 (2015)..........................................................................32

*Encino Motorcars, LLC v. Navarro*,
     579 U.S. 211 (2016)........................................................................19

\*    *FCC v. Fox Television Stations, Inc.*,
     556 U.S. 502 (2009).......................................4, 24, 26, 27, 28

*Franciscan All., Inc. v. Becerra*,
     47 F.4th 368 (5th Cir. 2022) ...........................................................33

ii

*Ga. by Dep't of Med. Assistance v. Heckler*,
  768 F.2d 1293 (11th Cir. 1985) ..........................................................19

\* *Hewitt v. Comm'r*,
  21 F.4th 1336 (11th Cir. 2021) ....................................................17, 27

*Hussion v. Madigan*,
  950 F.2d 1546 (11th Cir. 1992) .........................................................17

*Illinois v. I.C.C.*,
  698 F.2d 868 (7th Cir. 1983) ............................................................30

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980)............................................................................7

*Marshall v. Burlington Northern, Inc.*,
  720 F.2d 1149 (9th Cir. 1983) .............................................................9

\* *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)........................................................................9, 20

*Nasdaq Stock Market LLC v. SEC*,
  38 F.4th 1126 (D.C. Cir. 2022).........................................................34

\* *Ohio v. EPA*,
  603 U.S. 279 (2024)..........................................................................27

*Ragsdale v. Wolverine World Wide, Inc.*,
  535 U.S. 81 (2002)............................................................................21

*SEC v. Chenery*,
  332 U.S. 194 (1947)..........................................................................20

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp.*
  *Workers v. FRA*,
  988 F.3d 1170 (9th Cir. 2021) ...........................................................18

**Statutes**

5 U.S.C. § 706 ..........................................................................5, 20, 33

38 U.S.C. § 7433 ................................................................................6

42 U.S.C. § 264 ..................................................................................7

49 U.S.C. § 20103 ...................................................................1, 2, 16, 31

49 U.S.C. § 20103(a) ...........................................................1, 5, 6, 7, 8, 23

49 U.S.C. § 20135 ..............................................................................8

49 U.S.C. § 20156 ...................................................................12, 19, 23

49 U.S.C. § 20163 ..............................................................................8

49 U.S.C. § 20901 note .................................................................2, 18

**Regulations**

49 C.F.R. § 211.13 .......................................................................31, 33

49 C.F.R. § 229.140 ........................................................................13

Fed. R.R. Admin., *Final Rule—Risk Reduction Program*,
  85 Fed. Reg. 9262 (Feb. 18, 2020) .........................................12, 19, 22

Fed. R.R. Admin., *Final Rule—Train Crew Size Safety Requirements*,
  89 Fed. Reg. 25052 (Apr. 9, 2024) ..................... 12, 14, 15, 19, 24, 27

Fed. R.R. Admin., *Notice of Proposed Rulemaking—Train Crew Size Safety Requirements*,
  87 Fed. Reg. 45564 (July 28, 2022).................................. 1, 8, 10, 11, 23, 25, 26

Fed. R.R. Admin., *Notice of Proposed Rulemaking—Train Crew Staffing*,
  81 Fed. Reg. 13918 (Mar. 15, 2016)...................................1, 10, 28, 30

Fed. R.R. Admin., *Notice of Proposed Rulemaking—Train Crew Staffing*,
  84 Fed. Reg. 24735 (May 29, 2019).......................................10, 17, 28

Office of Management and Budget, Circular A-4 (Nov. 9, 2023)...........................30

**Other Authorities**

Accident Cause, U.S. Dep't of Transp.....................................................11

Amicus Br. of National Taxpayers Union Foundation ...........................................28

Amicus Br. of Ohio Chamber of Commerce .........................................................31

Amicus Br. of Rail Labor Attorneys.........................................................14

Amicus Br. of U.S. Chamber of Commerce ............................................................24

Fed. R.R. Admin., 2016 Regulatory Impact Analysis, Train Crew Staffing...........29

S. Rep. No. 91-619 (1969) ..........................................................................................6

Secretary Buttigieg on Rail Safety, C-SPAN (Apr. 2, 2024) ....................................3

## INTRODUCTION

The Federal Railroad Administration (FRA) fails to show that its crew-size rule is "necessary" for "railroad safety." 49 U.S.C. § 20103(a). The agency lacks any data or evidence that two-person crews are safer than one-person crews. And it maintains a studied silence on its admission during this rulemaking that its "lack of safety data … *does not support any conclusions* about the safety of single-person crews." *Notice of Proposed Rulemaking—Train Crew Size Safety Requirements*, 87 Fed. Reg. 45564, 45571 (July 28, 2022) (emphasis added). Where FRA itself admits that the evidence does not support the conclusion that a two-person crew is safer than a one-person crew, a two-person crew mandate cannot be "necessary" for "railroad safety." 49 U.S.C. § 20103(a). Indeed, FRA carefully avoids its prior acknowledgment that the evidence suggests that one-person crews may actually be *safer* than two-person crews because they reduce the likelihood of human error. *Notice of Proposed Rulemaking—Train Crew Staffing*, 81 Fed. Reg. 13918, 13932 (Mar. 15, 2016).

FRA is not forthright in stating that data showing the safety of one-person operations "does not exist." Opp.64. The data *does* exist—FRA just chose not to collect it. One of the more astonishing aspects of this rulemaking is that FRA, by its own admission, was utterly unaware of how prevalent one-person crews are in the United States. *See* Opp.85 (admitting that "the agency responsible for railroad safety

did not have an accurate count of Class II and III one-person train crew operations"). In its NPRM, the agency stated that it was aware of only <u>nine</u> one-person operations—that was its basis for claiming a lack of data. In fact, there are <u>hundreds</u> of ongoing one-person operations in the United States. When stunned commenters pointed this out to FRA, the agency blithely noted that it was mistaken but inexplicably did not revisit its conclusion that there is no data establishing the safety of one-person crews in the United States. It was FRA's stubborn refusal to collect and consider this data, despite urging from the National Transportation Safety Board, that led an exasperated Congress to pass a law *directing* FRA to do so, *see* 49 U.S.C. § 20901 note, in hopes that FRA would comply with another congressional mandate it has disregarded—that it base its rulemakings on "existing relevant safety information," *id*. § 20103(c).

The crew-size rule is unnecessary for another reason: Congress and FRA have *already established* a regulatory framework that requires Class I railroads considering a move to one-person crews to assess the risks, consult with labor, and identify the specific measures they will implement to ensure safe operations. Once FRA approves the risk-reduction plan, the railroad must implement it. So when FRA insists its crew-size rule is necessary because "no source of law other than the final rule expressly addresses whether a train … can operate with only a single crewmember," Opp.2, it is wrong. Under existing law, railroads are required to

2

assess the risks—and obtain FRA approval of their risk-mitigation plan—before they may move to one-person operations. The crew-size rule is not only unnecessary, it directly conflicts with the existing statutory and regulatory scheme by eliminating the pathway Congress and FRA had already established for railroads contemplating reductions in crew size.

Throughout its brief, FRA touts the "Special Approval" process as reflecting the agency's reasonableness. In FRA's view, the final rule is not a two-person-crew mandate at all, because railroads will easily obtain Special Approval. *See, e.g.*, Opp.17 ("FRA does not expect that the rule's requirements, such as the special approval process, will prevent railroads from moving to one-person train crew operations."). But the Secretary of Transportation said the exact opposite. In announcing the crew-size rule, the Secretary stated: "With this rule, we will allow special approval if, and only if, a requesting railroad can show to us that their circumstances mean a one-person crew will be no less safe. But I expect those cases to be the exception, not the rule." *See* https://www.c-span.org/video/?534612-1/secretary-buttigieg-rail-safety (emphasis added). The structure of the Special Approval process—railroads are required to prove the safety of their operations using an impossible-to-satisfy "risk matrix" or its equivalent, and FRA retains discretion to make subjective judgment calls—is specifically designed to ensure that Special Approval will never be granted.

Not only does the crew-size rule exceed FRA's statutory authority, but the rulemaking was procedurally deficient under the well-settled standards of the Administrative Procedure Act. FRA never explains why it disregarded many of the "facts and circumstances that underlay … [its] prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). Although FRA admits it has made a 180-degree turnaround from its prior policy that a crew-size rule was *not* necessary for railroad safety, the Supreme Court has stressed that "further justification is demanded" in this exact situation, *id.* at 515-16, and here FRA has failed to engage with the facts and circumstances on which its prior policy rested.

FRA does not dispute that it conducted a cost/benefit analysis that excluded the substantial opportunity costs its crew-size rule will impose—the labor costs arising from railroads required to staff their trains with a second crewmember when they are otherwise able to operate safely with one person in the cab. FRA's argument that it properly refused to consider these costs, Opp.66-67, is wrong as a matter of law, defies basic economics, contradicts the way FRA itself calculated costs during the prior crew-size rulemaking, and violates the directive from this Administration's Office of Management and Budget that federal agencies consider opportunity cost when calculating the cost of their regulations. Nor does FRA dispute that its crew-size rule was issued long after the statutory and regulatory deadlines for FRA to complete its rulemakings. FRA contends that it is not bound by the statutory

deadline because Congress did not specify a consequence for noncompliance, Opp.72, but it has no persuasive answer for why it is not bound by its own regulation under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

## ARGUMENT

## I.    A Crew-Size Rule Is Not "Necessary" For Railroad Safety.

FRA does not dispute that it lacks any data suggesting a crew-size rule is necessary for railroad safety.  Nor does it dispute that it failed to heed (or even acknowledge) the NTSB's call that it gather the relevant data before regulating.

### A.    FRA Exceeded Its Statutory Authority In Issuing The Rule.

This Court may "hold unlawful and set aside agency action" that is "not in accordance with law" or taken "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2).  The crew-size rule exceeds FRA's statutory authority because the rule is not "necessary" for "railroad safety."  49 U.S.C. § 20103(a).

1.    FRA begins not by discussing the text of the statute, but by contending that the statute's "legislative history" demonstrates the "expansive scope" of its rulemaking authority.  Opp.31.  It is telling that the agency first invokes legislative history rather than statutory text, but the legislative history confirms the important limitation on the agency's authority that is reflected in the statute itself:  The regulations must be necessary for railroad safety, because Congress delegated

rulemaking "power" to the agency "for the purpose of achieving railroad safety," rather than to advance the goals of organized labor or achieve other political objectives. S. Rep. No. 91-619, at 6 (1969). Enforcing the "necessary" for "railroad safety" limitation is especially warranted in a post-*Loper Bright* world, where agencies are held to statutory limits on their regulatory authority without the benefit of agency-favorable deference doctrines.

FRA argues that "necessary," as used in § 20103(a), simply means "reasonably related to the purposes of [the] statute[ ]." Opp.37 (quotation omitted). That is doubly wrong. First, the plain meaning of "necessary" in this context is that the regulation is *needed*, not that it merely bears some relation to the subject matter. If "necessary" just meant "related to," then regulations that *jeopardized* railroad safety would be "necessary" for railroad safety. When Congress gives a federal agency authority to issue regulations "relating to" a subject matter, it uses the words "relating to," not "necessary." *See, e.g.*, 38 U.S.C. § 7433(a) ("The Secretary shall prescribe regulations relating to the pay of physicians."). Second, 49 U.S.C. § 20103(a) does not give FRA authority to issue rules necessary to "carry out the provisions" of the statute or "effectuate the aim of the Act," as in the cases FRA cites. *See* Opp.37-39 (quotations omitted). Rather, Congress authorized FRA to issue "necessary" regulations for a single purpose—furthering "railroad safety." 49 U.S.C. § 20103(a).

6

That is why the far more relevant cases bearing on the meaning of "necessary" as Congress used it in § 20103(a) are the Supreme Court's decisions in *Alabama Association of Realtors v. Department of Health and Human Services*, 594 U.S. 758 (2021), and *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) (the *Benzene* case). Both cases involved, as here, a congressional grant of rulemaking authority to issue regulations "necessary" for safety. Those cases, and dictionary definitions contemporaneous with the statute's enactment, make clear that in this context, "necessary" means "essential" and requires not just that the statute "directly relate" to safety, *Alabama Ass'n*, 594 U.S. at 763 (majority), 768 (Breyer, J., dissenting), but that the agency find "a probability of significant [safety] benefits," *Benzene*, 448 U.S. at 644 (plurality).

FRA tries to distinguish *Alabama Association* on the grounds that § 20103(a) "presents no textual markers or other indications" that Congress intended to limit the agency's rulemaking authority. Opp.40. That is incorrect. The plain text of § 20103(a) is *more* restrictive than the statute at issue in *Alabama Association*, which authorized the agency head "to make and enforce such regulations as *in his judgment* are necessary." 594 U.S. at 761 (quoting 42 U.S.C. § 264(a) (emphasis added)). The statute here says nothing about agency "judgment." FRA argues that *Benzene* is distinguishable because the Court's interpretation of "necessary" was informed by "the statutory term 'safe.'" Opp.39 (statute authorizing regulations "necessary … to

7

provide safe … places of employment" (quotation omitted)).  But that just highlights the *similarity* with this case:  the Federal Rail Safety Act authorizes regulations "necessary" for "railroad safety."  49 U.S.C. § 20103(a).

FRA concludes its statutory interpretation argument where it began: legislative history.  The agency argues that a committee report shows that Congress's included the word "necessary" simply "to ensure parallelism" with a neighboring provision, rather than place a "severe restriction" on the agency's rulemaking power.  Opp.41.  But legislative history cannot override statutory text, and Congress' purpose in including the "necessary" limitation on FRA's rulemaking authority was simply to prevent the agency from issuing unnecessary rules—hardly a "severe restriction" on government power.  *Id.*[1]

2.    The crew-size rule is not "necessary" for railroad safety under any possible construction of the statute.  FRA has no data suggesting that one-person crews are less safe than two-person crews.  If, as FRA believes, the data "does not support any conclusions" about the relative safety of one- and two-person crews, 87 Fed. Reg. at 45571, the agency has no business concluding that a crew-size rule is "necessary" for railroad safety.  The Administrative Procedure Act requires a

---

[1]  FRA also cited 49 U.S.C. §§ 20135(a) and 20163(a), which authorize regulations concerning the certification of locomotive operators and conductors, as authority for the rulemaking.  Opp.30-31.  But neither statute facially authorizes a two-person crew mandate, and FRA does not develop any argument to the contrary.

rational connection between means and ends, *see Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), and if the end is railroad safety, there must be substantial evidence that the rule will increase railroad safety. As then-Judge Kennedy explained, the FRA has long understood that for a safety regulation to be "justified," the record must contain data or evidence showing that the regulation will be "effective" in increasing safety. *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149, 1153-54 (9th Cir. 1983) (quotation omitted). No such data or evidence exists here.

FRA's main response is to mischaracterize the railroads' argument. Throughout its brief, FRA contends that agencies do not need "conclusive" data before regulating. *See, e.g.*, Opp.3, 41, 43, 50, 60. But the railroads are not arguing that FRA needed "conclusive" data before regulating; rather, FRA needed *some* data sufficient to support its claim that its crew-size rule is necessary for railroad safety. FRA also contends that agencies are allowed to make "predictive judgments." Opp.44-46. True enough, but a predictive judgment must be "rational, based on a consideration of all the relevant factors, and adequately explained." *City of St. Louis v. Dep't of Transp.*, 936 F.2d 1528, 1534 (8th Cir. 1991) (quotation omitted). Here, FRA offered no evidence or data to support its so-called "informed conjecture." Opp.45 (quotation omitted). This is especially troubling, given that FRA could have

9

easily studied the various one-person operations and compared them to widely available two-person data but refused to do so. *See infra* Section I.B.

FRA's brief confirms what the agency said in 2016, again in 2019, and yet again in 2022: It has *no* evidence indicating that a two-person crew has any safety benefits, let alone that a two-person-crew is necessary for safe operations. *See* 81 Fed. Reg. at 13919 ("FRA does not have data to prove a direct correlation between higher rates of safety and multiple person crews."); 84 Fed. Reg. 24735, 24739 (May 29, 2019) ("FRA's accident/incident safety data does not establish that one-person operations are less safe than multi-person train crews"); 87 Fed. Reg. at 45571 (FRA's "lack of safety data … does not support *any* conclusions about the safety of single-person crews" (emphasis added)). In fact, the data that *does* exist establishes that one-person crews are just as safe as two-person crews. *See* JPA Doc.13056 Exs. 3, 6. Even FRA admits that "it is possible that one-person crews have contributed to the [industry's] improving safety record," 81 Fed. Reg. at 13932, because there is no risk of one crew member distracting the other, and in the event of an accident, there are fewer people in the cab of the locomotive potentially exposed to injury. *See, e.g., id*. at 13920 (acknowledging potential "safety costs from using two-person crews instead of one or zero person crews, such as additional accidents caused by non-engineer crew distracting the engineer or additional deaths and serious injuries from having more people on board trains involved in accidents").

FRA claims it has "several reasonable" explanations for why it believes its rule is "necessary" for railroad safety. Opp.32. None of them can make up for the total absence of evidence or data supporting the rule.

First, FRA says there is an "increased rate of human factor caused accidents." Opp.32 (cleaned up). But this claim is at odds with what FRA said in the NPRM, where it found that "over the five-year period from 2016 to 2020, the average rate of FRA-reportable, human-factor-caused accidents/incidents" had remained "consistent." 87 Fed. Reg. at 45580. In fact, FRA's own publicly-accessible database reveals that FRA-reportable human-factor-caused accidents have decreased dramatically—from 1354 such accidents in 2004 to 851 in 2023. *See* Accident Cause, https://data.transportation.gov/stories/s/Accident-Cause-including-Highway -Rail-Crossings-3-/ueau-ishk. And even if FRA's claims were true, an increase in human-factor-caused accidents would counsel *against* requiring two-person crews—and in favor of one-person crews and greater automation. Human-factor-caused accidents are accidents attributable to human error. Fully automated trains, such as those that move passengers between airport terminals, have virtually no human-factor-caused accidents. In any event, FRA's claim that a rise in human-factor-caused accidents justifies a two-person crew mandate fails because there is no evidence that requiring two-person crews will result in fewer such accidents. FRA also suggests that the absence of a second crewmember will create safety risks

because the second crewmember can perform safety-related tasks that a single crewmember could not. Opp.32. But the final rule acknowledges that these risks will not arise if "mitigating actions are taken." 89 Fed. Reg. at 25058.

Second, FRA says that without a crew-size rule, there would be "'uncertainty regarding whether railroads consider all relevant risks prior to adopting one-person crews.'" Opp.33 (quoting JPA Doc.13201, at 6). Not so. Regulatory oversight already exists through the risk-reduction statute and regulation, which expressly require railroads not just to consider all relevant risks before moving to one-person crews, but to submit a written plan to FRA addressing the precise measures they will implement to mitigate any safety risks that might arise from one-person operations. *See* 49 U.S.C. § 20156; Fed. R.R. Admin., *Final Rule—Risk Reduction Program*, 85 Fed. Reg. 9262 (Feb. 18, 2020); *see also* Section II *infra*. So there is no "uncertainty" over whether railroads will consider all relevant risks before implementing one-person operations: They are already legally required to do so.

Third, FRA says it relied on anecdotes submitted by "individual commenters" about "close calls" where accidents were avoided "by the action of two crewmembers working as a team." Opp.33-34 (quotation omitted). But a handful of unsubstantiated anecdotes cannot supply a legally sufficient evidentiary basis for the most significant rulemaking in the history of American railroading, particularly when the agency is favoring anecdotes over systematic data reflecting hundreds of

thousands of train starts that prove beyond doubt that one-person crews are safe.  *See* JPA Doc.13056 Exs. 3, 6.  FRA's observation that a second crewmember can take over if the other crewmember "is tired or sick or having a medical emergency," Opp.34, may have carried force 20 years ago, but rings hollow today when locomotives are required to be equipped with alerters, which stop the train if the engineer becomes unresponsive.  *See* 49 C.F.R. § 229.140(a)(2).

Moreover, Positive Train Control (PTC) is in widespread use throughout the United States.  PTC acts as a safety overlay that brings the train to an immediate stop if the engineer exceeds speed limits, disregards signals, or becomes unresponsive.  *See* JPA Doc.13056 at 2-3, 6.  FRA inaccurately characterizes PTC as a system that merely "delivers real-time information," Opp.34, but PTC does far more than that.  As its name indicates, PTC can *control* the train's movements and performs many of the same functions historically performed by the conductor.  *See* JPA Doc.13056 at 2-3, 6.  FRA says there are materials on the railroads' websites (but not in the administrative record) that supposedly acknowledge the importance of the conductor.  Opp.42-43.  But as the railroads explained in their comments, *see* JPA Doc.13056 at 2-3, 6, the functions traditionally performed by the conductor can be done without a second crewmember in the cab.

Fourth, FRA contends that its rule is justified by the increasing length of freight trains.  Opp.23.  But the agency offers no basis for concluding that longer

freight trains present heightened risk, let alone that two-person crews would mitigate that risk. The final rule's mention of train length is extremely vague and makes no effort to link train length to any safety concerns that could be addressed by requiring two-person crews. *See* 89 Fed. Reg. at 25083. FRA's amicus Rail Labor Attorneys cites two FRA safety advisories and a National Academy of Sciences study discussing potential safety issues arising from longer trains, *see* RLA.Br.17-18, but none of these materials identifies crew size as having any relevance in this context.

FRA does not deny that the Office of Management and Budget (OMB) directed FRA to delete language from its proposed rule stating that railroad "safety" could be "eroded" by a shift to one-person crews. *See* JPA Doc.2, Ex. 10 at 17. OMB is an honest broker whose role in the interagency process includes ensuring that agencies do not include false statements in their rulemaking documents. So FRA took it out. FRA now says it "did not need to make a conclusive finding that lives will in absolute certainty be saved," Opp.50, but this is a straw man. OMB would not even let FRA say that "safety … *could be* eroded" by a shift to one-person crews because FRA's evidentiary support for the rulemaking was so weak that the agency could not claim even the *possibility* that safety could be threatened by one-person operations. Remarkably, FRA's entire defense of this rulemaking rests on an argument OMB specifically ordered it *not* to make.

14

3.    FRA leans heavily on the Special Approval process.  The agency contends that its crew-size rule is a "modest" rule because railroads will be able to readily apply for and obtain "Special Approval" to move to one-person operations. Opp.17, 50.  But the agency's litigating position is directly contradicted by the Secretary of Transportation, who emphasized that one-person operations would be "the exception, not the rule."  *See* https://www.c-span.org/video/?534612-1/secretary-buttigieg-rail-safety.  FRA's appeal to the presumption of regularity, Opp.51-52, falls flat when the Secretary, in announcing the final rule, said railroads should *not* expect to be granted Special Approval.

Indeed, the final rule does not provide that if railroads can make a specific showing, they will be granted Special Approval.  Rather, under the rule, FRA always retains discretion to decide if its amorphous standard—that the proposed one-person operation is "as safe as or safer than" two-person operations—is satisfied.  The most FRA is willing to say is that certain types of mitigating actions "*could* support" an exception, Opp.53 (quoting 89 Fed. Reg. at 25076 (emphasis added)), not that a railroad that did all the things FRA suggests *would* be granted an exception.

FRA notes it made changes to its original proposal.  Opp.52.  But the agency does not dispute that under its original proposal, railroads would need to be accident-free until the year 4831 to qualify for Special Approval.  *See* Opening Br.43.  That

FRA may have shortened that time by a millennium or two does not mean that the final rule is a "modest regulatory effort." Opp.50.

FRA closes its discussion on an odd note by saying that if the railroads cannot prove the Special Approval process is a "charade," their arguments "fall apart." Opp.54. The Special Approval process *is* a charade, but the railroads' arguments do not depend on proving it. The final rule must be vacated for a host of reasons—among other things, it exceeds FRA's statutory authority and is arbitrary and capricious in many respects—and none of these arguments depend on demonstrating what is obvious: The Special Approval process is designed to be impossible to satisfy.

### B.    FRA Ignored Recommendations To Collect The Relevant Data *Before* It Regulates.

Congress directed FRA to "consider existing relevant safety information" when rulemaking. 49 U.S.C. § 20103(c). Here, FRA did *not* consider existing relevant safety information before issuing the final rule, despite the National Transportation Safety Board's (NTSB) recommendation that it do so, and despite Congress enacting a statute *directing* FRA to collect specific data concerning crew-size and safety.

In their brief, FRA's lawyers dispute that the NTSB recommended FRA collect the relevant crew-size data before it issued a crew-size regulation. Opp.62-63. But that is exactly how FRA itself interpreted the NTSB's recommendation. *See*

16

84 Fed. Reg. at 24737 (the NTSB "encourage[ed] FRA to first modify its accident report form to include the number of crewmembers in the controlling cab at the time of an accident and then use the data it gathers to evaluate the safety adequacy of current regulatory requirements"). FRA takes an unusual swipe at the nation's independent transportation-safety agency by arguing that the NTSB "does not regulate rail safety and lacks authority to order FRA to collect data." Opp.63. But the railroads' argument is not that the NTSB was *ordering* FRA to do anything; rather, the railroads are arguing that FRA acted arbitrarily by failing even to acknowledge the NTSB's recommendation, even though many commenters had discussed the recommendation in their comments and urged FRA to follow it. *See, e.g.*, JPA Doc.13056 at 29-30; JPA Doc.12313 at 9; JPA Doc.13018 at 3. FRA claims that the NTSB recommended it collect "data that does not exist" due to "the impossibility of developing an accident database comparing accident rates when no Class I railroad currently uses a one-person crew." Opp.64. But this is plainly wrong: Hundreds of short line railroads use one-person crews, and have been safely doing so for decades, so the data *does* exist and could easily have been collected.

In any event, FRA's strange attack on the NTSB does not respond to the clear procedural error in this rulemaking: FRA's failure to respond to a significant issue raised by multiple commenters. *See Hewitt v. Comm'r*, 21 F.4th 1336, 1350 (11th Cir. 2021) ("agencies should rebut relevant comments"); *Hussion v. Madigan*, 950

F.2d 1546, 1554 (11th Cir. 1992) ("[A]n agency is … required to respond to significant comments that cast doubt on the reasonableness of the rule the agency adopts." (quotation omitted)).  FRA should have, but did not, explain why it rejected the NTSB's recommendation.  The explanations the agency presents in its appellate brief do not appear in the final rule.

Next, FRA concedes that Congress has directed it to gather data bearing on the relationship between crew size and railroad safety, *see* 49 U.S.C. § 20901 note, but contends that even though it began collecting the data just a month before issuing the final rule, the statute "cannot fairly be read to preclude the agency from regulating [crew size]."  Opp.64.  Here too, FRA misapprehends the flaw in the rulemaking:  FRA should have explained why it was necessary to forge ahead with a crew-size rule when Congress had ordered FRA to collect the data and the agency had yet to do so.

Finally, FRA disputes that the Ninth Circuit also indicated that it should collect crew-size data before issuing a crew-size regulation.  Opp.64-65.  But the Ninth Circuit declared it "[c]ritical[ ]" that FRA did not have evidence concerning the relationship between safety and crew size—and expressly concluded that this "lack of data" did "not support the promulgation" of the prior "train crew rule." *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. FRA*, 988 F.3d 1170, 1182 (9th Cir. 2021).

## II.    The Rule Conflicts With The Existing Statute And Regulation Establishing The Process For Reducing Crew Size.

Congress and FRA had already established the process allowing railroads to move from two-person to one-person operations through the risk-reduction statute, 49 U.S.C. § 20156, and regulation, Fed. R.R. Admin., *Final Rule—Risk Reduction Program*, 85 Fed. Reg. 9262 (Feb. 18, 2020).  The crew-size rule "conflicts with a statute passed by Congress" and is therefore "without any legal effect."  *Ga. by Dep't of Med. Assistance v. Heckler*, 768 F.2d 1293, 1299 (11th Cir. 1985).  The rule also constitutes an arbitrary and capricious "unexplained inconsistency in agency policy": It contradicts FRA's earlier risk-reduction regulation, but FRA failed to "display awareness that it [was] changing position" or give "good reasons" for that change.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (cleaned up).  And the crew-size rule is unnecessary because the statute and regulation already require that the railroads assess the relevant risks before reducing crew size—and ensure that FRA will approve and supervise any shift to one-person crews.

### A.    FRA's New Arguments Are Foreclosed Under *Chenery*.

The clear conflict between the crew-size rule and the existing risk-reduction statute and regulation was discussed at length in the comments, as well as in the final rule, where FRA provided an explanation as to why it did not believe there was a conflict.  *See* 89 Fed. Reg. at 25084 (explaining that not all railroads were required to submit a risk-reduction plan, and that there was no guarantee railroads would

implement the risk-reduction measures in their plan). The railroads' opening brief explained why both reasons were baseless. *See* Opening Br.44-45. In response, FRA abandons the reasoning it offered in the final rule and now offers a brand new explanation. *See* Opp.72-77.

This is squarely prohibited under *Chenery*, which holds that an agency rulemaking cannot be defended on grounds that were not offered by the agency itself in the final rule. *See State Farm*, 463 U.S. at 50 ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself" (citing *SEC v. Chenery*, 332 U.S. 194, 196 (1947)). That FRA has chosen not to defend the explanation in the final rule resolves this issue and compels vacatur, as the crew-size rule cannot be upheld based on arguments the agency has abandoned, nor can it be upheld based on "appellate counsel's post hoc rationalizations for agency action." *Id.*

### B.    FRA's New Arguments Are Meritless.

Even if the Court were able to consider FRA's new made-for-litigation arguments, they are meritless.

FRA begins by arguing that the risk-reduction statute does not limit its rulemaking authority. Opp.73. That is wrong: Surely FRA is not suggesting that it may issue regulations that are contrary to a federal statute. *See* 5 U.S.C. § 706(2). Both FRA and rail labor intervenors cite *American Hospital Association v. NLRB*, 499 U.S. 606 (1991), but the point is not that Congress intended to curtail FRA's

20

rulemaking authority by enacting the risk-reduction statute. Rather, Congress *granted* FRA rulemaking authority in the risk-reduction statute—and FRA exercised that authority by enacting a regulation establishing the pathway for railroads to reduce crew-size by (1) analyzing the risks of a move to a one-person crew and (2) in consultation with labor, identifying the exact steps they will take to mitigate those risks and ensure safe operations. By eliminating this pathway, the crew-size rule conflicts with the statute and regulation. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 96 (2002) (regulation cannot alter statutory framework).

FRA never disputes that its crew-size rule closes this pathway. *See* Opp.72-77. Even the rail labor intervenors, while ultimately deeming the argument "unpersuasive," concede that "[o]n its face this seems a compelling point." SMART-TD Br.31. The crew-size rule replaces the process Congress and FRA carefully developed—one that allows railroads, in consultation with labor, to identify the safest way to move to one-person operations and propose it for FRA approval—with an inflexible command-and-control mandate giving FRA total discretion as to when it will deign to grant Special Approval. This is directly contrary to the process Congress and FRA established: in FRA's words, a "performance-based" approach to crew-size reductions that gives railroads and labor the "flexibility to identify hazards and mitigate risks in a manner best-suited to [their]

21

unique system" to "reduce a railroad's accidents/incidents, injuries, and fatalities." 85 Fed. Reg. at 9273.

Rather than engage with the plain text of the risk-reduction statute and regulation, FRA argues that the statute and regulation should not be read to conflict with the crew-size rule because doing so might "preclude FRA from regulating on any topic the statute touches." Opp.74. Not at all. Here, FRA *already regulated* on the topic of crew size. FRA argues that it does not approve "specific mitigation measures" when it approves a risk-reduction plan, Opp.75-76 (quotation omitted), but if the agency believes the specific mitigation measures a railroad is proposing are insufficient to ensure safety, it will not approve the risk-reduction plan. Moreover, FRA explained the reason why it did not intend to approve specific mitigation measures: It did not want the railroads "to freeze" their existing safety measures "at the moment of approval," but to keep "continuously moving forward and improving" the safety of one-person operations—and safety more generally. 85 Fed. Reg. at 9274.

FRA argues that the crew-size rule "complement[s]" and "supplement[s]" the risk-reduction process because that process is not "specific[ally]" focused on crew size. Opp.74-76. But the risk-reduction process indisputably *encompasses* crew size; that it also encompasses other risks does not erase the obvious conflict in the routes railroads must follow when seeking to reduce crew size. And while FRA

vaguely claims it made "changes" to the proposed crew-size rule to "integrat[e]" it "into the existing regulatory scheme," Opp.76, the agency does not identify any of those changes.

The crew-size rule is also not "necessary" in light of the risk-reduction statute and regulation. 49 U.S.C. § 20103(a). FRA argues the rule is necessary because otherwise railroads may begin one-person operations without assessing the risks. *See, e.g.*, Opp.2. But that is *exactly* what the risk-reduction statute and regulation address. As FRA has explained, its risk-reduction regulations "*require* a railroad to proactively identify hazards and risks associated with a reduction in crew size *before* making the operational change." 87 Fed. Reg. at 45582 n.174 (emphases added). Even the final crew-size rule describes a railroad's duty to "analyze risks associated with reducing train crew-members to below two" as a legal "obligation" under the risk-reduction statute and regulation. *Id*.

FRA tries to reframe this issue by arguing that the risk-reduction process "does not require FRA authorization before a class I railroad can remove second crewmembers." Opp.77. But this is semantic gamesmanship: Railroads must consult with rail labor and submit a risk-mitigation plan detailing how they would address risks arising from a move to one-person operations; FRA then reviews and approves the plan; and once approved, the railroads are legally bound to implement the plan. *See* 49 U.S.C. § 20156(a)(1)(B)-(C), (g).

### III.   FRA Did Not Adequately Explain Its Disregard Of The Factual Determinations Underpinning Its Prior Policy.

In issuing the final rule, FRA acknowledged its overall change in position, but failed to adequately explain why it was disregarding the factual determinations that underlay its prior policy that a two-person crew is not necessary for railroad safety. *See Fox Television Stations, Inc*., 556 U.S. at 516 (agency must provide "a reasoned explanation … for disregarding [the] facts and circumstances that underlay … the prior policy"); *see also* Amicus Br. of U.S. Chamber of Commerce at 3 ("Flip-flops that disregard prior agency findings or increase burdens on private parties raise special concerns" because these "circumstances suggest that the agency's decisions may not be the product of an appropriate exercise of technical expertise or a fair assessment of the facts.").

FRA says it changed its position for two reasons.  First, it says its prior position "'de-emphasized safety concerns'" raised by six research reports and commenters.  Opp.55 (quoting 89 Fed. Reg. at 25083).  But this merely states the agency's conclusion; it is not a reasoned explanation for *why* the agency reached a different conclusion.  FRA notes that the Ninth Circuit suggested that FRA more fully consider the research, Opp.59-60, but even if that is what FRA did, the final rule never explained why in 2019 the agency studied the six research reports and concluded that *none* of them supported a two-person crew rule, yet in 2023 it concluded that it had misread every one of the six reports and that *all* of them now

supported a two-person crew rule. Second, FRA says it changed its position based on "information not analyzed in the 2019 withdrawal, such as technological trends and operational changes." Opp.56 (quotation omitted). These arguments are baseless for the reasons stated above: FRA has never identified evidence connecting the alleged increases in train length and the rate of human-factors accidents to crew size. *See* Part I *supra*.

FRA argues that explanations offered in the *proposed* rule are not fair game for criticism if the agency did not repeat those explanations in the final rule. Opp.57. But if the explanations in the proposed rule are disregarded, that means FRA's actions are even *less* defensible—because while the proposed rule offered some inadequate explanations for the agency's disregard of the facts and circumstances that underlay its prior policy, the final rule offers no explanations at all.

The absence of data. The whiplash effect is most pronounced in FRA's total change of position concerning what it calls "the absence of single-person crew safety data." 87 Fed. Reg. at 45571. Previously, FRA said the absence of such data meant a crew-size rule could not be justified, but now it says the absence of data is no obstacle. The only "explanation" FRA provided for its about-face is that "upon reflection, FRA over-relied on the absence of single-person crew safety data." *Id*. FRA contends the agency adequately explained "why this crew size rule is necessary for safety based on the information the agency has before it," Opp.60, but that is not

"a reasoned explanation … for disregarding [the] facts and circumstances that underlay … the prior policy." *Fox*, 556 U.S. at 516.

Strong safety record of one-person operations.  One of the more extraordinary revelations in this rulemaking is that FRA was utterly oblivious as to how common one-person operations are in the United States.  In the NPRM, the agency said it was "aware of nine one-person train crew operations," 87 Fed. Reg. at 45607; stunned commenters pointed out that there are actually *hundreds* of one-person operations that are being conducted safely every day throughout the United States, JPA Doc. 13033 at 5-8 (estimating 696 one-person operations); and FRA grudgingly corrected the number to 75 in the final rule, JPA Doc.13201 at 11; *see also* Opp.85 (conceding error).  But while it made the correction (and still massively undercounted the number of existing one-person operations), FRA provided no explanation as to whether it still made sense to move ahead with the final rule even though it recognized that its proposed rule had rested on a profoundly mistaken factual premise.  Specifically, FRA did not explain how its initial conclusion that there was no "meaningful data" on the safety of one-person operations because there were only nine such operations in the United States, 87 Fed. Reg. at 45571, could still be correct given that there are actually at least ten times that number.  FRA's failure even to inquire into the prevalence of one-person crews over the many years they have been

in widespread operation undermines its claim that legitimate safety concerns prompted its sudden embrace of a two-person crew mandate.

FRA contends that one-person operations by Class II and III railroads present "different circumstances" that do not suggest that one-person Class I operations would have a similar safety record.  Opp.60-61.  But this explanation "does not appear in the final rule."  *Ohio v. EPA*, 603 U.S. 279, 294 (2024).  The final rule attempted to distinguish a single Class II one-person operation—Indiana Rail Road Company. 89 Fed. Reg. at 25078.  It did not address the hundreds of other one-person operations or give any reason why the strong safety record of these operations should be disregarded.  FRA thereby failed to "rebut relevant comments," *Hewitt*, 21 F.4th at 1350, and "reasonably explain[]" its decision, *Ohio*, 603 U.S. at 294 (quotation omitted).

Lac-Mégantic and Casselton.  FRA does not dispute that while it previously determined the Lac-Mégantic and Casselton accidents had nothing to do with crew size—and that FRA's robust regulatory response was sufficient to address the safety concerns arising from those accidents—it now holds the opposite view.  Instead, FRA argues that the final rule "did not rely" on those accidents because the final rule only mentioned the Lac-Mégantic derailment once in the preamble.  Opp.57-58.  But these two derailments plainly constitute material "facts and circumstances that underlay … the prior policy."  *Fox*, 556 U.S. at 516.  FRA identified the Lac-

Mégantic derailment as "the driving force" giving rise to the initial attempt to issue a two-person crew rule, 81 Fed. Reg. 13921, and analyzed both derailments at length in the prior rulemaking, *id*. at 13921-13924; 84 Fed. Reg. at 24738. That FRA did not even address these derailments in the final rule, let alone provide a reasoned explanation for disregarding the lesson it previously drew from them—that crew size had nothing to do with either derailment—violated *Fox Television*.

Stifling innovation. In 2019, FRA determined that a crew-size rule would stifle innovation. In 2023, FRA determined, without any meaningful explanation for its change in position, that a crew-size rule would *not* stifle innovation. *See Fox*, 556 U.S. at 515-16 (when a "new policy rests upon factual findings that contradict those that underlay [the agency's] prior policy … further justification is demanded"). On appeal, FRA asserts, seemingly without irony, that the agency's prior position was unjustified because it "lacked data to support it"—an argument that applies with greater force to the crew-size rule itself. Opp.58. FRA also argues that the Special Approval process will avoid stifling innovation, *id*. at 58-59, but this makes no sense. The rule proposed in the 2016 rulemaking contained a far more achievable Special Approval process, yet FRA still concluded that it would stifle innovation and hamper the development of the national rail system. *See* Amicus Br. of National Taxpayers Union Foundation at 3-8 (tracing history of U.S. rail regulation and noting how less regulation benefits taxpayers and consumers).

Finally, FRA contends that this Court should uphold its rule so long as a single one of the reasons it gave is valid.  Opp.61.  But courts may uphold agency action only when the agency's "mistake … clearly had no bearing on … the substance of [the] decision reached"—i.e., "[w]hen it is clear … the agency would have reached the same ultimate result."  *Animal Legal Def. Fund v. U.S. Dep't of Agric*., 789 F.3d 1206, 1224 n.13 (11th Cir. 2015) (quotation omitted).  Here, it is *not* clear FRA would have issued the identical rule based on a single one of its rationales, so if any rationale is invalid, this Court should vacate the final rule and allow the agency to determine whether it would still reach the same result absent the illegitimate rationale.

## IV.    FRA Did Not Consider The Labor Costs The Rule Will Impose.

FRA's cost/benefit analysis was deficient because the agency failed to consider the substantial labor costs its rule will impose.  Although the prior rulemaking considered the costs imposed on railroads required to use a second crewmember and forbidden to move to one-person operations, *see* 2016 RIA at 41, https://tinyurl.com/bymhjv2b, the current rulemaking ignored those costs entirely.

FRA makes little effort to defend the clearly erroneous statement in the Regulatory Impact Analysis:  "The requirements of this rule do not affect railroads operating trains with two-person crews; therefore, they will not incur any costs." JPA Doc.13201 at 5-6.  FRA responds that it is only obligated to consider what it

calls "out-of-pocket costs," and is free to ignore the labor costs imposed on railroads that would move to one-person operations but for the rule. Opp.66. This is arbitrary and capricious reasoning. Federal agencies, economists, and courts alike recognize that opportunity cost—here, an unrealized reduction in labor costs—is a real cost that should be taken into account in a cost/benefit analysis. Circular A-4 provides OMB's "guidance to Federal agencies on the development of regulatory analysis" and is intended to "standardiz[e] the way benefits and costs of Federal regulatory actions are measured and reported." Circular A-4, at 1-2, Office of Management and Budget (Nov. 9, 2023). According to OMB, "'[o]pportunity cost' is the appropriate concept for valuing benefits and costs." *Id*. at 28. The "opportunity cost" of a rule "includes the value of the benefits forgone as a result of" that rule. *Id*. at 29. "Opportunity costs measure the costs a railroad experiences by foregoing more profitable use of its resources." *Illinois v. I.C.C*., 698 F.2d 868, 875 (7th Cir. 1983). Here, railroads will incur substantial opportunity costs as a result of the final rule.

FRA admits that it *did* consider labor costs during the prior rulemaking in 2016. Opp.67. But FRA offers no coherent explanation for why it has changed its position and now deems these costs irrelevant. It appears to suggest that the current rule's Special Approval process renders these costs "speculative," *id.*, but the prior proposed crew-size rule *also* had a Special Approval process, *see* 81 Fed. Reg. at

13919-20, so this cannot explain the agency's change in position. In any event, FRA does not dispute that the final rule did not acknowledge the change in position or offer any explanation for it—and the agency's arguments in its appellate brief cannot cure those omissions.

The crew-size rule "is likely to substantially increase the costs of railroad operation in the United States, increasing prices for business and consumers around the country." Amicus Br. of Ohio Chamber of Commerce at 15. FRA downplays these and other costs—including the modal shift arising from putting railroads at a competitive disadvantage vis-à-vis trucks, as well as the costs to Class II and III railroads—by pointing to the Special Approval process. Opp.67-68 ("Petitioners' argument … assumes, again incorrectly, that they will not be able to successfully seek special approval where warranted."). But FRA does not explain why this is an "incorrect[ ]" assumption when it is exactly what the Secretary *told* the railroads to assume.

## V.     FRA Failed To Comply With The Statutory And Regulatory 12-Month Deadline.

FRA concedes that its rulemaking violated both the statutory 12-month deadline set by Congress, *see* 49 U.S.C. § 20103(b), as well as its own 12-month deadline set by regulation, *see* 49 C.F.R. § 211.13. The agency contends, however, that its defiance of these deadlines does not warrant vacating the rule. Opp.68-72.

FRA says the railroads' argument is forfeited because it was not raised during the rulemaking proceeding.  Opp.69.  But the violation did not occur until FRA issued the final rule, so there was nothing to challenge until the rulemaking was over.

Citing *Barnhart v. Peabody Coal Co*., 537 U.S. 149 (2003), FRA argues that its noncompliance with a statutory deadline has no consequence because Congress did not specify a consequence in the statute.  Opp.69-70.  But it is unclear whether *Barnhart* applies to questions of an agency's statutory authority to promulgate legislative rules.  That was not the question in *Barnhart* itself—which involved an agency official's authority to make "assignments" for purposes of Social Security benefits—or in the allegedly "similar cases applied to timing provisions."  Opp.71. This Court should hold that agencies lack authority to promulgate regulations after the statutory deadline because Congress likely intended to exercise greater control over its delegation of the easily abused power to formulate "generally applicable rules of private conduct."  *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 70 (2015) (Thomas, J., concurring in the judgment).  Because FRA exceeded its statutory authority when it tardily issued the final rule, the railroads need not show any additional prejudice beyond the harm from the unlawful regulation.  *See Alabama Ass'n*, 594 U.S. at 763-65 (granting relief simply because agency exceeded its statutory authority).

32

Moreover, *Barnhart* indisputably does not apply to *regulatory* deadlines. FRA says its own regulation should be interpreted in light of the "background" of *Barnhart* as not imposing any consequence because FRA did not specify one. Opp.72. No court has ever accepted this argument and this Court should not be the first. Instead, this Court should apply the well-settled rule of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-66 (1954)—agencies are bound by their own regulations—and hold that "shall" means "shall." *See* 49 C.F.R. § 211.13 ("Each rulemaking proceeding shall be completed [within] 12 months.").

## CONCLUSION

The Administrative Procedure Act (APA) says that courts "*shall* … hold unlawful and set aside" unlawful agency action. 5 U.S.C. § 706 (emphasis added). And "to 'set aside' a rule is to vacate it." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2463 (2024) (Kavanaugh, J., concurring). "[V]acatur … is the ordinary APA remedy" where unlawfulness "tainted the agency's decisionmaking process." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). Indeed, "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) (emphasis added). And vacatur under Section 706 "is not party-restricted." *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). Nor is

33

severance appropriate where, as here, "there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted." *Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1144 (D.C. Cir. 2022) (citation omitted).

This Court should vacate the final rule in its entirety.

Respectfully submitted,

/s/ Thomas H. Dupree Jr.

Kathryn D. Kirmayer
Stephen N. Gordon
Association of American Railroads
425 Third Street SW, Suite 1000
Washington, DC 20024
(202) 639-2100

Thomas H. Dupree Jr.
Jacob T. Spencer
David A. Schnitzer
Gibson Dunn & Crutcher LLP
1700 M Street NW
Washington, DC 20036
(202) 955-8500

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE AND TYPE STYLE**
**REQUIREMENTS, AND VIRUS-SCANNING REQUIREMENT**

1.     This brief complies with the type-volume limitation of the Court's July 1, 2024 order because this brief contains 7,997 words, as determined by the word-count function of Microsoft Word 365, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3.     This brief has been scanned for viruses and is virus-free.

Dated:  November 14, 2024.

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2024, a true and correct copy of the foregoing brief was served on all counsel of record through the CM/ECF system.

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.